1  **WO**

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9   Frank Jarvis Atwood,                    )   No. CV-98-116-TUC-JCC
                                            )
10              Petitioner,                 )   <u>DEATH PENALTY CASE</u>
                                            )
11  vs.                                     )
                                            )
12  Dora B. Schriro, et al.,                )   **ORDER**
                                            )
13              Respondents.                )
                                            )
14  _____        )

15

16       Frank Jarvis Atwood (Petitioner), a state prisoner under sentence of death, petitions this

17  Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned

18  and sentenced in violation of the United States Constitution.  This Order addresses the merits

    of all but one of Petitioner's claims and determines that he is not entitled to habeas relief.

19       The procedural history of this case is, regrettably, long.  As detailed below, almost three

20  years passed before trial began, and the state appellate and post-conviction proceedings

21  consumed an additional ten years.  Much of the delay in state court was attributable to an

22  extensive investigation, voluminous evidence and a vigorous defense presented at trial, and

23  an  extraordinary  number  of  issues  presented  on  direct  appeal  and  in  post-conviction

24  proceedings.

25       These federal proceedings were initiated in 1998, but were delayed by litigation over

26  a change of judge as well as successive significant decisions by the Ninth Circuit Court of

27  Appeals and the United States Supreme Court that effectively stayed the case for several

28

years.  In addition, the large number of habeas claims raised by Petitioner, along with the Court's bifurcated briefing procedure in which the parties first briefed the procedural status of Petitioner's claims before addressing merits, required that the extensive state appellate and post-conviction records, which exceed 35,000 pages, be reviewed twice.  In sum, the Court is cognizant that a significant amount of time has passed; however, a case of this magnitude cannot be resolved without careful consideration of the record, the briefs, and the relevant caselaw.

## FACTS AND PROCEDURAL HISTORY

The following facts are taken from the Court's review of the extensive record.  On September 17, 1984, eight-year-old Vicki Lynn Hoskinson disappeared.  At trial, her mother testified that she had left their home at 3:30 p.m. to mail a card at a mailbox near their neighborhood.  The pink bike she had been riding was found abandoned on Pocito Place, an unpaved road a few blocks from her home.  Seven months later, skeletal remains determined to be Vicki Lynn's were found in the desert northwest of Tucson.

The victim was last seen by two boys from her neighborhood, who passed her on Pocito Place while riding their bikes in the opposite direction.  One testified at trial that before turning on Pocito and seeing Vicky Lynn, he saw a dark "Datsun Z" car with California plates driving very slowly near the intersection of Pocito and Root Lane, the main road into their neighborhood.  The driver had long dark hair, a moustache, and appeared not to have shaved recently.

On the same day, Sam Hall, a teacher at Vicki Lynn's elementary school (located near her neighborhood), observed a dark "Z" car with California plates parked in an alley next to the school.  The driver had long, unkempt dark hair and a beard and moustache.  Hall noticed the driver making strange gestures and having difficulty getting his car into gear.  Because the driver appeared out of place and made him nervous, Hall wrote down the vehicle's license plate information.  After learning of Vicki Lynn's disappearance, Hall contacted the police, who traced the vehicle's registration to Petitioner.

On September 20, three days after the victim's disappearance, FBI agents learned from Petitioner's mother that Petitioner and a traveling companion, James McDonald, were at a Texas auto repair shop.  Petitioner and McDonald were arrested, and Petitioner's black Datsun 280-Z impounded.  At trial, an FBI examiner testified that pink paint found on the front bumper of Petitioner's car "matched" the victim's bicycle and that Petitioner's bumper was the "source" of nickel particles found on the bike.  An accident reconstructionist who testified for the State opined that the pedal of the victim's bike fit a deformation on the gravel pan of Petitioner's car and supported a theory that the car had struck the bicycle at a low speed, causing the bike to become lodged underneath.

In a statement to police following his arrest, Petitioner said he had been at DeAnza Park near downtown Tucson around noon on September 17.  After a fight with McDonald, he left to find other acquaintances and returned to the park between 4:00 and 5:00 p.m.  In a subsequent interview, Petitioner changed the time of his return to 3:30 p.m.  At trial, McDonald and Thomas Parisien, who lived near the park, testified they saw blood on Petitioner's hands, clothes, and knife the afternoon of September 17.  Petitioner told them he had stabbed a man who tried to rip him off during a drug deal and then had taken the body out into the desert.

Following Vicki Lynn's disappearance, numerous individuals reported seeing a dark "Z" car on September 17 and positively identified Petitioner as the driver.  Several claimed they saw Petitioner in the victim's neighborhood; one saw Petitioner drive out of the neighborhood with a small child in his car; and others placed Petitioner in the general vicinity of the site where the victim's remains were ultimately found.

During the investigation, detectives also learned of Petitioner's contacts with Ernest Bernsienne, a resident of Oklahoma who had been corresponding with Petitioner for about four years.  Portions of letters to Bernsienne were admitted at trial, including Petitioner's "confession" that he is attracted to children between the ages of seven and twelve.  Bernsienne also testified that Petitioner told him, during a phone conversation several months

before the victim's disappearance, that he planned to go out and pick up a child and would make sure the child would not report it.

Petitioner was initially charged with one count of kidnapping. After the victim's remains were discovered in April 1985, he was also charged with one count of first degree felony murder. Trial commenced in January 1987 and lasted approximately two months, with more than 75 witnesses testifying. On March 26, 1987, the jury returned a guilty verdict on both counts. Pima County Superior Court Judge John G. Hawkins sentenced Petitioner to death for the murder and a concurrent 25-year prison term for the kidnapping.

In 1993, the Arizona Supreme Court issued a lengthy, comprehensive opinion affirming Petitioner's conviction and sentence on direct appeal. *State v. Atwood*, 171 Ariz. 576, 592, 832 P.2d 593, 609 (1992), *cert. denied*, 506 U.S. 1084 (1993). In 1996, Petitioner filed in the trial court an amended petition for post-conviction relief ("PCR") under Rule 32 of the Arizona Rules of Criminal Procedure. Pima County Superior Court Judge Raner C. Collins, substituted for the deceased Judge Hawkins, denied the petition in January 1997.[1] A motion for rehearing was denied, and the Arizona Supreme Court summarily denied discretionary review in November 1997.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on March 12, 1998, and a 130-page amended petition raising 89 claims on May 2, 2000. (Dkts. 1, 103.)[2] Respondents filed an answer (limited by the Court's order to issues of exhaustion and procedural default), Petitioner filed a traverse, and Respondents filed a reply. (Dkts. 110, 113, 116.) In March 2001, the Ninth Circuit Court of Appeals issued a decision in *Smith v. Stewart*, 241 F.3d 1191 (9th Cir. 2001), that called into question Arizona's doctrine of procedural default. The Court stayed proceedings pending further review of *Smith*. (Dkt. 119.) In June 2002, the United States Supreme Court reversed. *Stewart v. Smith*, 536 U.S.

---

[1]    Judge Collins now sits as a United States District Judge for the District of Arizona.

[2]    "Dkt." refers to documents in this Court's file.

856 (2002) (per curiam). This Court lifted the stay (Dkt. 120), and in September 2002 Petitioner filed a sur-reply, limited to issues of cause, prejudice, and fundamental miscarriage of justice (Dkt. 122).

Around the same time the United States Supreme Court resolved the *Smith* issue, it also decided *Ring v. Arizona*, 536 U.S. 584 (2002), which invalidated Arizona's capital-sentencing scheme to the extent that it provided for a judge, not a jury, to determine capital-eligibility factors. In light of *Ring*, it was unclear whether Petitioner would be entitled to relief from his capital sentence. In June 2004, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases, such as Petitioner's, whose direct appeals were final at the time *Ring* was decided.

On June 6, 2005, the Court issued an extensive order identifying the procedural status of Petitioner's claims. (Dkt. 127.) The Court determined that nearly half of Petitioner's claims were either procedurally barred, not cognizable, or plainly meritless, and directed the parties to file supplemental briefs addressing the merits of the remaining claims under the standards set forth in the AEDPA.[3] (*Id.*) The Court also directed Petitioner to identify the claims for which he contends further evidentiary development is warranted. (*Id.*)

On November 14, 2005, Petitioner filed a 196-page opening merits brief. (Dkt. 140.) With respect to Claim 1-B, Petitioner set forth extensive new factual allegations that were not presented in his May 2000 amended petition. In response to Respondents' assertion that the new factual allegations had not been raised in the amended petition nor in state court (Dkt. 148 at 22, 25-27), Petitioner replied only that the new facts did not fundamentally alter the nature of the claim exhausted in state court (Dkt. 154 at 11). The Court disagreed and in July 2006 directed the parties to file supplemental briefs on the following issues:

> (1) Does Petitioner have an available state remedy to exhaust Claim 1-B's new factual allegations?

---

[3]   The Antiterrorism and Effective Death Penalty Act of 1996.

1      (2)   Can Petitioner establish either cause and prejudice or a fundamental
2            miscarriage of justice to excuse any procedural default of these new factual
             allegations?

3      (3)   Is amendment of the first amended petition to include the new factual
4            allegations appropriate under Rule 15, Federal Rules of Civil Procedure, and
             *Mayle v. Felix*, 125 S. Ct. 2562 (2005)?

5    (Dkt. 158 at 3.)  These briefs were filed on September 5, 2006.  (Dkts. 162, 163.)

6                                   **CLAIM 1-B**

7         In his May 2000 amended petition, Petitioner raised the following claim, which the

8    Court designed as "Claim 1-B" in its June 6, 2005 procedural status order:

9              As also noted in Mr. Atwood's Petition for Post-Conviction Relief, Mr.
10      Atwood's Datsun was meticulously examined by agents of the FBI shortly after
        the vehicle was seized in Kerrville, Texas.  No pink paint was observed.  In
11      addition, others who saw the vehicle shortly after it was seized saw no paint on the
        bumper.
12             As also observed in the Petition for Post-Conviction Relief, police and
        civilian eyewitnesses who saw the bicycle at the time of its discovery, saw no
        evidence that the bicycle had been in an accident or had been hit by a vehicle.
13             These findings support the claim asserted in the Post-Conviction Relief
14      Petition that Mr. Atwood was the victim of law enforcement misconduct.  The
        planting of evidence constitutes a deprivation of Mr. Atwood's right to a fair trial
15      and due process of law under the 5th, 6th, 8th and 14th Amendments to the United
        States Constitution.

16   Dkt. 103 at 30-31 (record citations omitted).  This is the entirety of Petitioner's claim

17   alleging the planting of pink paint evidence; it closely follows the claim asserted in

18   Petitioner's amended petition for post-conviction relief in state court. (ROA-PCR at 489-90.)

19        Not until November 14, 2005, when Petitioner filed his merits brief, did he flesh out the

20   specific factual details underlying his claim of law enforcement misconduct.  (Dkt. 140 at 25-

21   29.)  Petitioner now alleges that agents clandestinely removed the bumper of his car shortly

22   after his arrest in Texas, transported the bumper to Arizona, applied paint from the victim's

23   bicycle to the bumper, scraped a "sample," and returned the bumper and sample to Texas,

24   where agents reattached the bumper and then "discovered" the paint smear.  (*Id.* at 25.)  He

25   asserts that the government's photographic record, initial paint scrapings, and log index of

26   collected evidence were altered after the fact to conceal the misconduct.  (*Id.* at 25-29; Dkt.

27   154, Attach. A at 4.)  With regard to the photographs, he asserts that some were destroyed

28                                        - 6 -

and replaced by doctored photographs. He further asserts that upon return to Texas, a water-soluble paint was applied to cover the scrapings made in Tucson, photographs were taken to depict a "before scraping" view of the bumper, and then the water-soluble paint was removed. (*Id.* at 25, 28-29.) Petitioner claims that recent digital enhancement of the government's photographic evidence, conducted during these federal habeas proceedings, proves the misconduct. (Dkt. 140 at 25-29.)

**Exhaustion**

In its July 24, 2006 order requesting supplemental briefing, the Court concluded that Petitioner had failed to present these new operative facts to the state court and directed the parties to address whether Petitioner has an available remedy in state court to exhaust the allegations. (Dkt. 158 at 2-3.) Respondents concede that Petitioner may have an available remedy in state court to exhaust his new factual allegations. (Dkt. 162 at 2-3.) Petitioner also asserts that he likely has a remedy in state court, but states that his preference is to litigate the issue in this Court. (Dkt. 163 at 2-4, 21.) However, absent an affirmative waiver of the exhaustion requirement from Respondents pursuant to 28 U.S.C. § 2254(b)(3), this Court may not grant relief on an unexhausted claim. 28 U.S.C. § 2254(b)(1)(A); *see also* 28 U.S.C. § 2254(b)(2) (providing that an unexhausted claim may be denied on the merits).

**Stay and Abeyance**

If Respondents do not waive exhaustion, the Court would have to decide whether a stay of proceedings pending exhaustion of Petitioner's new allegations is warranted. In *Rhines v. Weber*, the Supreme Court considered "whether a federal district court has discretion to stay [a] mixed petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition." 544 U.S. 269, 270 (2005). The Court held that a district court does have such discretion where there is "good cause" for the failure to exhaust, the unexhausted claim is potentially meritorious, and the petitioner has not engaged in abusive litigation tactics or intentional delay. *Id.* at 277-78.

In his supplemental brief, Petitioner states that he "now has uncovered facts that support [Claim 1-B] that were unknown to him at the State post-conviction stage." (Dkt. 163 at 3-4.) He asserts "it is *highly likely* that the technology and expertise necessary to an evaluation of the photographic evidence would have been unavailable" to him at that time.   (*Id.* at 4.) Petitioner offers no further explanation for why his new facts have not been presented in state court, nor has he proffered any evidence to substantiate his claim that the type of photographic analysis critical to his allegations was not available at the time of his first PCR petition.  In fact, other than reproductions and blow-ups of some of the State's photographic exhibits as well as some other unidentified photographs, Petitioner does not proffer any support for his new allegations of planted evidence.  Petitioner's explanation for what the appended photographs allegedly show is far from persuasive, and many of his assertions are highly speculative.  The Court concludes that this record is insufficient to determine whether Petitioner has good cause for not exhausting his new allegations in state court during his first PCR proceeding or in the many years since then.  It is also unclear, based on the paucity of support appended to Petitioner's merits brief, whether the new allegations in Claim 1-B are potentially meritorious.

**Amendment**

If Respondents choose to waive exhaustion of Claim 1-B, it is not apparent from Petitioner's briefs that amendment would be warranted under Rule 15 of the Federal Rules of Civil Procedure. *See Calderon v. United States Dist. Ct. for the N. Dist. of Cal.*, 134 F.3d 981, 986 n.6 (9th Cir. 1998) (citing *Withrow v. Williams*, 507 U.S. 680, 696 n.7 (1993)). Under Rule 15(a), leave to amend "shall be freely given when justice so requires," and courts must review motions to amend "in light of the strong policy permitting amendment." *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir. 1986).  The factors which may justify denying a motion to amend are undue delay, bad faith or dilatory motive, futility of amendment, and undue prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Petitioner has not actually requested amendment. Rather, despite this Court's clear finding in its July 24, 2006 order, he continues to contend that his new facts do not fundamentally alter the nature of the claim that was exhausted in state court. The Court has already rejected this argument; therefore, amendment would be required if the Court is to consider the claim. (Dkt. 158 at 2-3.) Furthermore, pursuant to Rule 2 of the Rules Governing Habeas Corpus Cases, Petitioner was obligated to present all of his supporting facts in his amended petition; he did not, waiting until the subsequent round of merits briefing years later. Thus, if Respondents were to waive exhaustion, the Court would have to determine whether amendment is appropriate.

In their supplemental brief, Respondents argue that Petitioner's new allegations are untimely and, thus, amendment would be futile. In *Mayle v. Felix*, 545 U.S. 644 (2005), the Supreme Court explained the relation-back principle in Rule 15(c)(2) in light of the AEDPA's one-year limitations period. The Court held that proposed new claims relate back to "timely" ones only when such claims are tied to a common core of operative facts. *Id.* at 664. The Court rejected the argument that a common core of operative facts could be interpreted to include all facts arising out of a petitioner's trial, conviction, or sentence. *Id.* New claims supported by facts that differ in both "time and type" from those included in the original petition do not relate back. *Id.* at 650. In contrast, if a new claim merely clarifies or amplifies a claim or theory already in the original petition, it may relate back to the date of the original petition and avoid a time bar. *See Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001).

Respondents argue that Petitioner's new allegations are untimely because they rely on facts that differ in both "time and type" from those asserted in the original petition. Respondents' argument rests on an excessively narrow reading of Petitioner's claim. In their view, his original misconduct allegations were based only on misconduct by the FBI Crime Lab in Washington, D.C., not by field agents as now alleged. (Dkt. 162 at 4.) However, in his amended petition, Petitioner specifically alleged that he was "the victim of law

1   enforcement misconduct" because the FBI agents who examined the vehicle after it was

2   seized observed no pink paint.  (Dkt. 103 at 31.)  He further stated that the "planting of

3   evidence" violated his federal constitutional rights.  (*Id.*)

4        The Court finds that Petitioner's new allegations "relate back" to Claim 1-B.  It is

5   evident that the new allegations are tied to the same core allegation underlying the claim –

6   that law enforcement intentionally planted the pink paint smear on Petitioner's bumper.

7   Thus, Petitioner's allegations are not untimely under 28 U.S.C. § 2244(d), and amendment

8   would not be futile on the basis of the statute of limitations.

9        Whether amendment should be denied on the basis of other factors such as undue delay,

10  bad faith/dilatory motive, prejudice to Respondents, or because the claim is meritless is less

11  clear.  *Foman*, 371 U.S. at 182.

12  **Oral Argument and Offer of Proof**

13       Based on the foregoing, the Court finds that it would benefit from oral argument on

14  whether stay and abeyance and/or amendment is appropriate for Claim 1-B.  At the hearing,

15  either party may make an offer of proof as to any facts the parties believe would assist the

16  Court in deciding how to proceed with Petitioner's new, unexhausted allegations.  The Court

17  will by separate order direct the Clerk of the Pima County Superior Court to provide this

18  Court with the photographic exhibits from Petitioner's trial to assist any discussion relating

19  to the photographs during the hearing.

20  **AEDPA STANDARD FOR RELIEF**

21       Because this case was filed after April 24, 1996, it is governed by the AEDPA.  *Lindh*

22  *v. Murphy*, 521 U.S. 320, 336 (1997); *Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

23  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on

24  the merits" by the state court unless that adjudication:

25       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
26       Court of the United States; or

27       (2) resulted in a decision that was based on an unreasonable determination of the

28                                            - 10 -

1    facts in light of the evidence presented in the State court proceeding.

2    28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

3    a party's claim which is based on the substance of the claim rather than on a procedural or

4    other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The

5    relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v.*

6    *Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

7    04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

8        "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

9    of law that was clearly established at the time his state-court conviction became final."

10   *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

11   (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

12   the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

13   of the holdings of the Supreme Court at the time the petitioner's state court conviction

14   became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

15   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

16   the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

17   advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

18   U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court

19   precedent may be "persuasive" in determining what law is clearly established and whether

20   a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

21       The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).  The

22   Court has explained that a state court decision is "contrary to" the Supreme Court's clearly

23   established precedents if the decision applies a rule that contradicts the governing law set

24   forth in those precedents, thereby reaching a conclusion opposite to that reached by the

25   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

26   indistinguishable from a decision of the Supreme Court but reaches a different result.

27   *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

28                                          - 11 -

1    characterizing the claims subject to analysis under the "contrary to" prong, the Court has

2    observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

3    facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

4    clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

5          Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may

6    grant relief where a state court "identifies the correct governing legal rule from [the

7    Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

8    "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

9    where it should not apply or unreasonably refuses to extend that principle to a new context

10   where it should apply." *Williams*, 529 U.S. at 407.  In order for a federal court to find a state

11   court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the

12   petitioner must show that the state court's decision was not merely incorrect or erroneous,

13   but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per

14   curiam).

15         Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

16   court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

17   *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

18   determination will not be overturned on factual grounds unless objectively unreasonable in

19   light of the evidence presented in the state-court proceeding." *See Miller-El v. Cockrell*, 537

20   U.S. 322, 340 (2003) (*Miller-El I*).  In considering a challenge under 2254(d)(2), state court

21   factual determinations are presumed to be correct, and a petitioner bears the "burden of

22   rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

23   *Miller-El II*, 545 U.S. at 240.

24         As the Ninth Circuit has noted, application of the foregoing standards presents

25   difficulties when the state court decided the merits of a claim without providing its rationale.

26   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

27   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those

28

1  circumstances, a federal court independently reviews the record to assess whether the state

2  court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d

3  at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

4  court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167

5  (citing *Delgado*, 223 F.3d at 981-82); *see also, Himes*, 336 F.3d at 853.  Only when a state

6  court did not decide the merits of a properly raised claim will the claim be reviewed de novo,

7  because in that circumstance "there is no state court decision on [the] issue to which to

8  accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

9  1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

10  **AEDPA STANDARD FOR EVIDENTIARY HEARING**

11  Historically, the district court had considerable discretion to hold an evidentiary hearing

12  to resolve disputed issues of material fact. *See Townsend v. Sain*, 372 U.S. 293, 312, 318

13  (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by*

14  § 2254(e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules

15  Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall

16  determine if an evidentiary hearing is required).   That discretion is significantly

17  circumscribed by § 2254(e)(2) of the Antiterrorism and Effective Death Penalty Act of 1996

18  (AEDPA). *See Baja*, 187 F.3d at 1077-78.

19  Section 2254 provides that:

20  *If the applicant has failed to develop the factual basis of a claim in State court*
21  *proceedings, the court shall not hold an evidentiary hearing on the claim unless*
   *the applicant shows that –*

22  (A) the claim relies on –

23      (i) a new rule of constitutional law, made retroactive to cases on collateral
        review by the Supreme Court, that was previously unavailable; or
24

25      (ii) a factual predicate that could not have been previously discovered
        through the exercise of due diligence; and

26  (B) the facts underlying the claim would be sufficient to establish by clear and
    convincing evidence that but for constitutional error, no reasonable factfinder
27  would have found the applicant guilty of the underlying offense.

28

28 U.S.C. § 2254(e)(2) (emphasis added).  The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."   *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The test for determining "diligence" is whether Petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

If the petitioner has not failed to develop the factual basis of a claim in state court, the Court will then proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend*.  372 U.S. 293; *see Baja*, 187 F.3d at 1078; *Horton v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005).  Pursuant to *Townsend*, a federal district court *must* hold an evidentiary hearing in a § 2254 case when:  (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding.  *Townsend*, 372 U.S. at 312-13; *cf. Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations).  In any other case in which diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Townsend*, 372 U.S. at 318 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing.").

## ANALYSIS OF CLAIMS

**Claim 7:**          **Violation of the Fourteenth Amendment based on insufficient evidence to support the jury's verdict.**

Petitioner contends that the evidence at trial was constitutionally insufficient to support

either the kidnapping or murder convictions.  (Dkt. 103 at 53; Dkt. 140 at 88.)  Petitioner raised this claim on appeal.  Viewing the evidence in the light most favorable to sustaining the verdict, the Arizona Supreme Court concluded there was substantial evidence from which the jury could conclude beyond a reasonable doubt that the defendant kidnapped and murdered the victim.  *Atwood,* 171 Ariz. at 596-99, 832 P.2d at 613-16.  In upholding the kidnapping conviction, the high court found the following evidence "particularly damning":

> – Defendant was in the neighborhood on the afternoon the victim disappeared, a fact made virtually unquestionable by Sam Hall's sighting of a 280Z with license plates registered to defendant and his identification of defendant as the driver.
>
> – Testimony from one of the teenage boys placed defendant at the intersection where the victim's bike was found.
>
> – Prosecution experts testified, albeit not without disagreement from defendant's own experts, that paint and nickel transfers between the vehicle and the bike indicated that the two had come in contact, and that damage to defendant's car was consistent with striking a bicycle.
>
> – Three witnesses identified defendant and testified that they had seen a young child riding with him in his car.
>
> – Defendant's letters revealed his sexual attraction to young children.

*Id.* at 597, 832 P.2d at 614.

With regard to Petitioner's claim that the State had failed to establish the corpus delicti of murder, the court ruled that the evidence presented at trial, although circumstantial, "plainly negated the possibility that the victim died as a result of an accident."  *Id.* at 599, 832 P.2d at 616.  The court also considered Petitioner's post-arrest statements, together with the evidence listed above, and concluded there was sufficient evidence from which the jury could find that Petitioner killed the victim.  *Id.*  Specifically, Petitioner told acquaintances, who noticed blood on his hands the afternoon the victim disappeared, that he:

> had stabbed a man in a drug transaction and had taken the body to the desert.  He repeated this story several times during the next few days as he and McDonald traveled to Texas.  Defendant also told McDonald and Parisien that he had gotten cactus needles in his arms and legs when he returned to the location where he left the body to retrieve keys he had dropped.  Defendant also discussed the idea of disposing of his blood-stained clothes and, during his trip to Texas, he repeatedly sandpapered the blade of his knife.

1 | *Id.*

2   Petitioner argues that the Arizona court's ruling was based on an unreasonable
3 application of both controlling Supreme Court law and the facts in light of the evidence
4 presented in state court.[4] (Dkt. 140 at 91.)  Specifically, he asserts the case against him was
5 "entirely circumstantial"; no reliable eyewitness provided evidence he kidnapped or killed
6 the victim (only that he was in her neighborhood); the state high court incorrectly stated that
7 Petitioner is a "convicted pedophile"; there was no reliable evidence of motive; and pink
8 paint matching the victim's bike found on the bumper of Petitioner's car is "highly dubious"
9 because "there is no satisfying explanation for [the FBI's] failure to observe the paint" on the
10 day Petitioner was arrested and his car impounded.  (*Id.* at 90.)

11   There is sufficient evidence to support a conviction if, "after viewing the evidence in
12 the light most favorable to the prosecution, *any* rational trier of fact could have found the
13 essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.
14 307, 319 (1979).  In making such a determination, a reviewing court is guided by a number
15 of principles which reflect the doctrine that "deference [is] owed to the trier of fact." *Wright*

16

17      [4]   The Court notes that both for this and numerous other claims Petitioner repeatedly
18 argues for relief under 28 U.S.C. § 2254(d)(2) based on the state court's allegedly
   unreasonable *application* of the law to the facts.  As set forth earlier in this Order, habeas
19 relief under § 2254(d)(2) is available only if the state court decision was based upon an
   unreasonable *determination* of the facts in light of the evidence presented in state court.  In
20 considering a challenge under § 2254(d)(2), state court factual determinations are presumed
   to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and
21 convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.  Where
22 asserted, the Court has construed Petitioner's argument that the state court unreasonably
   applied the facts to the law as an allegation that the state court's factual determinations were
23 unreasonable under § 2254(d)(2).  With respect to Claim 7, however, the Court notes that the
24 Ninth Circuit has concluded that § 2254(d)(2) is not applicable to review of a state court's
   sufficiency-of-evidence analysis. *Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir. 2007);
25 *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (as amended).  Rather, this Court
26 determines only whether the state court's assessment of the evidence was "objectively
27 unreasonable."  *Sarausad*, 479 F.3d at 677.

28

1    *v. West*, 505 U.S. 277, 296 (1992).  For example, "a federal habeas court faced with a record

2    of historical facts that supports conflicting inferences must presume – even if it does not

3    affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor

4    of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.  In addition,

5    it is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and

6    to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319; *see Walters v.*

7    *Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  As the Ninth Circuit has explained, "The

8    question is not whether we are personally convinced beyond a reasonable doubt. It is whether

9    rational jurors could reach the conclusion that these jurors reached." *Roehler v. Borg*, 945

10   F.2d 303, 306 (9th Cir. 1991) (citing *Jackson*, 443 U.S. at 326).  While "mere suspicion or

11   speculation cannot be the basis for creation of logical inferences . . . [c]ircumstantial

12   evidence and inferences drawn from it may be sufficient to sustain a conviction." *United*

13   *States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986); *see United States v. Johnson*, 804 F.2d

14   1078, 1083 (9th Cir. 1986) (the government is entitled to all reasonable inferences that may

15   be drawn from the evidence).

16        Under Arizona law, a person commits first degree felony murder if "[a]cting alone or

17   with one or more other persons such person commits or attempts to commit . . . kidnapping

18   under § 13-1304 . . . and in the course of and in furtherance of such offense or immediate

19   flight from such offense, such person or another person causes the death of any person."

20   A.R.S. § 13-1104 (West 1978 & Supp. 1984).  "A person commits kidnapping by knowingly

21   restraining another person with the intent to . . . [i]nflict death, physical injury or a sexual

22   offense on the victim or to otherwise aid in the commission of a felony." A.R.S. § 13-1304.

23        Although the case against Petitioner was based upon circumstantial evidence, viewing

24   that evidence in the light most favorable to the prosecution, this Court cannot say that no

25   rational trier of fact could have found Petitioner guilty of kidnapping and first degree felony

26   murder.  Petitioner was seen at the victim's school and in her neighborhood just prior to her

27   disappearance, and two witnesses saw Petitioner with a child in his car in the general vicinity

28                                              - 17 -

of where her remains were eventually found.  Paint and nickel transfer established that Petitioner's car made contact with the victim's bike, and there is no reasonable explanation other than forcible kidnapping for the victim to be in a remote desert area, miles from where her bike was found.   Petitioner's correspondence with Ernest Bernsienne revealed Petitioner's sexual attraction to children, and just months prior to Vicki Lynn's disappearance Petitioner told Bernsienne he was going to pick up a child and would make sure the child could not report him to authorities.  Witnesses testified that they saw blood on Petitioner's clothing and knife, and that he had cactus needles in his arms and legs the afternoon after the victim's disappearance.  Petitioner told them he had stabbed a man and taken the body to the desert, but he later recanted this story, saying it was a fabrication.

Petitioner complains about the reliability of the witnesses who testified to seeing him with a child in his car, but Petitioner's counsel exhaustively cross-examined these witnesses and their credibility was for the jury to determine.  Petitioner also asserts that the Arizona Supreme Court's characterization of him as a "convicted pedophile" evidences an unreasonable determination of the facts.  However, this reference was included only in the general background facts of the opinion.  The court's *Jackson* analysis did not rely on this statement, presumably because evidence of Petitioner's prior convictions was not submitted to the jury.  Rather, the court referenced only the uncontroverted fact that Petitioner is sexually attracted to children, which was before the jury through Petitioner's letter to Bernsienne.[5]  *Atwood*, 171 Ariz. at 597, 832 P.2d at 614; *see also Sarausad v. Porter*, 479

---

[5]   Moreover, the Arizona Supreme Court's description of Petitioner as a "convicted pedophile" was not unreasonable.  A pedophile is one who has an "erotic desire" for children.  *Webster's New International Dictionary* 1803 (2d ed. 1954).  Petitioner plead guilty to two prior offenses involving children – a 1975 conviction for lewd or lascivious conduct for fondling a 10-year-old girl and a 1981 conviction for kidnapping a 7-year-old boy (Pima Co. Presentence Rpt).  *See Atwood*, 171 Ariz. at 646-47, 832 P.2d at 663-64.  The presentence report from the latter offense states that Petitioner grabbed the boy and drove him to a concealed location, where he pulled down the victim's pants and masturbated and orally copulated him.  It states that Petitioner allegedly inserted a finger in the victim's

F.3d 671, 678 (9th Cir. 2007) (observing that a court analyzing sufficiency of the evidence under *Jackson* does not make any "determination of the facts" in the ordinary sense of resolving factual disputes).

Finally, Petitioner argues that the pink paint evidence is "highly dubious" because there is a lack of explanation for the failure of the FBI to find the paint on the day Petitioner was arrested and his car impounded. This again was an issue for the jury to determine. Testimony at trial established that Petitioner's car was seized on September 20, after he was arrested in Kerrville, Texas. The vehicle was photographed that day by FBI Agent Declan Hoffman. Agent Hoffman testified that he photographed the car "in general" and did not focus with any particularity on the bumpers; that he was neither aware of the significance of nor specifically looked for pink paint; and that the vehicle was filthy. (RT 2/18/87 PM at 96, 104, 106.)[6] The vehicle was transported from Kerrville to San Antonio on September 21. (RT 2/13/87 at 26.) FBI Agent Edward Burwitz testified that he arrived in San Antonio from Washington that afternoon and the next morning (September 22) began collecting evidence, including pink paint scrapings from the front bumper of Petitioner's car. (*Id.* at 47-48.) By this time, agents were aware that the vehicle may have come in contact with the victim's bike and were on the lookout for corroborating evidence. (RT 2/18/87 PM at 99.) Viewed in the

_____

rectum, telling him he would kill him if he screamed. Petitioner then allegedly exposed his own penis and forced the child to orally copulate him and put his finger in Petitioner's rectum. After ejaculating, Petitioner drove the boy back to where he picked him up (Pima Co. Presentence Rpt). *See Atwood*, 171 Ariz. at 655, 832 P.2d at 672.

[6] "RT" refers to reporter's transcript. "ROA" refers to the fifty-five-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-87-0135-AP). "ROA-PCR" refers to the nine-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-97-0289-PC). As is the general practice in this District, the original reporter's transcripts, the trial court's presentence report, and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court. (*See* Dkt. 104.)

- 19 -

1   light most favorable to the State, this was sufficient evidence from which the jury could find

2   that the FBI's initial failure to notice the small paint markings was understandable.

3        The Court has reviewed the extensive trial record and concludes that the evidence is

4   sufficient to support Petitioner's convictions.  The Arizona Supreme Court's rejection of this

5   claim was not objectively unreasonable.  *Sarausad*, 479 F.3d at 677.

6
7
**Claim 1-A:**    **Violation of the Sixth and Fourteenth Amendments based on expert testimony regarding the pink paint match.**

8        Petitioner alleges that the pink-paint tests conducted and testified to by James Corby,

9   an FBI laboratory analyst, were inadequate; therefore, the trial court's admission of Agent

10  Corby's testimony violated his due process rights.[7] (Dkt. 103 at 30.)  Further, Petitioner

11  alleges that his due process rights were violated by misconduct at the FBI Crime Lab.

12       <u>**Admission of Agent Corby's Testimony**</u>

13       At trial, Agent Corby testified that he performed microscopic, microchemical, and

14  instrumental analyses on pink paint scrapings collected from the bumper of Petitioner's car.

15  *Atwood*, 171 Ariz. at 595, 832 P.2d at 612.  He concluded from these tests that "the paint on

16  the bumper either came from the victim's bike or from another source exactly like the bike."

17  *Id.*  Petitioner asserts that the tests performed by Corby were "materially deficient" and

18  consequently his conclusions regarding the paint match were erroneous.  (Dkt. 103 at 30.)

19       In his merits brief, Petitioner asserts that new experts he has consulted during these

20

21         [7]   This Court's review of the record reveals that Petitioner never raised in state court

22  a due process claim based on the trial court's admission of Agent Corby's testimony. However, in their answer to Petitioner's amended petition, Respondents conceded that a

23  "somewhat similar" claim was raised by Petitioner in his PCR petition. (Dkt. 110 at 24-25.) The Court therefore found the claim appropriate for review on the merits.  (Dkt. 127 at 8.)

24  *See* 28 U.S.C. § 2254(b)(3) (providing that State can expressly waive exhaustion

25  requirement).  As discussed more fully below, Petitioner's PCR claim rested on alleged misconduct at the FBI Crime Lab, not trial court error for admitting expert paint analysis

26  testimony.  (ROA-PCR 489-90.)  Therefore, there is no state court ruling on this aspect of

27  Claim 1-A, and the Court reviews the claim *de novo*.  *Pirtle*, 313 F.3d at 1167.

28

habeas proceedings support his claim that Agent Corby's "assessment and testimony was sufficiently misleading and unreliable" to deprive him of due process. (Dkt. 140 at 31.) He states that Dr. Frederic Whitehurst, who worked in the FBI Crime Lab at the time of the paint comparison and analysis testified to in this case,

> concludes that the tests performed were *materially deficient* and that those tests do not and can not support the conclusion offered by FBI Agent Corby at the time of trial. Dr. Whitehurst further concludes that based upon the tests performed by the FBI Crime Lab it is not reasonably possible to conclude that a match existed and, to the contrary, the scientific comparisons undertaken support the opposite conclusion – the paint on the bumper does not match the paint on the bicycle. His concerns with respect to this particular comparison are the same as the concerns that led him to become a "whistleblower" on the Crime Lab in the first instance.

(Dkt. 103 at 28) (emphasis added.) Petitioner also declares that Dr. Darlene Brezinski, a nationally-known expert in the field of materials comparison, "has opined that the paint comparison was fundamentally flawed and that the tests performed do not support the conclusion offered at trial." (*Id.* at 28.)

"The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "A writ of habeas corpus will be granted for an erroneous admission of evidence only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 955-56 (9th Cir. 2002) (quoting *Barefoot*, 463 U.S. at 899). In other words, the evidentiary admission must have "rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." *Id.* (internal quotations omitted).

Petitioner does not assert that at the time of his trial expert testimony on microscopic,

1   microchemical, and instrumental analyses of paint was not admissible; nor does he claim that

2   Agent Corby lacked expertise in paint analysis.  While defense counsel did not question the

3   reliability of Corby's testing (RT 3/4/87 PM at 89-90, 97), he extensively cross-examined

4   Corby's qualifications, analysis, and conclusions (RT 3/5/87 AM at 55-102; RT 3/5/87 PM

5   at 6-13, 26-31, 36-50, 81-89).  The defense also enlisted its own paint expert to review

6   Corby's report, charts, and graphs, and to inform defense counsel's cross-examination,

7   examine the testing done by the FBI's analysts, and provide testimony challenging Corby's

8   testing methods and the validity of his conclusions.  (RT 3/4/87 PM at 77-79, 113; RT 3/5/87

9   AM at 49; RT 3/16/87 at 28-75, 104-08.)  The trial court instructed the jury that it was to

10  determine the weight to be given any expert testimony.  (RT 3/24/87 at 180.)

11      Petitioner is not entitled to relitigate the sufficiency of Corby's testing in these

12  proceedings.  *See Siripongs v. Calderon*, 167 F.3d 1225, 1227-28 (9th Cir. 1999) (rejecting

13  habeas claims based on opinion of newly-hired defense expert, where test results were

14  available and reviewed by defense expert prior to trial); *Moore v. Gibson*, 195 F.3d 1152,

15  1168 (10th Cir. 1999) (same).  "Because this evidentiary issue was fully and competently

16  aired in the state courts, no violation of fundamental fairness under the due process clause

17  has been shown."  *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996); *see also Moore*,

18  195 F.3d at 1167-68 (finding no due process violation from admission of forensic chemist's

19  testimony where defense counsel ably challenged evidence, expert's qualifications, and

20  testing methods).

21      Petitioner concedes that information concerning alleged misconduct at the FBI Crime

22  Lab "did not begin to emerge until many years" after his trial.  (Dkt. 140 at 30.)  Thus, any

23  claim that the trial court erred because it should have known that Agent Corby's proposed

24  testimony was based on faulty lab work necessarily fails.  Moreover, in light of the relevancy

25  of the evidence, the admissibility of paint comparison analysis, and Agent Corby's expertise,

26  this Court cannot say that it was fundamentally unfair for the trial court to allow admission

27  of Corby's testimony.  Petitioner's desire to present new expert testimony to establish that

28

Corby's testing was deficient, and therefore should not have been admitted, is a transparent attempt "to relitigate this aspect of his defense." *Spence v. Johnson*, 80 F.3d at 1000.  Even if the Court were to consider the expert opinions Petitioner now presents, he has not provided an affidavit from either expert and fails to identify in any specific way how Corby's testing was "materially deficient."

### Police Misconduct

To the extent Petitioner is arguing that his right to due process was violated by specific misconduct at the FBI Crime Lab, the Court finds no basis for an evidentiary hearing or habeas relief.  Petitioner presented this claim in his PCR petition.  (ROA-PCR at 489-90.)  In denying relief, the PCR court wrote:

> This claim, alleging evidence-rigging by the FBI, asserts as its basis newly discovered evidence of misconduct in FBI laboratories in other cases, citing an article published in the <u>Arizona Daily Star</u> which was not provided to the court.  Even assuming that misconduct has been conclusively proven in other cases, such evidence is immaterial to the present case.  In the absence of any specific facts alleging misconduct by the FBI in this case, this claim is denied because it does not present a material issue or fact or law which would entitle the petitioner to relief under Rule 32.

(ROA-PCR at 1008-09.)  Petitioner does not state with any particularity how the state court's ruling was either contrary to, or an unreasonable application of, controlling Supreme Court law or was based on an unreasonable determination of the facts.  Rather, Petitioner asserts only that a federal evidentiary hearing is necessary because this aspect of his case was not further developed during the state PCR proceeding because the state court ruled summarily without a hearing.  (Dkt. 140 at 31.)

The AEDPA limits a district court's discretion to conduct evidentiary hearings.  Under § 2254(e)(2), a petitioner who failed to develop the facts of a claim in state court may not obtain a hearing in federal court except in limited circumstances.  "A petitioner has not neglected his or her rights in state court if diligent in efforts to search for evidence." *Bragg v. Galaza*, 242 F.3d 1082, 1090, *as amended by* 253 F.3d 1150 (9th Cir. 2001).  The test for determining "diligence" is whether Petitioner "made a reasonable attempt, in light of the

1    information available at the time, to investigate and pursue claims in state court." *Williams*,

2    529 U.S. at 435.  The mere request for an evidentiary hearing may not be sufficient to

3    establish diligence if a reasonable person would have taken additional steps.  *See Dowthitt*

4    *v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (petitioner requested hearing but found not

5    diligent because he failed to present affidavits of family members that were easily obtained

6    without court order and with minimal expense); *see also Koste v. Dormire*, 345 F.3d 974,

7    985-86 (8th Cir. 2003) (lack of diligence despite hearing request because petitioner made no

8    effort to develop the record or assert any facts to support claim that his counsel was

9    ineffective for knowing of and failing to investigate petitioner's psychiatric condition).

10           Under Arizona law, Petitioner had a duty to file affidavits, records, or other evidence

11   available to him to support the allegations raised in his PCR petition.  Ariz. R. Crim. P. 32.5.

12   Petitioner did append numerous materials to his PCR petition; however, none supported the

13   allegation that the FBI Crime Lab engaged in evidence-rigging *in his case*.  As the PCR court

14   noted, Petitioner did not even provide a copy of the article cited in his petition.  Petitioner's

15   lack of diligence precludes this Court from holding a hearing, and he has not attempted to

16   satisfy the requirements of §§ 2254(e)(2)(A) & (B).  More significantly, Petitioner has failed

17   both in state court and in these proceedings to allege specific facts supporting a claim of

18   police misconduct.

19           As already noted, Petitioner asserts that a former FBI Crime Lab employee, Dr. Frederic

20   Whitehurst, has reviewed Corby's testing in this case and concluded that it was "materially

21   deficient."  (Dkt. 103 at 28.)  Further, Petitioner points to improprieties occurring in the FBI

22   Crime Lab that surfaced in the mid-90s and says "the jury never learned that the Unit from

23   which [the FBI analysts] came was highly compromised."  (Dkt. 140 at 30.)  However, he

24   does not assert that Corby engaged in misconduct by, for example, falsifying test results or

25   planting evidence.  Rather, Petitioner attempts to insinuate, based on his new experts'

26   unsworn views alleging (in only general terms) deficiency and flaws in Corby's testing, that

27   Corby must have engaged in some kind of improper conduct.  On its face, the petition fails

28                                              - 24 -

to set forth a factual predicate for a claim of police misconduct. *See Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) ("[C]onclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing.").

Moreover, as already discussed, Petitioner had an opportunity during trial to fully cross-examine Corby regarding his testing methodology and conclusions and had his own expert review Corby's work. While critical of Corby's conclusions, the defense expert acknowledged that Corby utilized appropriate methods for analyzing the pink paint smear and could not rule out that the paint came from the victim's bicycle. (RT 3/24/87 at 103, 86.) In addition, the Court notes that Petitioner's assertion in his petition that it was "not reasonably possible to conclude that a match existed" (Dkt. 103 at 28) is belied by the new allegation in his merits brief that the pink paint analyzed by Agent Corby was in fact from the victim's bicycle – planted there by agents following Petitioner's arrest in Texas (Dkt. 140 at 22-29).

In sum, whether framed as trial court error for admitting Corby's expert testimony or as police misconduct, Petitioner has failed to establish entitlement to either an evidentiary hearing or habeas relief on Claim 1-A.

**Claim 5-A:    Violation of the Sixth and Fourteenth Amendments based on counsel's failure to investigate paint smear evidence.**

Petitioner was initially represented, for approximately seven months, by court-appointed counsel, Lamar Couser. Twenty months before trial began, Petitioner's parents retained Stanton Bloom, who represented him through trial and sentencing. Petitioner asserts that Couser's representation was constitutionally deficient because he failed to "conduct any meaningful investigation" with respect to the alleged discovery of pink paint on Petitioner's car. (Dkt. 140 at 79.)

For a claim alleging ineffective assistance of counsel (IAC), the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*'s two-

- 25 -

pronged standard, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88. The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*; *see Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Under the AEDPA, the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). To merit habeas relief, a petitioner must make the additional showing that the state court's determination that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

On direct appeal, the Arizona Supreme Court rejected this claim:

> First, defendant admits that a defense expert later examined the paint smear. Although this examination took place approximately two years after the state's examination, defendant has not shown that the time lapse resulted in prejudice to the defense. Second, defendant offers no proof that investigations into possible alternative sources of the paint smear would have yielded anything valuable to the defense. Thus, the required showing of prejudice has not been met.

*Atwood*, 171 Ariz. at 600, 832 P.2d at 617. Petitioner does not argue that the state court's ruling is an unreasonable application of either *Strickland* or the facts. Rather, he asserts that Couser's ineffectiveness is apparent from the allegations of fraud in Claim 1-B because he failed to subject the paint evidence to "adversarial testing" or "take any steps to investigate how it was possible for the paint to have been overlooked by the first FBI agents to inspect the vehicle and then mysteriously to have appeared days later." (Dkt. 140 at 79.) The Court disagrees.

1     First, as noted by the Arizona Supreme Court, Couser's successor counsel subjected the

2     paint to "adversarial testing." He enlisted an expert to review both Agent Corby's paint

3     analysis report and the underlying charts and graphs from his testing. Second, Petitioner does

4     not identify the "steps" he alleges Couser should have taken to explain how the FBI failed

5     to discover the pink paint during the initial search of the car. The Court finds that Petitioner

6     has failed to show that the state court's denial of Claim 5-A was based on an unreasonable

7     application of *Strickland* or an unreasonable determination of the facts as developed in state

8     court.

9     Petitioner asserts that an evidentiary hearing is necessary because "Couser has refused

10    to communicate" with habeas counsel and "therefore, a court-ordered deposition will be

11    required in preparation for the evidentiary hearing on these claims." (Dkt. 140 at 194.)

12    Petitioner does not identify what evidence would be presented at a hearing. In addition, the

13    Court granted Petitioner's request for an ex parte deposition of Couser precisely because

14    habeas counsel averred that Couser would not voluntarily discuss the case. (Dkt. 98 at 4.)

15    Petitioner states in his amended petition that the deposition was taken on April 4, 2000 (Dkt.

16    103 at 8); nonetheless, Petitioner proffers no excerpt to support any claims of ineffectiveness

17    against Couser. Petitioner's unsupported, conclusory allegations are insufficient to warrant

18    a hearing. *Williams*, 384 F.3d at 588.

19
20    **Claim 2-A:      Violation of the Fifth, Eighth and Fourteenth Amendments based on the
      prosecution's failure to disclose that State witnesses possessed
21                      information from which the prosecution allegedly concluded the victim
                        had been buried by her assailant.**

22    In April 1985, a skull, lower jaw bone (mandible), and numerous smaller bones later

23    identified as the victim's were found in a desert area in northwest Tucson. (RT 2/18/87 PM

24    at 112; RT 2/23/87 at 158-62; RT 2/27/87 at 38, 51-52; RT 3/2/87 AM at 44.) All but the

25    skull showed signs of carnivore and rodent tooth marks. (RT 2/27/87 at 39, 52.) Dr. Richard

26    Froede, the chief medical examiner for Pima County, testified at trial that he found adipocere,

27    a substance formed by moisture and bacteria during postmortem decomposition, on some of

28                                                 - 27 -

the fragments of tissue attached to the bones.  (*Id.* at 37, 41-43.)  He explained that adipocere develops in specific time intervals and, therefore, its presence helped establish the time of death.   (*Id.* at 37.)   Dr. Froede further explained that adipocere only forms in moist conditions, with a temperature above seventy degrees, and that there had been a good deal of rain toward the end of the first week after the victim's disappearance in the area where her remains were later found.  (*Id.* at 42-43.)  He did not find any adipocere on the skull or mandible.  (*Id.* at 52.)  Dr. Froede was assisted in his examination and identification of the victim's remains by Dr. Walter Birkby, a forensic anthropologist.  (*Id.* at 35.)

Petitioner alleges that Drs. Froede and Birkby, during pretrial interviews, led his counsel to believe there was no "scientific relevance" to the adipocere finding.  (Dkt. 103 at 32; Dkt. 140 at 33.)  He further alleges that, subsequent to trial, these experts revealed that adipocere was unlikely to have formed unless the victim's body had been buried.  (Dkt 103 at 34-35.)  Petitioner argues that the prosecutor's failure to disclose this "fact of burial" violated his rights under the Fifth, Eighth and Fourteenth Amendments and *Brady v. Maryland*, 373 U.S. 83 (1963), because there was insufficient evidence that he had either the means or the time to bury the victim.  (*Id.* at 33-35, 37.)

**Background**

Petitioner presented this *Brady* claim in his PCR petition, along with numerous other federal and state-law claims relating to the purported newly-discovered "fact of burial."  In support of these claims, Petitioner appended an affidavit from Dr. Kris Sperry, a forensic pathologist, opining that the adipocere on the victim's remains could have formed only if her body had been "buried in a grave for no less than two months."  (ROA-PCR at 318.)  He based this opinion on the weather conditions that existed around the time of her disappearance and the conclusion that the desert where the victim's remains were found was not a sufficiently moist environment for the production of adipocere.  (*Id.*)  "In order for the reported adipocere to develop, it would be necessary that Vicki Lynn Hoskinson be buried in the ground to a depth of no less than one foot and most probably two feet."  (*Id.*)  Dr.

1    Sperry further opined that "portions of her remains were then disinterred by a human and

2    moved and scattered around the site" where the bones were found.  (*Id.*)  He based this

3    conclusion on the absence of carnivore tooth marks on the victim's skull; thus indicating that

4    a human, and not animals, must have exhumed her.  (*Id.*)

5        The PCR court denied relief on Petitioner's adipocere-related claims without holding

6    an evidentiary hearing.  In its order, the court first determined that the alleged "fact" of burial

7    failed to satisfy the standard set forth in Rule 32.1(e) for granting a new trial based on newly-

8    discovered evidence.  In doing so, the court addressed each of the rule's requirements:

9    (1) whether the newly-discovered facts were discovered after trial and are material; (2)

10   whether the defendant exercised due diligence to secure the facts; and (3) whether the new

11   facts are merely cumulative or relate solely to impeachment.  Ariz. R. Crim. P. 32.1(e).  The

12   court ruled:

13           A.   THE CLAIM IS NOT BASED UPON NEWLY DISCOVERED
         EVIDENCE: The Court finds that the claim – that the victim was buried and later
14       exhumed – is not based upon fact but, rather, on the opinion of an expert
         concerning the conditions necessary for the formation of adipocere and the
15       absence of evidence of a grave in the area where the victim's remains were found.
         The affidavit of Dr. Sperry (Petition Exhibit 32) forms the basis for this claim.  In
16       forming his opinion, Dr. Sperry relied on the Report of the Post Mortem
         Examination (Petition Exhibit 31), which noted as early as April, 1985, the finding
17       of adipocere on the skeletal remains of the victim.  Dr. Sperry also relied on the
         trial testimony of Dr. Froede (Petition, Exhibit 36, p. 37 lines 11-16) and Dr.
18       Birkby, (Petition, Exhibit 35, p. 50 lines 5-10) both of which revealed to the jury
         that adipocere had formed on the skeletal remains, as well as the recent interviews
19       with Drs. Froede (Petition, Exhibit 60) and Birkby (Petition, Exhibit 59) which do
         not contradict their trial testimony.  Thus, the existence of adipocere is not newly
20       discovered evidence; it was known to the defense prior to trial and was offered to
         the jury as testimonial evidence.  Nor is the absence of a grave a "new fact."

21           B.  THERE HAS BEEN NO DEMONSTRATION OF DUE DILIGENCE:
22       Except for the recent interviews with Drs. Froede and Birkby, which do not
         provide new facts, the evidence upon which Dr. Sperry relied in arriving at his
23       opinion was available to petitioner at the time of trial.  The petitioner has failed
         to allege facts from which this court could infer that the theory presented in Dr.
24       Sperry's affidavit could not have been presented at trial.

25           C.  THE EVIDENCE IS MERELY CUMULATIVE OR IMPEACHING:
         Dr. Sperry's affidavit asserts an opinion which disputes what the State's experts
26       said at trial about the inferences that may be drawn from the known evidence of
         adipocere formation.  This opinion evidence is merely impeaching and does not
27       substantially undermine trial testimony of critical significance for the reasons

28                                          - 29 -

stated below:

D.   THE EVIDENCE IS NOT SUFFICIENTLY PROBATIVE THAT IT PROBABLY WOULD HAVE CHANGED THE VERDICT because the State has shown, and the Court finds, that the factual predicates for Dr. Sperry's opinion are disputed or contradicted by other credible sources:

1.   The weather station located in Saguaro National Monument is closer to the Ina/Artesiano intersection than is the weather station at the Campbell Experimental Farms, from which the defendant gathered his rainfall data.  The rain measured at Saguaro National Monument is, therefore, more probative of area rainfall than the source upon which Dr. Sperry relied.  September 1984 rainfall records from the Tucson 17 N.W. weather station located at Saguaro National Monument (Response Exhibit A) are corroborated by the Report of Search and Rescue Effort (Petition Exhibit 28).  Both indicate that, during the week following the victim's disappearance, significant rainfall was measured and observed on the northwest side of Tucson near the location where the victim's remains were eventually discovered.  This evidence belies Dr. Sperry's statement that "the desert is not the moist environment required for the production of adipocere" (Exhibit 32, p. 1, line 24) and his implication that the atmospheric conditions for the period following the victim's disappearance were not conducive to the formation of adipocere.

2.   At least one published authority indicates that the human body itself, even absent environmental moisture, can provide adequate moisture for adipocere formation.  (Response Exhibit B, *Taylor's Principles and Practice of Medical Jurisprudence*, Mant, ed., p. 153: "The intact cadaver, however, will normally contain enough water to convert the fat to adipocere").

3.   Also contrary to Dr. Sperry's assertion, mummification need not "preclude the formation of adipocere" (Petition Exhibit 32, p.2, line 1).  At least one published authority indicates that mummification of the muscles and organs and the formation of adipocere have a symbiotic relationship: according to *Taylor's Principles*, during the process of adipocere formation, "the muscles and internal organs become dehydrated and mummified."  (Response Exhibit B, p. 153).

4.   According to a published study of the decay rate of human remains in the southern Arizona desert, the time required for insects and carnivores to skeletonize a corpse left in the desert areas of southern Arizona may be four to six months.  (Response, Exhibit E, p. 615).  This evidence contradicts Dr. Sperry's assumption that the body would have skeletonized within 2-4 weeks.

5.   The time required for adipocere formation on a corpse left in the desert of southern Arizona may be significantly less than the two month period asserted by Dr. Sperry.  (Petition Exhibit 32, p. 1, lines 16-17).  According to *Taylor's Principles* (Response Exhibit B, p. 154), the rate of adipocere formation is significantly faster in hot climates than in cool climates: "in the height of a European summer it [adipocere] may be obvious in five or six weeks; in Egypt and India it is often seen in half this time."   Thus, it is reasonably possible that Tucson's climate in late September of 1984 was not dissimilar to parts of Egypt and India where adipocere could form on a body in as little as two and a half to three weeks.  (See also, Response Exhibit G, reporting a finding of extensive

adipocere formation on the exposed corpse of a plane crash victim found 22 days after the crash).

6.  Adipocere formation may not require an anaerobic environment, such as a grave, as stated by Dr. Sperry.  (Petition Exhibit 32, p.2 line 2).  Published laboratory experiments demonstrated that adipocere will occur with or without oxygen.  (Response Exhibit C, p. 26).  At trial, Dr. Froede explained that adipocere is formed in part through the action of "clostridia welchii" bacteria, an anaerobe, which "can operate in a certain environment without oxygen." (Petition, Ex. 36 p. 43 lines 2-4).  These sources contradict the implication that adipocere could not form on a corpse left unburied in a southern Arizona desert.

7.  The defendant has cited no evidence, such as dirt imbedded in the openings of the bones and skull, which would suggest that the victim's body had been buried.

8.  The defendant has cited no evidence, such as tool marks on the bones, which would suggest that the victim's skeletal remains had been exhumed from a grave by a human.

9.  The absence of carnivore tooth marks on the cranium does not require the assumption that the skull could not have been moved by animals to the position where it was ultimately found.  Dr. Birkby testified that, due to its convex shape, an animal would have trouble grasping the cranium with its teeth, and that the absence of marks from carnivore teeth did not eliminate the possibility that the skull was moved by animals to the site where it was ultimately found.  (Petition, Exhibit 35, p. 45 lines 4-16).

In drawing the conclusion that the victim's body must have been buried (because of the existence of adipocere) and that the skeletal remains must have been later exhumed by a human, Dr. Sperry's opinion fails to consider the known evidence, such as the weather conditions recorded at the weather station closest to the site where the remains were found, the absence of tool marks on the skeletal remains, and the absence of dirt imbedded in the openings of the bones and skull. Dr. Sperry's opinion is based upon assumptions about the conditions for adipocere formation which are at odds with published articles reporting the influence of climatic conditions on the formation of adipocere.  Because the factual basis for his opinion is contradicted by other credible sources, the probative value of Dr. Sperry's opinion is minimal. The defendant has failed to show that Dr. Sperry's opinion evidence probably would have changed the jury's verdict.

(ROA-PCR at 1000-04.)

Although an issue of state law, the PCR court's factual findings with regard to Petitioner's claim of newly-discovered material facts informed its ruling on Petitioner's other burial-related claims.  With respect to the alleged *Brady* violation for failing to disclose the "fact" of burial, the PCR court found no credible evidence that there ever was a grave. (*Id.* at 1004.)  The court further observed that Petitioner had failed to allege specific facts to

1  support his claim that the State knew of but failed to disclose evidence that any grave existed.

2  (*Id.* at 1005.)

3  **Analysis**

4  Petitioner does not specifically address the *Brady* standard.  Instead, his merits brief and

5  reply focus solely on the alleged flaws in the state court's ruling and the need for evidentiary

6  development in these proceedings.  (Dkt. 140 at 35-59.)  The crux of Petitioner's argument

7  is that the amount of rainfall following the victim's disappearance and the ability of

8  adipocere to form without the body having been buried at least one foot under ground are

9  disputed issues of fact.  However, even assuming Petitioner diligently sought to develop this

10  claim in state court, *see* 28 U.S.C. § 2254(e)(2), an evidentiary hearing is unnecessary

11  because he has not alleged facts that would entitle him to relief.  *Townsend*, 372 U.S. at 312-

12  13.

13  Under *Brady v. Maryland*, a defendant's due process rights are violated if the

14  prosecution fails to disclose evidence that is "material either to guilt or to punishment."  373

15  U.S. at 87. A successful *Brady* claim requires three findings:  (1) the evidence at issue is

16  favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was

17  suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice resulted.

18  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  However, "where the defendant is aware

19  of the essential facts enabling him to take advantage of any exculpatory evidence, the

20  Government does not commit a *Brady* violation by not bringing the evidence to the attention

21  of the defense."  *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (citing *United States v.*

22  *Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).  Respondents argue that the evidence of adipocere

23  was known to the defense long before trial and thus there was no "suppression" for purposes

24  of *Brady*.  (Dkt. 148 at 40.)  The Court agrees.

25  As noted by the state PCR court, Petitioner was aware of the "essential facts"

26  concerning the discovery of adipocere on the victim's remains – the adipocere finding was

27  included in the State's experts' post-mortem examination reports (ROA-PCR at 282, 364),

28

1   defense counsel interviewed Drs. Froede and Birkby before trial and discussed adipocere (*id.*

2   at 391-400, 874-77), and Dr. Froede testified about the adipocere finding during trial (RT

3   2/27/87 at 37, 41-43).   In addition, a pathologist who examined the victim's remains on

4   behalf of predecessor defense counsel reported that the finding of adipocere "suggests that

5   at least for some time after death and prior to skeletonization of the remains the body was

6   subjected to a moist environment." (ROA-PCR at 367.)  Petitioner concedes awareness of

7   these facts in Claim 2-D, discussed next, in which he asserts that trial counsel was ineffective

8   for not appreciating the significance of the adipocere finding. (Dkt. 140 at 65-66.)  Because

9   Petitioner knew of the existence of adipocere, he could have independently pursued a burial

10  theory.  *See United States v. Dupuy*, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) ("Where

11  defendants . . . had within their knowledge the information by which they could have

12  ascertained the supposed *Brady* material, there is no suppression by the government.") (citing

13  *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)).

14          Perhaps recognizing that he already possessed the information from which trial counsel

15  could have argued that the victim had been buried, Petitioner alleges that Drs. Froede and

16  Birkby "actively deceived" trial counsel regarding the evidentiary significance of the

17  adipocere finding.  (Dkt. 140 at 33, 66.)  Petitioner's merits brief fails to cite to any source

18  for this bald assertion, an allegation he did not make in his state PCR proceedings.  In the

19  amended petition, Petitioner cites no evidence concerning allegedly deceitful action by Dr.

20  Birkby and provides only an "E.g." citation to pages 68 and 69 of trial counsel's interview

21  with Dr. Froede.  (Dkt. 103 at 32.)  However, a review of these pages, which were not

22  provided to this Court but are appended to the state PCR petition, reveals no discussion

23  whatsoever about adipocere.  (ROA-PCR at 399-400.)  Further, in a separate excerpt from

24  that interview provided to the PCR court, Dr. Froede and defense counsel engage in the

25  following exchange:

26          MR. BLOOM:   Okay, go ahead.  You were telling me about –

27          A.    The presence of moisture, water in general will retard the post-mortem

28                                          - 33 -

decomposition and the – if the body is in the water for example, you find it in a lake or something like that.  Generally it will decompose at a slower rate than the body left sitting out on the desert floor.  The presence of water, a great deal of water, like a lake or something like that, sometimes will actually because of so much water that you don't get adipocere formation.  The presence of an optimum amount of water plus the temperature will lend – lend itself to the body to go through this particular process of hydrogenation and hydrolysis to change the fatty materials and even the tissues, used to be thought just fat but now organs can actually go through this.  I've seen this happen in some of these cases where they actually go through this process and the break down through this enzyme called lecithin produced by the cholistridia (phonetic) species and so in presence of an optimum temperature of water, then adipocere will form.

(ROA-PCR at 394.)  Nothing in the excerpt of counsel's interview with Froede supports Petitioner's specious claim that he was affirmatively misled about the scientific relevancy of adipocere.  To the contrary, Dr. Froede explained that adipocere formation requires an optimum amount of water and temperature, thus corroborating the opinion of the defense's own expert that the victim's body "was subjected to a moist environment."  (ROA-PCR at 367.)  In addition, none of the experts' reports, including those obtained by predecessor defense counsel, specifically addressed the issue of whether the victim had been buried or indicated that the adipocere could not have formed absent burial in the ground.  Thus, Petitioner's contention that he was "misled" about the significance of adipocere is wholly unsupported.

Finally, Petitioner asserts that "[s]ince the conclusion of the Rule 32 proceedings, the state and its witnesses have shifted their position away from defending the claim of exposed remains and have grudgingly accepted the fact that the girl's remains were buried."  (Dkt. 140 at 41.)  He states that a 1999 television program on the Learning Channel addressed the forensic evidence in this case and that Drs. Froede and Birkby participated in its production.  According to Petitioner, the show's narrator "attributes to Dr. Froede the conclusion that the remains were placed in a shallow grave" and that the prosecution believed the remains were buried on the day of the victim's abduction.  (*Id.*)  Petitioner did not append a copy of this program to his petition or merits brief.  Regardless, a "shift" of position following trial does not support Petitioner's *Brady* claim.  "As Justice White has said, 'any allegation of

suppression boils down to an assessment of *what the State knows at trial* in comparison to the knowledge held by the defense." *Dupuy*, 760 F.2d at 1502 n.5 (quoting *Giles v. Maryland*, 386 U.S. 66, 96 (1967) (White, J., concurring) (emphasis added)).

The PCR court expressly found no credible evidence that the State knew of, but failed to disclose prior to trial, evidence that the victim had been buried. (ROA-PCR at 1004-05.) This finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Petitioner has proffered nothing to indicate that at the time of trial the prosecution's experts believed, in light of the presence of adipocere, that the victim had to have been buried at least one foot under ground. *Cf. Paradis v. Arave*, 240 F.3d 1169, 1179-81 (9th Cir. 2001) (finding *Brady* violation where prosecutor's notes revealed inconsistency in medical examiner's opinions that would have been useful to impeach examiner's testimony). Rather, Petitioner relies only on a new expert's opinion that conditions were inadequate for adipocere development and, therefore, the "logical inference to be drawn" is that the State's experts' claims that adipocere could develop without inhumation were "fabrications." (Dkt. 140 at 59.) He further states that his new expert can establish "that Dr. Froede knew *or should have known* of the fact of burial." (*Id.* at 59.) These speculative, unsupported allegations are insufficient to establish by clear and convincing evidence that at the time of trial the prosecution believed but failed to disclose that the victim had been buried. The PCR court's ruling was based on neither an unreasonable application of *Brady* nor an unreasonable determination of the evidence presented in state court; therefore, Petitioner is not entitled to relief on this claim. 28 U.S.C. § 2254(d).

**Claim 2-D:**     **Violation of the Sixth and Fourteenth Amendments based on trial counsel's failure to investigate and appreciate the scientific importance of adipocere.**

Petitioner next argues that trial counsel Bloom's failure to appreciate the significance of adipocere and investigate facts that would have shown the victim had been buried rendered his representation constitutionally deficient. (Dkt. 140 at 65.) He complains that

trial counsel took a "myopic view towards the remains" and unreasonably limited "his attack on this crucial evidence solely to identification of the remains." (*Id.* at 66.) He further contends that counsel "sorely underutilized" Dr. Clyde Snow, a forensic pathologist retained by the defense, and that "[a] more thorough-going analysis of this physical evidence . . . would have alerted Mr. Bloom to the further evidentiary value locked within those remains." (*Id.*)

The state PCR court denied this claim without an evidentiary hearing. (ROA-PCR at 1010.) Petitioner argues that the state court failed to conduct a proper *Strickland* analysis and that its factual conclusions are subject to *de novo* review because it reached these conclusions without holding an evidentiary hearing. He further argues that a federal habeas evidentiary hearing is needed "to establish the fact of burial" and the standard of care required of counsel in these circumstances. (Dkt. 140 at 68, 64.) The Court finds that Petitioner is not entitled to an evidentiary hearing on this claim because he has failed to set forth facts which, if proved, would merit relief.[8] *See Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001) (observing that no evidentiary hearing required if petitioner does not demonstrate that "the *allegations* in his petition would, if proved, entitle him to relief").

**Background**

Following discovery of the victim's remains, Petitioner's then-counsel, Lamar Couser, secured the appointment of a forensic pathologist, Dr. Philip Keen, the Yavapai County Medical Examiner, and a forensic odontologist, Dr. Hal Chilton. (ROA at 253-55; 480-84.) Drs. Keen and Chilton concurred with the State's experts' identification of the remains and

---

[8]   In addition, Petitioner did not diligently develop the IAC aspect of his burial-related claims in state court. Although Petitioner appended numerous materials and transcripts of interviews with the State's experts to support his claim of newly-discovered evidence, he failed to include any proffer of evidence from trial counsel. There is nothing in the record to indicate that trial counsel refused to be interviewed or cooperate with PCR counsel's investigation of Petitioner's IAC claims, and the Court finds that Petitioner could have "easily obtained [his] affidavit[]." *Dowthitt*, 230 F.3d at 758.

their conclusion that the cause of death could not be determined. (ROA-PCR at 368-369A.)
Dr. Keen's report further states: "The finding of adipocere on the initial examination of the
skeleton suggests that at least for some time after death and prior to skeletonization of the
remains the body was subjected to a moist environment." (*Id.* at 367.)

In June 1985, Petitioner retained the services of Stanton Bloom to replace Couser as
counsel. (ROA at 409-12.) Around the time Petitioner was negotiating with Bloom to take
over his representation, the victim's family buried her remains.[9] (*Id.* at 802.) Five months
later, Bloom moved for exhumation of the remains, arguing that examination of the bones
by his new forensic expert would reveal cause of death, identification, and numerous other
findings. (*Id.* at 577-80; 801-03.) He further avowed that his expert, whose identity he
refused to disclose, had reviewed relevant photos, reports, and x-rays. (*Id.* at 803.) The trial
court denied the motion, and requests for interlocutory review by the Arizona Court of
Appeals and the Arizona Supreme Court were denied. *Atwood*, 171 Ariz. at 604-05, 832
P.2d at 621-22.

At some point during preparation for trial, Bloom requested that Petitioner be found
indigent for the purpose of expert and investigative costs. After trial concluded, Bloom
submitted a request for payment of expert fees. (ROA at 9205.) The motion states that he
had consulted with Dr. Clyde Snow, a forensic anthropologist; Dr. Gerald Vale, an
odontologist; Dr. Michael Charney, a forensic anthropologist whose bill also reveals that he
reviewed materials relating to this case; and Dr. William Psaltis, a dentist. (*Id.*) The record
does not reveal whether this is the full extent of counsel's consultation with forensic experts
or whether Petitioner paid for additional services prior to requesting financial assistance from

---

[9]   According to the prosecutor, he contacted Bloom and offered an opportunity to
have the remains examined by a new expert of his choice several weeks before she was
buried. (ROA at 782.) He also notified both Couser and Bloom by letter of the impending
funeral and diminishing window of time for an additional examination. (*Id.* at 786-87.)
Bloom apparently requested that Couser, who was still attorney of record, seek delay of the
funeral; Couser declined to do so. *See* discussion *infra* Claim 2-B.

1    the court.

2        **Analysis**

3        Under *Strickland*, trial counsel has "a duty to make reasonable investigations or to make

4    a reasonable decision that makes particular investigations unnecessary," and "a particular

5    decision not to investigate must be directly assessed for reasonableness in all the

6    circumstances, applying a heavy measure of deference to counsel's judgments." *Hayes v.*

7    *Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). To

8    determine whether the investigation was reasonable, the court "must conduct an objective

9    review of [counsel's] performance, measured for reasonableness under prevailing

10   professional norms, which includes a context-dependent consideration of the challenged

11   conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523

12   (2003) (citation and quotation marks omitted). As the Supreme Court recently reiterated, "In

13   judging the defense's investigation, as in applying *Strickland* generally, hindsight is

14   discounted by pegging adequacy to counsel's perspective at the time investigative decisions

15   are made and by giving a heavy measure of deference to counsel's judgments." *Rompilla v.*

16   *Beard*, 545 U.S. 374, 381 (2005) (internal quotes omitted).

17       Petitioner argues that Bloom's failure to understand the significance of adipocere led

18   to abandonment of burial as a defense. If Bloom had been aware of the "fact of burial," it

19   is argued, he could have used that evidence to undermine the prosecution's timeline of

20   sightings of Petitioner and the required driving time between the victim's neighborhood, the

21   area where her remains were found, and the park where Petitioner met up with acquaintances.

22   Petitioner further asserts that "the association between the presence of adipocere and the fact

23   of burial should have been evident to any forensic pathologist or anthropologist *tasked with*

24   *that analysis*." (Dkt. 140 at 66) (emphasis added.) Thus, according to Petitioner, Bloom's

25   failure to direct his forensic experts to analyze the relationship between adipocere and burial

26   constituted deficient performance. The Court disagrees.

27       It is settled that an attorney who retains experts "is not required to dictate what his

28                                              - 38 -

experts in their professional judgment need to do to render proper professional services."
*Jackson v. Calderon*, 211 F.3d 1148, 1159 (9th Cir. 2000) (citing *Hendricks v. Calderon*, 70
F.3d 1032, 1038-1039)).  In *Hendricks*, the Ninth Court explained:

> An integral part of an expert's specialized skill at analyzing information is an
> understanding of what information is relevant to reaching a conclusion.  Experts
> are valuable to an attorney's investigation, then, not only because they have
> special abilities to process the information gathered by the attorney, but because
> they also are able to guide the attorney's efforts toward collecting relevant
> evidence.

70 F.3d at 1038-39.

Petitioner does not assert that Bloom should have understood the significance of the
adipocere finding without the assistance of experts and concedes that "the association
between the presence of adipocere and the fact of burial" is within the specialized skill of a
forensic pathologist or anthropologist. (Dkt. 140 at 66.)  However, none of the pathologists
and anthropologists who examined the victim's remains or reviewed the relevant materials
prior to trial indicated that burial was a prerequisite to adipocere formation, and none
suggested that the conditions at the time of the victim's disappearance or in the desert area
where the remains were found negated the theory that her body had been left abandoned in
the desert.

Both Drs. Froede and Keen acknowledged that adipocere formation requires a moist
environment.  Dr. Froede testified that he reviewed the pertinent weather records and there
was a "good deal of rain in the area" after the victim's disappearance on September 17.  (RT
2/27/87 at 43.)  This was corroborated by the search and rescue report, which noted rain on
September 25 and "heavy rain" on September 26.[10]  In addition, Dr. Birkby's notes stated "no

---

[10]    In their response to Petitioner's PCR petition, Respondents appended a National
Weather Service document identifying the nearest weather station to the area where the
victim's remains were found – Tucson 17 NW.  (ROA-PCR at 669-70.)  Weather records
attached to the PCR petition reflect that this station recorded .20 inches of rain on September
24, .30 inches on September 25, 1.31 inches on September 26, and small amounts on
September 22, 27, and 28, for a total of 1.95 inches over a six-day period beginning less than

1   indication of burial" and he explained, during his interview with Bloom, that he reached this

2   conclusion because there were no soil particles in "the holes that normally occur in the bone"

3   or in any of the bones' orifices.  (ROA-PCR at 82-84.)  In addition, the bones lacked

4   "differential discoloration," which normally occurs when a bone is buried.  (*Id.* at 84.)

5   Bloom specifically asked whether "we can state with a degree of assurity [sic] that the body

6   was not buried," and Dr. Birkby responded, "Right.  There's no indication for that."  (*Id.* at

7   85.)

8        The record refutes Petitioner's allegation that Bloom failed to appreciate the

9   significance of the adipocere finding.  Based upon the information about the rainfall, which

10  counsel could have reasonably believed was the source of the necessary moisture referenced

11  by the experts, the lack of indication from any expert that burial was a necessary prerequisite

12  to adipocere formation, and the absence of evidence indicating burial on the bones

13  themselves, it was not unreasonable for Bloom to not further investigate whether the victim

14  had been buried.  *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (observing that

15  counsel not deficient for failing to find evidence if, after a reasonable investigation, nothing

16  has put counsel on notice of the existence of that evidence).  Petitioner has not alleged, nor

17  provided evidence to support, a claim that Bloom failed to ask either his own or the State's

18  experts about the amount of moisture needed for adipocere development and whether the

19

20  _____

21  a week after the child disappeared.  (*Id.* at 566.)  Petitioner did not refute this data but instead
    asserted that the "Tucson 17 NW" station is actually in Mexico because the station index

22  provided by Respondents lists the latitude as 31 degrees, 15 minutes (ROA-PCR at 958), a
    proposition he advances again in these proceedings.  (Dkt. 140 at 39.)  It is evident the

23  reference to "31" degrees was a typographical error, as the station index also indicated that

24  the weather observer for station Tucson 17 NW is the Saguaro National Monument (now
    Saguaro National Park) in Tucson.  In addition, the National Climatic Data Center identifies

25  Tucson 17 NW at latitude 32 degrees, 15 minutes North and longitude 111 degrees, 12
    minutes West – in the general area where the victim's remains were found.  National

26  Climatic Data Center, Tucson 17 NW Station, http://www4.ncdc.noaa.gov/cgi-win/

27  wwcgi.dll?wwDI~StnSrch~StnID~20001351.

28                                        - 40 -

1    recorded rainfall was sufficient.  Having enlisted appropriate experts and made a reasonable

2    investigation of the remains, Bloom was entitled to rely on the experts' evaluations, none of

3    which suggested that the victim had been buried.  *See Wildman v. Johnson*, 261 F.3d 832,

4    838 (9th Cir. 2001) ("Trial counsel could reasonably rely on [the] initial expert investigation

5    and Wildman did not show that the expert retained revealed that further investigation would

6    be productive.").

7        In addition, Petitioner has not alleged any facts showing that Bloom should not have

8    chosen the two forensic anthropologists who assisted the defense, or that Bloom had any

9    reason to believe these experts and those retained by predecessor counsel were incompetent,

10   or that their credentials were deficient in any way.  *See Harris v. Vasquez*, 949 F.2d 1497,

11   1525 (9th Cir. 1990) (finding trial counsel's reliance on properly selected experts within the

12   wide range of professionally competent assistance).  Petitioner has not proffered any

13   evidence regarding these experts' work or opinions, nor of Bloom's discussions with any of

14   the experts retained by the defense.[11]

15       Finally, even if trial counsel's failure to pursue a burial theory constitutes deficient

16   performance, the Court concludes that Petitioner cannot establish prejudice.  The State

17   presented numerous witnesses to establish a timeline of events on September 17, 1984. Sam

18   Hall testified that he saw Petitioner parked near Vicki Lynn's elementary school at 3:15 p.m.;

19   Petitioner's appearance concerned him and he wrote down Petitioner's license plate number.

20   (RT 2/11/87 AM at 18, 22-25.)  Vicki Lynn's mother testified that her daughter left home on

21   her bicycle at 3:30 p.m.  (RT 3/3/87 PM at 53.)  Vicki Lynn's sister left home at 3:50 to look

22   for Vicki Lynn and thereafter found her sister's bike lying on a road in their neighborhood.

23

24       [11]   The Court notes that at no time during these lengthy proceedings has Petitioner
25   alleged uncooperativeness by Bloom.  Indeed, this Court's review of habeas counsel's billing
     statements confirms that both lawyers have met on numerous occasions for extended periods
26   of time.  Notwithstanding this contact, Petitioner has proffered no affidavit or declaration
27   from Bloom to support any claim of ineffectiveness.

28                                                    - 41 -

1    (RT 2/11/87 AM at 70.)  Jack McDonald testified that Petitioner returned to DeAnza Park

2    at dusk, somewhere around 5:00 p.m.  (RT 2/11/87 PM at 14.)  Det. Dhaemers testified that

3    McDonald gave various times for Petitioner's return to the park, including 4:00, 4:30, 5:00,

4    5:30 and 6:00, but that McDonald felt the "best" description was when the sun was starting

5    to go down.  (RT 2/24/87 at 180.)  Det. Dhaemers further testified that in September the sun

6    sets between 6:00 and 6:30 p.m. (*Id.* at 181.)  He also stated that the driving time from Vicki

7    Lynn's neighborhood, to the area where her remains were found, and back to DeAnza Park

8    is approximately one hour.  (*Id.* at 179.)

9         The defense  attempted to discredit the prosecution's timeline, through both direct and

10    cross examination of numerous witnesses.  For example, McDonald conceded on cross that

11    Petitioner could have returned to the park as early as 4:00.  (RT 2/11/87 PM at 121, 139.)

12    Gary Cisco testified that Brian Hall (who died prior to trial) stopped by his house between

13    4:00 and 4:30 and told Cisco he had just seen Petitioner and McDonald at the park and that

14    Petitioner told Hall he had stabbed someone over a coke deal.  (RT 2/17/87 at 29-30.)  The

15    defense also presented testimony from Thomas Parisien, who said Petitioner and McDonald

16    arrived at his house while he was watching a one-hour television program that began at 3:00

17    p.m.  (RT 3/10/87 at 187-90.)  Petitioner himself initially told the FBI he returned to the park

18    between 4:00 and 5:00 but then later claimed it was 3:30.  (RT 2/13/87 at 26.)

19         For the jury to have convicted Petitioner, it must not have found the defense's timeline

20    evidence credible.  Indeed, Petitioner's timeline theory rests primarily on the testimony of

21    street people, alcoholics, and drug addicts.  Seldom has this Court seen a more untrustworthy

22    set of witnesses.  Asserting a burial theory would not have made a significant impact on the

23    jury's consideration of these witnesses' testimony.  In light of the timing discrepancies and

24    the unreliability of the witness testimony in this regard, it is far from clear that Petitioner

25    would not have had sufficient time to abduct the victim, dig a shallow grave, and return to

26    the park.  Moreover, arguing that the victim had to have been buried would have generated

27    conflicting expert views on whether burial was necessary for adipocere development.  The

28                                                      - 42 -

prosecution would have brought out that the forensic pathologist who examined the victim's remains for the defense did not indicate that burial had to have occurred for the adipocere to form (ROA-PCR at 368-369A) and that the lack of soil particulars in any of the bones' orifices combined with the lack of differential discoloration on the bones established conclusively that the body had not been buried (*id.* at 82-84). Therefore, the Court concludes there is no reasonable probability that, but for counsel's failure to assert that the victim had been buried, the jury would not have convicted him.

Based on this record, the Court finds that the state court's denial of Claim 2-D was neither an unreasonable application of *Strickland* nor an unreasonable determination of the facts.

**Claim 2-B:**     **Violation of the Sixth and Fourteenth Amendments based on counsel's failure to object to the victim's remains being buried without further examination.**

**Claim 5-B:**     **Violation of the Sixth and Fourteenth Amendments based on counsel's failure to obtain an anthropological expert to examine the victim's remains.**

As already noted, predecessor counsel Couser declined to seek postponement of the victim's funeral pending appointment of new trial counsel. *See supra* note 9. Petitioner asserts that this amounted to ineffective assistance of counsel. (Dkt. 140 at 60.) He further asserts that Couser's representation was constitutionally deficient because he failed to enlist the services of an anthropologist. (*Id.* at 81.) These claims were denied on direct appeal. *Atwood*, 171 Ariz. at 601, 832 P.2d at 618. In finding no prejudice, the Arizona Supreme Court observed that two defense experts examined the remains prior to the funeral and Petitioner failed to establish that an additional examination would have yielded any useful evidence. *Id.* at 605, 832 P.2d at 622.

Petitioner does not clearly articulate a basis for finding the state court's ruling unreasonable. He asserts cryptically that the "prejudice from failure to independently review the remains is now demonstrable," but does not set forth any facts suggesting prejudice.

(Dkt. 140 at 61.)  He has not alleged what an anthropologist would have discovered from an examination of the bones that was not already set out in the reports of Drs. Froede, Birkby, Keen, and Chilton.  He asserts that Couser "took no steps to subject the state's forensic evidence to an independent and aggressive evaluation" (Dkt. 140 at 81), yet the record is undisputed that Couser enlisted both a forensic pathologist and odontologist to examine the remains.  He complains that Dr. Keen, a pathologist, failed to draw any inferences from the finding of adipocere and suggests that an anthropologist would have, but does not acknowledge that successor counsel Bloom consulted with two forensic anthropologists, neither of whom apparently drew any helpful inferences from the finding of adipocere.  On their face, the Court finds these claims to be plainly meritless.  Petitioner has not alleged any facts that would entitle him to relief.

**Claim 2-F:**     **Violation of the Eighth Amendment based on the trial court's failure to consider residual doubt as to guilt resulting from prosecution's failure to disclose significance of adipocere.**

Petitioner asserts that his death sentence is tainted by the prosecutor's failure to disclose the "fact of burial" pursuant to its duty under *Brady* and that his newly-discovered burial evidence provides residual doubt of guilt such that his sentence must be vacated and remanded for resentencing.  (Dkt. 140 at 68.)  Petitioner provides no authority for this novel Eighth Amendment claim, and it is self-evident that the trial court cannot be faulted for failing to consider facts not before it.  Moreover, the Arizona Supreme Court ruled that the trial court "properly refused to find lingering doubt to be a mitigating circumstance sufficiently substantial to call for leniency," *Atwood*, 171 Ariz. at 654, 832 P.2d at 671, and the United States Supreme Court has expressly rejected the assertion that a capital defendant has a federal constitutional right to produce evidence of residual doubt at sentencing, *Oregon v. Guzek*, 546 U.S. 517, ___, 126 S. Ct. 1226, 1231-32 (2006).  Finally, as discussed in Claim 2-A, Petitioner has not established that a *Brady* violation occurred.  Accordingly, this claim is summarily denied.

1

2

**Claim 3-A:     Violation of the Fourteenth Amendment based on the trial court's admission of unreliable eyewitness testimony.**

3      Petitioner challenges the trial court's admission of eyewitness testimony allegedly

4  contaminated by improper pretrial viewings of Petitioner.  He further asserts, summarily, that

5  the Arizona Supreme Court's decision affirming admission of these witnesses' testimony

6  fails to conform with *Neil v. Biggers*, 409 U.S. 188 (1972), and is the product of an

7  "unreasonable application of the facts in light of the evidence presented in the State Court

8  proceeding."  (Dkt. 140 at 72.)

9      Evaluating whether an in-court identification has been irreparably tainted by a pretrial

10  encounter between a witness and an accused requires a two-part analysis.  First, the Court

11  must determine whether the challenged pretrial encounter was suggestive.  *Simmons v.*

12  *United States*, 390 U.S. 377, 384 (1968).  Second, the Court must examine the totality of the

13  circumstances to determine whether the witness's in-court identification is nonetheless

14  reliable.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  The factors to be considered in

15  assessing reliability are: (1) the witness's opportunity to view the accused at the time of the

16  crime, (2) the witness's degree of attention, (3) the accuracy of the description, (4) the

17  witness's level of certainty, and (5) the length of time between the crime and the

18  confrontation.  *Id.* (citing *Biggers*, 409 U.S. at 199-200).

19  **Background**

20      Prior to trial, Petitioner moved to suppress identification testimony of fourteen

21  witnesses, arguing that some had been subjected to improperly suggestive identification

22  procedures and all had been tainted by pretrial publicity.  (ROA at 1067.)  The trial court held

23  an eleven-day *Dessureault* hearing[12] on the admissibility of these witnesses' identifications

24  of Petitioner.  (RT 4/3/86, 4/8/86, 4/9/86, 4/10/86, 4/11/86, 4/14/86, 5/7/86, 5/8/86, 5/9/86,

25

26      [12]   *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969) (requiring trial courts to
27  hold hearings on challenges to pretrial identifications).

28                                              - 45 -

1  5/13/86, 5/14/86.)  The State filed a post-hearing memorandum, Petitioner filed a response,

2  and the court held oral argument.  (ROA at 1873, 1999; RT 9/9/86 at 106-89.)

3      In its ruling, the trial court noted that all of the witnesses had been exposed "to one or

4  more pre-trial viewings of the Defendant in circumstances that were inherently suggestive."

5  (ROA at 2562.)  The court noted the "high profile" nature of the case, observing that from

6  the day of the victim's disappearance, "the newspapers, radio stations and television stations

7  saturated the community with the case and its investigation.  To live in Pima County and

8  avoid exposure to this coverage would have required one to be a hermit living in a cave."

9  (*Id.*)  It further stated:

10        As a result of all of this exposure every eye-witness has had one or multiple pre-
      hearing and pre-trial viewings of the Defendant.  Whatever the witnesses'

11        opportunity and ability to make their original observations and to then recall and
      testify about them, those observations cannot be free of influence from their

12        subsequent viewings of the Defendant in the various suggestive circumstances.

13  (*Id.* at 2563-64.)  Having found suggestiveness, the trial court then considered the *Biggers*

14  reliability factors and determined that two of the fourteen eyewitnesses' identifications were

15  inherently unreliable.  On appeal, the Arizona Supreme Court ruled that the trial court

16  "properly concluded that the identification testimony of 12 of the 14 witnesses was reliable"

17  and, therefore, its admission did not violate Petitioner's right to due process under

18  *Brathwaite* and *Biggers*.  *Atwood*, 171 Ariz. at 603, 832 P.2d at 620.

19      **Analysis**

20      Recently, the Supreme Court reiterated that "clearly established Federal law" in

21  § 2254(d)(1) "refers to the holdings . . . of [the] Court's decisions as of the time of the

22  relevant state-court decision."  *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006).  In *Musladin*,

23  the habeas petitioner argued that his right to a fair trial was violated when spectators in the

24  courtroom wore buttons depicting the murder victim.  *Id.* at 652.  In reversing the lower

25  court's grant of habeas relief, the Supreme Court found an absence of clearly established

26  federal law because the effect of private-actor courtroom conduct on a defendant's fair trial

27  rights is an open question in the Court's jurisprudence.  *Id.* at 653.  The Court noted that its

28

1    existing caselaw dealt only with government-sponsored practices and that "lower courts have

2    diverged widely in their treatment of defendants' spectator-conduct claims." *Id.* at 654.

3    Because no holding of the Court required the state court to apply the government-related

4    precedent to spectator conduct, the state court's decision was not contrary to or an

5    unreasonable application of clearly established federal law. *Id.*

6        Similarly, with regard to admission of identification testimony, no Supreme Court case

7    addresses the effect of media exposure unrelated to government action on a defendant's

8    constitutional rights.  Rather, the relevant cases all deal with suggestive governmental

9    identification procedures. *See Brathwaite*, 432 U.S. at 101 (detective gave photograph of

10   suspect to eyewitness); *Biggers,* 409 U.S. at 195 (detectives walked suspect by victim at

11   police station); *Simmons*, 390 U.S. at 380 (FBI showed photograph of suspect to

12   eyewitnesses).  In addition, the Ninth Circuit has held that *Simmons* is not applicable to a

13   case in which the suggestive identification resulted from photographs in a newspaper and the

14   government had not assisted or encouraged the publicity. *United States v. Peele*, 574 F.2d

15   489, 491 (9th Cir. 1978); *see also United States v. Kimberlin*, 805 F.2d 210, 233 (7th Cir.

16   1986) (finding no due process right to judicial evaluation of reliability under *Biggers* where

17   witness saw defendant's picture on television); *United States v. Zeiler*, 470 F.2d 717, 720 (3d

18   Cir. 1972) (holding photographs of an accused on television or in newspapers do not

19   constitute identification procedures for reliability analysis under *Simmons*).  Rather, the

20   "extent to which a suggestion from nongovernment sources has influenced the memory or

21   perception of the witness, or the ability of the witness to articulate or relate the identifying

22   characteristics of the accused, is a proper issue for the trier of fact to determine." *Peele*, 574

23   F.2d at 491; *Zeiler*, 470 F.2d at 720 ("The credibility of witnesses' subsequent identifications

24   can be weighed by the jury in light of the witnesses' statements as to their reactions to

25   television or newspaper pictures.").

26       It thus appears that Petitioner is not entitled to relief because this Court cannot say that

27   the Arizona Supreme Court's decision was contrary to or an unreasonable application of

28                                                        - 47 -

clearly established federal law.[13]   *Musladin*, 127 S. Ct. at 654; *Williams*, 529 U.S. at 381 (noting that habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue).

Even assuming non-governmentally-induced media exposure affects the admissibility, and not simply the weight, of identification testimony, the Court finds that the pretrial identifications questioned here were sufficiently reliable, despite the witnesses' exposure to media, when the totality of the circumstances is considered.  *See Biggers*, 409 U.S. at 199-200.  The Court further concludes that evidentiary development is not warranted.

Petitioner's request for evidentiary development is sparse.  He argues that a federal evidentiary hearing is necessary to assess "the avalanche of publicity," to provide an opportunity for all of the eyewitnesses "to hear from an expert in the field of perception, memory, and recall," and to allow these witnesses to describe "the extent to which their testimony was shaped" by the pink paint evidence and discovery of the victim's remains. (Dkt. 140 at 69, 72.)  However, he fails to articulate how such evidence would bear on the issue before this Court: whether he is entitled to relief under § 2254(d).  *See Campbell v. Blodgett*, 978 F.2d 1502, 1519 (9th Cir. 1992) ("The court need not conduct an evidentiary hearing on allegations in the petition that are conclusory and wholly devoid of specifics.").

---

[13]   The Court notes that Petitioner wrongly asserts in his petition that the Arizona Supreme Court found there had been "unnecessarily suggestive *government* identification procedures."  (Dkt. 103 at 37, citing *Atwood*, 171 Ariz. at 603, 832 P.2d at 620) (emphasis added.)  Petitioner misstates the court's decision, which expressly found that "the record in this case reveals no such procedures."  *Atwood*, 171 Ariz. at 603, 832 P.2d at 620.  Rather, the court noted that the United States Supreme Court cases relied on by the trial court (*Simmons*, *Biggers*, and *Brathwaite*) concerned identifications tied to governmental action, such as a suggestive line-up.  *Id.*  Although the court found that the government had no role in the extensive media exposure in this case, it nonetheless concluded that federal due process required the trial court to consider the reliability of the witnesses' identifications. *Id.*

1    Furthermore, Petitioner does not address why such evidence was not presented and

2    developed in state court during the extensive eleven-day suppression hearing.

3          In his petition and merits brief, Petitioner presents specific argument regarding the

4    testimony of only three of the twelve testifying eyewitnesses – Nora Wilson, Robert

5    McCormick, and Michael Young.  (Dkt. 103 at 39-40; Dkt. 140 at 70.)  For the remaining

6    witnesses, he simply lists their names and asserts that the failure to exclude their testimony

7    deprived him of his right to a fair trial.  (Dkt. 103 at 40.)  This is insufficient.  *See Jones v.*

8    *Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-settled that 'conclusory allegations

9    which are not supported by a statement of facts do not warrant habeas relief.'") (citing *James*

10   *v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).  In addition, Petitioner fails to set forth with any

11   particularity how the state court's ruling was either contrary to, or an unreasonable

12   application of, controlling Supreme Court law or was based on an unreasonable

13   determination of the facts, despite this Court's directive that he apply the AEDPA standards

14   to his claims.  (Dkt. 127 at 61.)

15         Addressing only the witnesses for which Petitioner has presented specific argument and

16   assessing the totality of the circumstances pursuant to *Biggers*, the Court concludes that the

17   state court's reliability finding was neither contrary to, or an unreasonable application of,

18   established federal law, nor an unreasonable determination of the facts.

19         ***Nora Wilson***

20         Nora Wilson testified during the *Dessureault* hearing.  She stated that around 4:20 p.m.

21   on September 17, 1984, she noticed a parked Datsun vehicle outside her home in a rural

22   neighborhood in the northwest part of Tucson, the same general part of town where the

23   victim's remains were later found.  (RT 4/10/86 at 18.)  She observed the car for about one

24   minute.  (*Id.* at 9, 12-13.)  The driver's window was down, and the driver was looking

25   around.  (*Id.* at 13-14.)  At some point, the driver looked directly at her.  (*Id.* at 14.)  "He got

26   a very startled look on his face, pulled back in the car and attempted to drive away."  (*Id.* at

27   15.)  She described the driver as having a mass of long, unkempt hair and said there was a

28                                          - 49 -

1   young girl in the passenger seat; the child was slight and had short hair. (*Id.* at 17-18.) She

2   saw the vehicle again about twenty minutes later but the child was no longer in the car. (*Id.*

3   at 12, 17, 19.)

4       Wilson testified that after the initial sighting, she picked up the phone to call police but

5   then hung up, believing she was being overly imaginative. (*Id.* at 10-11.) Five days later,

6   at a "search-and-rescue" operation set up to look for the victim, Wilson learned that

7   investigators were looking for Datsun tire tracks. (*Id.* at 22.) She telephoned police to report

8   her sighting of a Datsun on September 17, and, on September 24, a detective and an FBI

9   agent went to her house. (*Id.* at 23.) Wilson was feeling ill, and the conversation was brief.

10  (*Id.* at 24.)   Wilson took a nap and, after feeling better, made notes regarding her

11  observations of the car, driver, and child. (*Id.* at 25.) The next day, investigators returned

12  to her house and showed her a "very dark black and white photograph . . . [that] looked very

13  much like the man that was driving the car." (*Id.* at 31.) Because the photo quality was poor,

14  she refused to make a positive identification. (*Id.*)

15      After the September 25 interview with police, Wilson "made a very serious attempt

16  from that point on for a number of weeks not to read about the case." (*Id.* at 34.) However,

17  the week prior to Thanksgiving 1984, she saw Petitioner on television and "had a very strong

18  physical reaction. . . . I sat down in a chair and I kept saying, 'It's him, it's him, it's him.'"

19  (*Id.* at 34-35.) After this viewing, Wilson saw Petitioner's photograph in the newspaper and

20  on television on several additional occasions but denied that her in-court identification of

21  Petitioner, whose appearance was significantly changed at the time of the pretrial hearing,

22  was influenced by these media images. (*Id.* at 39, 42-43.)

23      Petitioner asserts Wilson's identification was unreliable because she was unable to

24  make an identification when first approached by the police. However, later, after the onset

25  of television news reports, she claimed Petitioner was the man she saw in the vicinity of her

26  home the afternoon of September 17, 1984. (Dkt. 103 at 39.) "She claimed to have been

27  able to see clearly the hair on his forearms, yet she was unable to recall that those same

28                                        - 50 -

1   forearms were heavily tattooed." (*Id.*)  Petitioner also claims that the victim's hair was not

2   short at the time of her disappearance and, therefore, Wilson's assertion that the child had

3   short hair, similar to photos shown on television and billboards, evidences undue media

4   influence. (*Id.*)   A review of the *Biggers* factors shows that Petitioner's challenges are

5   unfounded.

6        With regard to the first factor, Wilson had a good opportunity to view the driver of the

7   car.  She observed the car and driver for about a minute during the initial sighting, and at one

8   point the driver turned and looked at her directly.

9        The second factor is also satisfied.  Wilson had a heightened degree of attention because

10  she lived in a rural area on a dead-end street and there was an unfamiliar car parked near her

11  home.  She was not a disinterested bystander or casual observer, and told police her attention

12  was drawn to the vehicle because the driver "didn't seem like the kind of man who would

13  have a child with him."  (RT 5/14/86 at 28.)

14       The third factor examines the accuracy of the witness's description of the defendant.

15  In her initial statement to police, Wilson described seeing a dark-colored, dirty Datsun 280-Z

16  twice within a 20-minute interval. (*Id.* at 11, 26.)  The driver had long, dark hair. (*Id.* at 15.)

17  The first time she saw the car there was a child with short hair in the passenger seat. (*Id.* at

18  20.)  Although these descriptions are sparse, they are not inaccurate.  It is undisputed that

19  Petitioner drove a Datsun 280-Z car and, at the time of the offense, had long dark hair.  In

20  addition, the victim's mother testified at trial that her daughter's hair had just been cut "very

21  short" at the time of her disappearance.  (RT 3/3/87 PM at 62.)  Wilson also testified that she

22  did not distinctly see Petitioner's forearm, which could explain why she failed to notice the

23  tattoos on his arm.  (RT 4/11/86 at 40-41.)  Regardless, this "discrepancy" falls far short of

24  rendering Wilson's identification constitutionally unreliable.

25       The fourth factor examines the level of certainty shown by the witness.  At the time she

26  saw Petitioner on television, Wilson was certain he was the man she had seen outside her

27  home and testified to this identification without equivocation at the pretrial hearing.  (RT

28                                         - 51 -

4/10/86 at 41.)  Finally, Wilson's identification of Petitioner from television news footage occurred no more than two months after she initially saw the car and driver.  Under these circumstances, the Court finds reasonable the state court's conclusion that Wilson's testimony was reliable.

### Robert McCormick

At the *Dessureault* hearing, Robert McCormick testified that around 3:45 p.m. on September 17, 1984, he drove past a black Datsun 280-Z with California plates that was heading west on a two-lane road in northwest Tucson (the victim's remains were later found further west in a desert area near this same road).  (RT 4/9/86 at 8, 12-14.).  As he passed the car, he saw a small child with short hair in the passenger seat; she looked frightened.  (*Id.* at 8, 13.)  The driver, who had long hair pulled back into a ponytail and a moustache and beard, gave McCormick a "dirty look."  (*Id.* at 8, 13.)  Later that day, McCormick heard that authorities were looking for a black 280-Z in relation to the victim's disappearance and called the police.  (*Id.* at 16-17.)  He left a message with an operator but no one returned his call.  (*Id.* at 18.)  Several days later, he called a sheriff's hot line and spoke with a detective, who showed him two newspaper photos.  (*Id.* at 18, 96-97.)  McCormick commented on similarities with the driver (long hair, heavy mustache, light beard) but did not make a positive identification.  (*Id.* at 21, 97-98, 100.)  Later, McCormick saw Petitioner on television and recognized him as the driver of the 280-Z he had driven past on September 17.  (*Id.* at 24-25, 105.)

Petitioner's claim of constitutional unreliability rests on the fact that both McCormick and Petitioner were driving approximately 25-30 miles per hour in opposite directions.  He also asserts that McCormick's "ability to describe the man he saw improved as Mr. Atwood continued to be shown on television."  (Dkt. 103 at 40.)  These arguments fall short of establishing a substantial likelihood of irreparable misidentification from McCormick's testimony.

McCormick had an opportunity, albeit a brief one, to view the driver of the car.

- 52 -

1    Although he and the other driver were proceeding in opposite directions, McCormick

2    testified that the road was under construction and there was a point when he had taken his

3    foot off of the gas and they were face-to-face.  (RT 4/9/86 at 58, 64.)  He was particularly

4    attentive at first because the vehicle was a "nice looking" sports car and then because he saw

5    the driver treating the child roughly.  (*Id.* at 8, 65-66.)  He described the driver as having

6    long, dark hair with a thick moustache and light beard.  Although sparse, this description of

7    Petitioner was not inaccurate.  In court, McCormick testified that he was certain Petitioner

8    was the driver of the car he had passed and denied that subsequent viewings on TV and in

9    the newspaper affected his identification.  (*Id.* at 150, 154.)  Finally, McCormick's

10   identification of Petitioner from television news footage occurred just two weeks after he saw

11   the 280-Z.  (RT 5/7/86 at 122.)  Based on these circumstances, this Court cannot say that the

12   state court's reliability finding was unreasonable.

13          ***Michael Young***

14          Michael Young testified during the *Dessureault* hearing that sometime near 4:00 p.m.

15   on September 17, 1984, he drove past a black Datsun "Z" car traveling in the opposite

16   direction in the school zone in front of Homer Davis Elementary school.  (RT 4/14/86 at 15-

17   18.)  He identified Petitioner as the driver and said there was a small child in the passenger

18   seat.  (*Id.* at 18.)

19          Petitioner's only argument with respect to Michael Young's identification testimony is

20   that Young claimed the child he saw had short hair.  As already noted, the victim's mother

21   testified at trial that her daughter's hair had been cut just days before she disappeared and

22   was "very short."  (RT 3/3/87 PM at 62.)  Petitioner has failed to show that the state court's

23   reliability finding was contrary to, or an unreasonable application of, established federal law

24   or was based on an unreasonable determination of the facts.

25   **Claim 4-B:      Violation of the Sixth Amendment based on counsel's failure to assert**

26   **priest-penitent privilege as to Petitioner's communications with Ernest**

27   **Bernsienne.**

28                                              - 53 -

1    Under A.R.S. § 13-4062(3), a "clergyman or priest" shall not be examined "as to any

2    confession made to the clergyman or priest in his professional character in the course of

3    discipline enjoined by the church to which the clergyman or priest belongs" without consent

4    of the person making the confession.  Petitioner asserts that trial counsel Bloom performed

5    ineffectively by not invoking § 13-4062 to bar admission of a letter Petitioner wrote to Ernest

6    Bernsienne stating that he is attracted to children between the ages of seven and twelve and

7    admission of Bernsienne's testimony concerning a phone conversation several months before

8    the victim's disappearance in which Petitioner said he planned to go out and pick up a child

9    and would make sure the child would not report it.

10    Petitioner raised this claim in his PCR petition in a fairly summary fashion, asserting

11    only that the relationship between Petitioner and Bernsienne was one of "initiate and

12    religious mentor" and that the letter admitted at trial is in the "form of a confessional."

13    (ROA-PCR at 494.)  In denying relief, the state court noted that the PCR petition offered:

14        no specific facts about whether there was a recognizable "church" as that term is
         used in the privilege statute, A.R.S. § 13-4062(3) and A.R.S. § 12-2233.  Nor does
15        it state whether Atwood and Bernsienne were both members of such "church" or
         whether Bernsienne was recognized as a "clergyman or priest," as those terms are
16        used in the statute.  Absent such information, the petition fails to assert a viable
         objection which would have been available to Mr. Bloom.
17
(ROA-PCR at 1011.)
18
19    Petitioner argues that the PCR court's ruling is not entitled to deference because it

20    ignored the following facts: (1) the Ordo Templi Orietis (OTO) is a recognized religion with

21    § 501(c)(3) status granted by the Internal Revenue Service; (2) Bernsienne "enjoyed a

22    position as someone who could receive confessions from members and those who wished to

23    become members"; and (3) the trial judge recognized the existence of OTO as a recognizable

24    church in limiting cross-examination of Bernsienne because "it would interfere with the

25    witness's rights of religious privacy."  (Dkt. 140 at 76.)  He further asserts "there is no doubt

26    that if properly asserted the statutorily-based privilege would have applied."  (*Id.* at 77.)  The

27    Court disagrees.

28
- 54 -

1    First, during trial Bernsienne denied being a member of the OTO.  (RT 3/2/87 PM at

2    30-32, 46-47.)  He further denied being an "instructor" and said he agreed to teach Petitioner

3    only astrology.  (*Id.* at 34, 39, 48.)  Petitioner has proffered no evidence to establish that

4    Bernsienne was a "clergyman or priest" as those terms are used in A.R.S. § 13-4062(3).

5    Second, it was established at trial that Bernsienne was attracted to Petitioner sexually and

6    "entertained fantasies about him" (*id.* at 52-53); thus, their relationship was far from one of

7    priest-penitent and Bernsienne was clearly not acting in any "official" capacity in counseling

8    Petitioner about his sexual proclivities.  Third, I.R.C. § 501(c)(3) provides tax-exempt status

9    for charitable and non-profit organizations including but not limited to religious groups.

10   Thus, tax-exempt status under § 501(c)(3) does not establish that OTO is an organized church

11   or religion.  Fourth, the trial judge's limitation of Bernsienne's cross-examination was not

12   based on Bernsienne's "right to religious privacy" as advanced by Petitioner, but on

13   relevancy.  (*See* RT 2/5/87 at 7, 9, 11-12, 51-52; RT 3/2/87 AM at 21, 24, 27.)

14   Regardless of whether OTO is an organized religion, it is clear from the record that

15   Petitioner cannot establish that Bernsienne was a "clergyman or priest" or that he was

16   "enjoined by the practices or rules of the [OTO] to receive the confidential communication

17   and to provide spiritual counsel."  *Waters v. O'Connor*, 209 Ariz. 380, 385, 103 P.3d 292,

18   297 (App. 2004) (quoting *State v. Martin*, 959 P.2d 152, 157 (Wash. App. 1998)).  Nor can

19   Petitioner establish that the alleged "confession," one letter out of a multitude written over

20   a four-year period, was directed to Bernsienne in his "professional character in the course of

21   discipline enjoined" by the OTO.  A.R.S. § 13-4062(3); *see also* Joseph M. Livermore et al.,

22   *Arizona Practice: Law of Evidence* § 501.7 (4th ed. 2000) ("The clergyman must be acting

23   in his capacity as cleric.").  Because Petitioner has not shown that § 13-4062(c)'s privilege

24   would have applied to the letters and conversations between him and Bernsienne, he cannot

25   establish that Bloom's failure to assert the priest-penitent privilege amounted to deficient

26   performance under *Strickland* or resulted in prejudice.  The state court's denial of this IAC

27   claim was based on neither an unreasonable application of the law or an unreasonable

28

- 55 -

1   determination of the facts as presented in that court.

2
3   **Claim 5-C:**  **Violation of the Sixth and Fourteenth Amendments based on counsel's failure to interview disclosed eyewitnesses.**

4   **Claim 5-D:**  **Violation of the Sixth and Fourteenth Amendments based on counsel's failure to locate and interview witnesses identified by Petitioner.**

5
6   Petitioner contends that initial trial counsel Lamar Couser performed deficiently by not

7   interviewing disclosed eyewitnesses (Claim 5-C) and by not locating and interviewing

8   witnesses identified by Petitioner as individuals he saw on the day the victim disappeared

9   (Claim 5-D).  (Dkt. 140 at 83-88.)   Petitioner further contends that "[s]everal of these

10  transient witnesses were never located, and those who were later interviewed had been long

11  since contaminated or compromised." (*Id.* at 87.)  Petitioner raised these claims on direct

12  appeal, and the Arizona Supreme Court found a lack of prejudice because Petitioner had

13  failed to show that "any witness possessed any information helpful to his defense which,

14  because undiscovered, undermined the reliability of his guilt determination." *Atwood*, 171

15  Ariz. at 601, 832 P.2d at 618.

16  Petitioner asserts that the state court's ruling is "unsatisfying."  (Dkt. 140 at 84.)

17  However, he fails to articulate how the court's decision was based on either an unreasonable

18  application of *Strickland* or an unreasonable determination of the facts.  Petitioner does not

19  identify the witnesses he allegedly told Couser to interview, *see Bowling v. Parker*, 344 F.3d

20  487, 506 (6th Cir. 2003) (criticizing petitioner's failure to provide personal affidavit to

21  substantiate bare allegation concerning amount of time spent with counsel), or what these

22  individuals could have provided in terms of his defense.  Thus, he has alleged neither

23  deficient performance nor prejudice for failing to interview unidentified individuals at the

24  request of Petitioner.  With regard to the State's disclosed eyewitnesses, Petitioner lists Nora

25  Wilson and Robert McCormick.  However, Couser did interview Nora Wilson and filed a

26  motion to suppress her testimony.  (ROA at 219, 177-79.)  Thus, his representation was not

27  deficient.  In addition, Petitioner does not set forth what Couser should have uncovered from

28

Wilson and McCormick that trial counsel Bloom did not discover in his later interviews. Accordingly, Petitioner has failed to establish any prejudice with regard to these witnesses.

On their face, Claims 5-C and 5-D amount to nothing more than speculation and conjecture and are summarily denied; Petitioner has failed to argue let alone establish that the Arizona Supreme Court's ruling was based on an unreasonable application of *Strickland*. *See Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) (holding that district court properly rejected claim of ineffective assistance of counsel where petitioner failed to explain how counsel's insufficient preparation prejudiced the proceeding). Because the claims fail to set forth any specific factual basis for relief, Petitioner's request for an evidentiary hearing is also denied. *See Davis v. Woodford*, 384 F.3d 628, 650 (9th Cir. 2004) (upholding district court's denial of evidentiary hearing where petitioner failed to allege the specific evidence witnesses would have presented); *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994) (hearing not required where allegations are "conclusory and wholly devoid of specifics").

**Claim 8:**          **Violation of the Sixth Amendment based on trial counsel's failure to call Mary Ann Redgate as a witness.**

Petitioner argues that trial counsel should have called Mary Ann Redgate as a witness to establish that Petitioner was in the trailer park next to the victim's elementary school between 3:45 and 4:00 p.m., a time period that allegedly exonerates him. (Dkt. 140 at 93-97.) This claim was raised during Petitioner's PCR proceeding. The PCR court found that counsel's performance was not deficient because Redgate was unreliable based on her indication to police that the black automobile she saw had tinted windows, while testimony at trial established that Petitioner's car did not have tinted windows. (ROA-PCR at 1010.)

**Background Facts**

On September 24, 1984, Redgate spoke with investigators twice. During the initial interview, she reported seeing a black 280-Z with tinted windows and California license plates parked near her trailer, located near Homer Davis Elementary School, around 3:15 to 3:30 p.m. on September 17, 1984. (ROA-PCR at 58-64.) She described the driver as a white

male with long, bushy, dark brown hair, who she was certain was Petitioner based on seeing his picture in a newspaper. (*Id.* at 59, 61, 64.) Redgate also stated that approximately 30 to 45 minutes later (around 3:45 to 4:00 p.m.), she returned home and saw the same car – with no occupant – parked in a different spot, next to her neighbor's trailer. (*Id.* at 59, 61, 63, 64.) Later on September 24, Redgate contacted investigators to report that her six-year-old daughter had told her that the man from the black Datsun had come out of their neighbor's trailer and was a friend of their neighbor named "Richard." (*Id.* at 60.)

Defense counsel listed Redgate as a witness in his disclosure, and issued a subpoena for her to appear at trial. (ROA at 2617, 2982.) However, she was not called to testify.

**Analysis**

Petitioner argues that he is entitled to an evidentiary hearing regarding Redgate's recollections. (Dkt. 140 at 194.) He states that "[t]rial counsel has been unable to articulate the reason for failing to call her as a witness." (*Id.* at 92, 97.) This implies that habeas counsel has met with trial counsel (which habeas counsel's billing statements confirm); however, Petitioner has proffered no affidavit or declaration from Bloom explaining the basis for his actions. Also noticeably absent is any offer of proof concerning Redgate's proposed testimony or notes of any interview Bloom presumably undertook of Redgate prior to trial. *See Williams v. Woodford*, 384 F.3d at 588 ("[C]onclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing."); *Campbell v. Blodgett*, 978 F.2d at 1519 ("The court need not conduct an evidentiary hearing on allegations in the petition that are conclusory and wholly devoid of specifics.").

Petitioner asserts that he requested an evidentiary hearing in state court and, therefore, was "diligent" in trying to develop the claim. However, as previously noted, the test for determining "diligence" is whether Petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. The mere request for an evidentiary hearing may not be sufficient to

1   establish diligence if a reasonable person would have taken additional steps.  *Dowthitt v.*

2   *Johnson*, 230 F.3d at 758; *Koste v. Dormire*, 345 F.3d at 985-86.

3       Under Arizona law, Petitioner had a duty to file affidavits, records, or other evidence

4   available to him to support the allegations raised in his PCR petition.  Ariz. R. Crim. P. 32.5.

5   Petitioner did provide the PCR court with the Sheriff and FBI investigative reports

6   concerning Redgate, but failed to provide anything further such as an affidavit or declaration

7   from Bloom and/or Redgate in support of his request for an evidentiary hearing.  There is

8   nothing in the record to indicate that either of them refused to be interviewed or cooperate

9   with PCR counsel's investigation of Petitioner's IAC claims, and the Court finds that at a

10  minimum Petitioner could have "easily obtained [Bloom's] affidavit[]." *Dowthitt*, 230 F.3d

11  at 758.  Thus, even if Petitioner had provided a sufficient factual basis in these proceedings,

12  his lack of diligence in state court prohibits this Court from holding a hearing, and he has not

13  attempted to satisfy the requirements of §§ 2254(e)(2)(A) & (B).

14      Finally, the Court finds that Petitioner's claim is without merit.  In addition to the

15  discrepancy regarding tinted windows, any claim that Redgate saw Petitioner is undercut by

16  her daughter's statement that the man in the black car was a neighbor's friend.  More

17  significantly, Petitioner told police he was "pretty sure" he had returned to De Anza Park at

18  3:30 p.m. the day Vicki Lynn disappeared, and this statement was before the jury through

19  Agent McCormick's testimony.  (RT 2/13/87 at 27.)  The defense cross-examined Jack

20  McDonald on the time Petitioner returned to the park, trying to establish that it could have

21  been as early as 4:00 p.m.  (RT 2/11/87 PM at 121, 139.)  The defense also presented

22  testimony from Thomas Parisien, who claimed Petitioner and McDonald arrived at his house

23  while he was watching a one-hour television program that began at 3:00 p.m.  (RT 3/10/87

24  at 187-90.)  It is evident that counsel attempted to corroborate Petitioner's claim of being at

25  the park by 3:30, and it was not unreasonable to decline to present testimony of a witness

26  who would have undermined this claim by asserting she saw Petitioner in her neighborhood

27  between 3:45 and 4:00 p.m.  Therefore, Petitioner has not established that his counsel

28

performed deficiently.  Nor has he shown that he was prejudiced by omission of Redgate's

testimony.  Thus, the state court's denial of this claim was not an unreasonable application

of *Strickland*.

**Claim 9-A:**     **Violation of the Fourteenth Amendment based on the failure of investigators to pursue alternative suspect Annette Fries.**

**Claim 9-B:**     **Violation of the Fourteenth Amendment based on the failure of investigators and the prosecutor to timely disclose "cuckoo file."**

**Claim 9-E:**     **Violation of the Fourteenth Amendment based on the prosecutor's presentation of misleading evidence to the grand jury.**

**Claim 9-F:**     **Violation of the Fourteenth Amendment based on the prosecutor's contact with the media.**

**Claim 9-G:**     **Violation of the Fourteenth Amendment based on the prosecutor's failure during trial to prevent witness McDonald from revealing that he had taken a polygraph exam.**

**Claim 9-H:**     **Violation of the Fourteenth Amendment based on the prosecutor's reference during trial to discovery of children's panties near the victim's remains.**

**Claim 9-I:**     **Violation of the Fourteenth Amendment based on the prosecutor's closing argument.**

**Claim 9-K:**     **Violation of the Fourteenth Amendment based on the Arizona Attorney General's attempt to remove appellate counsel from case.**

Petitioner alleges numerous instances of prosecutorial misconduct. (Dkt. 103 at 59-67;

Dkt. 140 at 97-119.)  Specifically, he contends that investigators failed to pursue alternative

theories and that the prosecutor engaged in prejudicial misconduct when he failed to timely

disclose a "cuckoo file" of leads, presented misleading evidence to the grand jury, had

improper contact with the media, failed to prevent a witness from revealing that he had taken

a polygraph exam, elicited testimony about the discovery of a pair of children's underpants

near the victim's remains, improperly commented on defense counsel during closing

argument, and tried to have appellate counsel removed from the case.  (*Id.*)  For the reasons

set forth below, the Court concludes that these claims are without merit.

Clearly established Supreme Court law provides that the standard of federal habeas

review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  Therefore, to prevail on a claim of prosecutorial misconduct, Petitioner must prove not only that the prosecutor's actions were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

As set forth herein, the Court finds that Petitioner's individual claims of prosecutorial misconduct fail.  The Court also concludes that, considered cumulatively, the totality of the misconduct allegations do not establish entitlement to habeas relief.

### Selective Prosecution

Petitioner argues that his Fourteenth Amendment rights were violated because he was singled out for prosecution and investigators failed to pursue Annette Fries as a suspect. (Dkt. 140 at 100.)  On direct appeal, the Arizona Supreme Court rejected this claim:

> As a preliminary matter, we note that our review of the record does not support defendant's claim that the prosecution "singled" him out.  The police did in fact question, investigate, and evaluate the disparate sources of information concerning the case.  Concededly, their investigation quickly narrowed its focus on defendant.  This concentration, however, was engendered by the evidence pointing to him, not by an apparent desire of the police or prosecution to find a person upon whom to place the blame, regardless of that person's guilt or innocence.

171 Ariz. at 606, 832 P.2d at 623.  The court further concluded that even if the State acted improperly in failing to investigate alternative theories, the "ample evidence" supporting Petitioner's conviction would prohibit a finding that there was a reasonable likelihood that the misconduct could have affected the jury's verdict.  *Id*.

To establish selective prosecution, a petitioner must show "(1) that similarly situated persons have not been prosecuted and (2) that he was selected for prosecution on the basis of an impermissible ground such as race, religion or the exercise of constitutional rights."

1  *United States v. DeTar*, 832 F.2d 1110, 1112 (9th Cir. 1987).  Petitioner argues only that

2  Fries was an alternative suspect; he does not allege that the prosecutor was motivated by a

3  discriminatory purpose.  *See United States v. Christopher*, 700 F.2d 1253, 1258 (9th Cir.

4  1983) ("Mere selectivity in prosecution . . . creates no constitutional problem.  The

5  impermissible selection must be shown to be based on an unjustifiable standard such as the

6  exercise of the first amendment right of free speech.") (internal citation omitted); *United*

7  *States v. Wilson*, 639 F.2d 500, 503-04 (9th Cir. 1981).  Petitioner also fails to assert how the

8  state court's ruling is either contrary to, or an unreasonable application of, established federal

9  law, or based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

10  Therefore, the claim fails.  Petitioner's request for an evidentiary hearing is also lacking.  He

11  asserts summarily that additional investigation with respect to Fries is necessary but fails to

12  assert why this investigation was not undertaken during state PCR proceedings or how such

13  development would support his claim.  (Dkt. 140 at 100, 194.)  Finally, the state court's

14  factual finding that investigators did not improperly single Petitioner out for prosecution is

15  supported by the record.

16      As noted by the Arizona Supreme Court, the police did in fact investigate numerous

17  leads concerning the victim's disappearance, especially reports that she was seen at the

18  Tucson Mall the evening of September 17 in the company of a woman.  Based on witness

19  interviews, a composite sketch of the woman was created and circulated, including within

20  the victim's neighborhood.  During trial, lead detective Gary Dhaemers testified that

21  information resulting from the composite led him to Fries, who looked "similar" to the

22  drawing.  (RT 2/24/87 at 114-15; *see also* Dkt. 103, Ex. E.)  Two days after the victim's

23  disappearance, Dhaemers interviewed Fries at her home.  (*Id.*)  Investigators also searched

24  Fries's car and took fingerprints, hair samples, and fingernail scrapings, the processing of

25  which continued even after Petitioner was arrested.  (*Id.* at 124, 143.)

26      The police also followed up with the Tucson Mall witnesses but none could positively

27  identify Fries as the woman they saw with a young girl.  (RT 3/6/87 PM at 70-71, 93-94; RT

28                                                      - 62 -

1   3/9/87 at 13-15, 40; RT 3/10/87 at 127-29.)  Investigators went so far as to drive one of the

2   witnesses, Konnie Koger, past Fries's home for her to see Fries in person, and arranged for

3   Koger to hear Fries's voice.  (RT 3/10/87 at 14, 39-40.)  In addition, the witnesses'

4   description of the girl did not unequivocally match that of Vicki Lynn.  Koger testified to

5   seeing longer, curlier hair and described seeing earrings, gaps between the child's teeth, and

6   relatively new shoes that the girl had bent down to tie.  (RT 3/9/87 at 15, 29-31.)  Sylvia

7   Graham and Kimberly Hilbert also testified that the girl's hair was longer and curlier than

8   in photos shown on television.  (RT 3/6/87 PM at 72, 84, 96.)  However, the victim's mother

9   testified that, at the time of her disappearance, Vicki Lynn's hair was very short, and her

10  teeth had grown in completely (filling in gaps reflected in older photos); she was wearing old

11  velcro-closure tennis shoes that had a hole in the toe and no laces, and she was not wearing

12  earrings.  (RT 3/3/87 PM at 62; RT 3/18/87 at 28-31.)  Lastly, Therese Pongratz testified that

13  the child she saw at the mall on September 17 wore jeans and a short-sleeved shirt; by

14  contrast, the victim was wearing a dress the day she disappeared.  (RT 3/10/87 at 137; RT

15  3/18/87 at 34.)

16   **Untimely Disclosure of Cuckoo File**

17   Over a year before trial began, the prosecutor indicated that he had a group of

18  investigative leads dubbed "the cuckoo file" that consisted of "a torrent of letters from

19  obviously disturbed people about this case."  (RT 11/25/85 at 78.)  In his view, none of the

20  letters constituted *Brady* material, but he nonetheless offered to provide the file to defense

21  counsel.  (*Id.*)  He further stated that prior defense counsel Couser and he would routinely

22  compare files to see if they were getting correspondence from the same individuals, which

23  he said was often the case.  (*Id.*)  On appeal, the Arizona Supreme Court noted that the record

24  was unclear whether defense counsel received the file in an untimely manner.  *Atwood*, 171

25  Ariz. at 607 n.4, 832 P.2d at 624 n.4.  However, even applying the standard of *Brady v.*

26  *Maryland*, 373 U.S. 83, the court found that the file did not constitute "material" evidence.

27  *Atwood*, 171 Ariz. at 607, 832 P.2d at 624.

28

1     In this Court, Petitioner asserts summarily that his constitutional rights were violated

2     by the prosecution's failure to disclose "a file of materials containing leads to persons other

3     than Petitioner who may have committed the crime for which Petitioner was charged." (Dkt.

4     140 at 100-01.) However, it appears from the record that the State provided a copy of the file

5     to Petitioner; the issue on appeal was whether the disclosure was timely.  Furthermore,

6     Petitioner does not identify any specific "leads" from the file that were exculpatory in nature,

7     nor does he allege how a more timely disclosure of the file would have affected the jury's

8     verdict.

9     As discussed above, a successful *Brady* claim requires three findings: that the evidence

10    in question was favorable to the accused, that the government suppressed the evidence, and

11    that the evidence was "material" – i.e., that prejudice resulted from its suppression. *Strickler*,

12    527 U.S. at 281-82; *see Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514

13    U.S. 419, 433 (1995).  Evidence is material for *Brady* purposes "if there is a reasonable

14    probability that, had the evidence been disclosed to the defense, the result of the proceeding

15    would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473

16    U.S. 667, 682 (1985)); *see Banks*, 540 U.S. at 699; *Strickler*, 527 U.S. at 280.  Petitioner's

17    generic allegations, without identification of any specific exculpatory facts or evidence that

18    he alleges should have been timely disclosed, are insufficient to show that the Arizona

19    Supreme Court's decision was objectively unreasonable. *Jones v. Gomez*, 66 F.3d at 204

20    (conclusory allegations unsupported by statement of facts insufficient to establish entitlement

21    to habeas relief).

22    **Presentation of False Evidence to Grand Jury**

23    Petitioner claims that during grand jury proceedings the prosecutor failed to present

24    exculpatory evidence and also presented false testimony.  Specifically, Petitioner contends

25    that grand jurors were not told of inaccuracies in witnesses' statements, discrepancies

26    between identifications given of the person allegedly seen with the victim, and the lack of

27    any trace evidence in Petitioner's car linking him to the victim. (Dkt. 140 at 105-06.)  On

28

1    appeal, the Arizona Supreme Court declined to address this claim because it was mooted by

2    the jury's verdict.  *Atwood*, 171 Ariz. at 607, 832 P.2d at 624.

3         Because the jury ultimately convicted Petitioner of both charged offenses, "any error

4    in the grand jury proceeding connected with the charging decision was harmless beyond a

5    reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986); *see also Williams v.*

6    *Stewart*, 441 F.3d 1030, 1041-42 (9th Cir.), *cert. denied*, 127 S. Ct. 510 (2006) (observing

7    that any constitutional error from prosecutor's alleged misconduct during grand jury

8    proceeding harmless because petitioner ultimately convicted on charged offenses).  Petitioner

9    argues that *Vasquez v. Hillery*, 474 U.S. 254 (1986), rather than *Mechanik*, controls here

10   because Petitioner's claim is based on "pernicious" conduct by the government.   The

11   Supreme Court in *Mechanik* distinguished the "automatic reversal" rule of *Vasquez* and held

12   that it has "little force outside the context of racial discrimination in the composition of the

13   grand jury."  475 U.S. at 70 n.1.  The Arizona Supreme Court's decision was not contrary to

14   or an unreasonable application of clearly established Supreme Court law.

15                         **Improper Media Contact**

16        Petitioner argues that his due process rights were violated by the prosecutor's

17   "persistent and prejudicial pattern of making highly improper statements to the media

18   covering Petitioner's case." (Dkt. 140 at 108.)  In denying this claim, the Arizona Supreme

19   Court found that, because pretrial publicity did not deny Petitioner a fair trial, the alleged

20   prosecutorial misconduct with respect to the media did not affect the conduct of the trial.

21   *Atwood*, 171 Ariz. at 607, 630-43, 832 P.2d at 624, 647-50.

22        Petitioner argues that this Court must review his claim *de novo* because the state court

23   addressed the claim only in terms of prejudicial pretrial publicity, not prosecutorial

24   misconduct.  (Dkt. 140 at 109.)  However, *de novo* review is appropriate only when a state

25   court fails to reach the merits of the claim.  *Pirtle*, 313 F.3d at 1167.  Here, the claim was

26   clearly addressed.  Further, assuming the prosecutor's conduct was improper, Petitioner is

27   entitled to relief only if the misconduct "so infected the trial with unfairness as to make the

28                                           - 65 -

1    resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

2        In his merits brief, Petitioner's sole allegation of prejudice rests on the argument that

3    the prosecutor's actions denied him a "fair trial by removing his presumption of innocence

4    *through pretrial publicity*." (Dkt. 140 at 108) (emphasis added.)  Indeed, Petitioner cites in

5    support of this assertion a quote from the seminal Supreme Court case on prejudicial pretrial

6    publicity – *Irvin v. Dowd*, 366 U.S. 717 (1961).  (Dkt. 140 at 108.)  As discussed below

7    regarding Claim 21-A, the state court's finding that pretrial publicity did not prejudice

8    Petitioner is not based on an unreasonable application of controlling federal law or an

9    unreasonable determination of the facts as developed in state court.  Therefore, misconduct

10   by the prosecutor, if any, did not render Petitioner's trial fundamentally unfair, and he is not

11   entitled to habeas relief on this claim.

12   **Reference to Polygraph Exam**

13       During trial, James ("Jack") McDonald testified for the prosecution.  He described how

14   he met and became travel companions with Petitioner and his memory of the events of

15   September 17, 1984, including seeing blood on Petitioner's hands and knife.  (RT 2/11/87

16   PM at 15, 17.)  McDonald also testified to overhearing Petitioner tell Petitioner's mother,

17   during a phone conversation from the repair shop in Texas where they were later arrested,

18   "Even if I did do it, you have to help me." (*Id.* at 23.)  After this phone call, Petitioner told

19   McDonald that "they were trying to stick something on him about a little girl." (*Id.* at 24.)

20       During cross-examination, defense counsel questioned McDonald about when he first

21   remembered Petitioner's conversation with his mother.  (*Id.* at 111-13.)  In attempting to

22   elicit from McDonald the reason he did not tell detectives about the conversation until six

23   or seven weeks after being arrested, the following exchange ensued:

24       Q:   Where were you when the information came to you after you had given all
              the long statements to the Police?  Where was it this business of information
25           came to your mind?

26       A:   I think it was when I was taking the lie detector test.  I'm not really sure.

27   (*Id.* at 114.)  The trial court immediately held a bench conference and afterward instructed

28                                            - 66 -

1   the jury to disregard the answer.  (*Id.*)  At the conclusion of the day's testimony, after the jury

2   was excused, defense counsel questioned McDonald about the prosecutor's admonitions

3   prior to his testifying.  McDonald relayed that the prosecutor had directed him not to talk

4   about Petitioner's prior record, the fact he was on parole, and some parts of conversations

5   he had with Petitioner, but did not include in his admonitions anything about the polygraph

6   exam he failed to pass.  (*Id.* at 146-47.)

7          Petitioner contends that the prosecutor's failure to counsel McDonald not to mention

8   he had taken a polygraph exam violated his rights under the Fourteenth Amendment.  (Dkt.

9   140 at 109-10.)   On appeal, the Arizona Supreme Court concluded that the polygraph

10   reference and the possible reflection it had on McDonald's veracity did not deny Petitioner

11   a fair trial "when viewed in relation to the totality of the evidence presented by the state."

12   *Atwood*, 171 Ariz. at 608-09, 832 P.2d at 625-26.  It further concluded that any error was

13   harmless because the trial court immediately instructed the jury to disregard the witness's

14   answer.  *Id.* at 609, 832 P.2d at 626.

15          In his merits brief, Petitioner argues that the state court's ruling was contrary to and an

16   unreasonable application of *Miller v. Pate*, 386 U.S. 1 (1967); *Napue v. Illinois*, 360 U.S. 264

17   (1959); and *Alcorta v. Texas*, 355 U.S. 28 (1957).  These cases are not on point, however,

18   because each involves a conviction obtained through the use of knowingly false evidence.

19   *See Miller*, 386 U.S. at 3 (witnesses repeatedly described a pair of shorts as "blood-stained"

20   even though prosecution knew stains were paint); *Napue*, 360 U.S. at 265 (witness denied

21   receiving anything in exchange for testimony even though prosecution in fact promised him

22   a reduced sentence); *Alcorta*, 355 U.S. at 30-31 (prosecutor aware witness falsely denied

23   having sexual relationship with victim).  Here, there was nothing false about the fact that

24   McDonald took a polygraph exam; he did not falsely claim to have passed the test.

25   Nonetheless, Petitioner asserts that the falsity is the "impression" left on the jury that

26   McDonald must have passed the test.  The Court cannot find, based on Petitioner's

27   speculation about the effect of McDonald's testimony, that the prosecution had an

28                                              - 67 -

affirmative duty to correct the impression left with the jury, especially given the fact that it was the defense and not the prosecution that elicited the testimony.  Moreover, Petitioner did not properly exhaust a *Miller*/*Napue*/*Alcorta* claim in state court or include such a claim in his amended habeas petition; his argument both in state court and here rested solely on the prosecution's failure to instruct McDonald not to talk about taking a polygraph, not its duty to correct any mis-impression left with the jury.  The Arizona Supreme Court applied the appropriate standard for prosecutorial misconduct and its ruling was neither contrary to nor an unreasonable application of that law.

Petitioner also argues that the state court's ruling was based on an unreasonable determination of the facts.  (Dkt. 140 at 114.)  Specifically, he asserts that the Arizona Supreme Court's implication that "there was a wealth of incriminating evidence against Petitioner is disingenuous, at best." (*Id.*)  He also points out that the trial judge instructed only that the jury "*may* disregard the answer," not that it *had* to disregard it.  (RT 2/11/87 PM at 114) (emphasis added).  Consequently, Petitioner contends, the Arizona Supreme Court's finding of harmless error rested on a misstatement of the facts.  The Court finds this argument unpersuasive.  If the trial court's directive could in any way have been construed as equivocal, defense counsel likely would have objected.  In any event, this Court concludes that the Arizona Supreme Court's finding of harmless error was not based on an unreasonable interpretation of the facts.

**Reference to Children's Panties**

During trial, Det. Dhaemers was asked by the prosecution whether any items were discovered in the vicinity of the victim's remains.  While pointing to a photograph, the detective stated: "[We] found a piece of cloth down here just right off of this little driveway area.  We found a pair of little girl's underpants right in this area along a little tree, a little bush, in between where we found the mandible and the skull."  (RT 2/23/87 at 163-64.)  These were two separate items, marked as trial exhibits 79 and 80.  In argument to the trial court concerning the propriety of the detective's testimony, the prosecutor avowed that the

1  victim's mother had told him "the cloth was not Vicki's" and "the underwear was not the

2  underwear she had thought Vicki had been wearing, but she could not rule them out."  (RT

3  2/23/87 at 209.)

4       Petitioner argues that the prosecution's elicitation of Det. Dhaemers's testimony

5  constituted misconduct because both the detective and prosecutor knew that the panties "had

6  absolutely nothing to do with the instant case."  (Dkt. 140 at 115.)  Petitioner's attempt to

7  characterize Det. Dhaemers's testimony as false and the prosecutor's conduct as

8  inappropriate is unsupportable.[14]

9       First, there is no dispute that child's underpants were found in the vicinity of the

10  victim's remains, which is the full extent of the detective's direct testimony; he did not claim

11  the panties belonged to the victim.  Second, defense counsel cross-examined both Det.

12  Dhaemers and the victim's mother concerning the lack of positive identification of the

13  panties as belonging to the victim.  (RT 2/23/87 at 190–91; RT 2/24/87 at 183-84; RT 3/3/87

14  PM at 69-71.)  Third, defense counsel stated that he had no opposition to admission of the

15  panties as an exhibit.  (*See* RT 3/5/87 PM at 110.)  Finally, the Arizona Supreme Court ruled

16  that the trial court's admission of the underpants was proper under the state's rules of

17  evidence because lack of a positive identification went to the weight, not admissibility, of the

18  evidence.  *Atwood*, 171 Ariz. at 643, 832 P.2d at 660.  In finding the evidence relevant, the

19  court noted that the victim's mother testified she could not rule out the possibility that Vicki

20  Lynn had been wearing them the day she disappeared.  *Id.*  The court further found the

21  evidence relevant "to demonstrate the thoroughness of the search of the area where the

22  victim's remains were found and thereby to counter defense claims of inadequate or selective

23

---

24       [14]   Petitioner attempts to bolster his argument by reference to the prosecutor's alleged
     admission that "the cloth was not Vicki's."  (Dkt. 140 at 115.)   As already noted,

25  investigators found two pieces of material near the remains – a piece of red, white, and blue
     cloth *and* a pair of children's panties.  The prosecutor's statement that the "cloth" did not

26  belong to the victim clearly referred to this separate trial exhibit, not the underpants.  (*See*
     RT 2/23/87 at 209.)

27

28                                              - 69 -

1    investigation." *Id.*

2        Petitioner has failed to show that the Arizona Supreme Court's dismissal of his

3    prosecutorial misconduct claim, *id.* at 610, 832 P.2d at 627, was based on an unreasonable

4    application of controlling federal law.

5        **Closing Argument**

6        During his rebuttal closing argument, the prosecutor questioned defense counsel's

7    motives for making arguably improper statements in his own closing argument:

8        MR. DAVIS:   Now, Mr. Bloom in his closing argument does several things
               [that] are kind of indicative of this whole trial.  Remember that
9               question to Mike Young?  Objection sustained.  Came back in
               closing argument, didn't it?  Objection sustained.
10
         MR. BLOOM: Objection to that, Your Honor.  Reference to.
11
         COURT: Objection is overruled.  You may proceed, Mr. Davis.
12
         MR. DAVIS:   Why do you do that?  Why do you break the rules?
13
         MR. BLOOM: Objection, Your Honor.
14
         MR. DAVIS:   Why do you express your personal opinion in closing argument?
15
         COURT:  Mr. Davis, I think it's gone far enough.  Let's get back to discussing the
16               evidence and the law and its application.

17   (RT 3/24/87 at 166-67.)   The prosecutor also made repeated comments about defense

18   counsel's lengthy orations.  (*See, e.g.*, *id.* at 163, 164, 165.)  On appeal, the Arizona Supreme

19   Court stated:

20        Although we recognize that an adversarial setting may encourage some good
         humored – and even ill-humored – repartee between attorneys, we believe that,
21        regardless of its effect on defendant's trial, the prosecutor's attempts to discredit
         the defense attorney before the jury evidence a lack of discretion and a disregard
22        for the high standards expected of attorneys who represent the public interest, and
         as such they were not "innocuous."  Regardless of whether Mr. Davis's glibness
23        and his personal comments about the defense counsel were precipitated by the
         culmination of a long, emotional trial, or whether they were encouraged by the
24        gavel-to-gavel television coverage of the case, we find his statements unnecessary
         and inappropriate.
25
             Nevertheless, we do not believe that the comments deprived defendant of a
26        fair trial. . . .

27             . . . The statements conceivably were attempts to call to the jurors' attention

28                                          - 70 -

1    matters irrelevant to the determination of defendant's guilt or innocence.  The
2    probability that the statements actually influenced the jury's verdict, however, is
     remote.  We find no patent error.

3    *Atwood*, 171 Ariz. at 611, 832 P.2d at 628.

4         In determining if a defendant's due process rights were violated by a prosecutor's

5    remarks during closing argument, a reviewing court "must consider the probable effect of the

6    prosecutor's [comments] on the jury's ability to judge the evidence fairly."  *United States v.*

7    *Young*, 470 U.S. 1, 12 (1985).  To make such an assessment, it is necessary to place the

8    prosecutor's remarks in context.  *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United*

9    *States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir.

10   1998).  In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by

11   considering, among other circumstances, whether the prosecutor's comments manipulated

12   or misstated the evidence; whether the trial court gave a curative instruction; and the weight

13   of the evidence against the accused.  477 U.S. at 181-82.

14        Having reviewed the record and considered the Arizona Supreme Court's analysis of

15   the prosecutor's comments, this Court cannot say that the state court's ruling was based on

16   an unreasonable application of the law.  The prosecutor's comments did not pertain to the

17   evidence and were not "pronounced and persistent."  *Berger v. United States*, 295 U.S. 78,

18   89 (1935).  Petitioner was not denied a fair trial.

19   **Appellate Counsel Removal**

20        Regarding the State's attempt to have appellate counsel removed from Petitioner's case,

21   the Arizona Supreme Court wrote:

22        [T]he state sought to have Ms. Carla Ryan, defendant's appointed appellate
          counsel, removed because she had indicated to a Tucson newspaper in August
23        1987 that she was suffering from "burn out" due to overwork.  In the article, Ryan
          stated that she had left her job with the Pima County Public Defender's office
24        because she "couldn't go on" and that she intended to "put in half-days in private
          practice for several years, then scrutinize her career."  In its attempt to have Ryan
25        removed, the state argued that Ryan's condition and her reduced workload
          jeopardized the possibility of a speedy and effective appeal in defendant's case.
26
          The state was unsuccessful in its attempt to have Ryan removed.  Because
27        this incident could not, on this appeal, have had any effect on the outcome of

28
                                        - 71 -

defendant's trial, however, we do not address defendant's claim that the attempt to remove Ryan constitutes prosecutorial misconduct.

*Atwood*, 171 Ariz. at 605 n.2, 832 P.2d at 622 n.2.  Petitioner re-raised the claim in his PCR petition but the court denied relief because Petitioner failed to show "how the State's unsuccessful attempt to have Ms. Ryan disqualified affected the outcome of the appeal." (ROA-PCR at 1009.)  In this Court, Petitioner's only assertion of prejudice is that the removal litigation caused counsel to "use valuable time, which could have been better spent preparing Petitioner's appeal." (Dkt. 140 at 155.)  The Court finds this patently insufficient to establish a due process violation.

**Claim 10:       Violation of the Fifth, Sixth and Fourteenth Amendments based on the trial court's consolidation of kidnapping and murder charges.**

On appeal, the Arizona Supreme Court denied this claim on several grounds.  First, the court found that "a substantial portion of the evidence regarding the kidnapping charge would have been admissible at trial for the felony murder charge to provide the jury with a 'complete picture' of the events preceding defendant's arrest."  *Atwood*, 171 Ariz. at 612, 832 P.2d at 629.  Second, the court found no impermissible "rub-off" effect because the jury was instructed to consider the offenses separately and that each offense must be proven beyond a reasonable doubt.  *Id.* at 613, 832 P.2d at 630.  Finally, the court observed that, although Petitioner claimed joinder prevented him from testifying on one but not the other charge, his "general explanation did not reach the level of specificity necessary" to establish that he had important testimony to give on some counts and strong reasons for not testifying on others.  *Id.*

On habeas review, propriety of a joinder of counts "rests within the sound discretion of the state trial judge."  *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002).  "The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate."  *Id.*  To establish the requisite level of prejudice, a petitioner

- 72 -

1    must show that the impermissible joinder "had a substantial and injurious effect or influence

2    in determining the jury's verdict." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

3         Petitioner asserts that joinder of the kidnapping and felony murder counts "obscured the

4    paucity of evidence supporting each claim" and prevented him from testifying. (Dkt. 103 at

5    67.)  However, he does not specifically identify the testimony he would have presented had

6    the counts been severed. *See United States v. Nolan*, 700 F.2d 479, 483 (9th Cir. 1983) ("If

7    a defendant seeks severance because he wishes to testify on some counts and not others, he

8    must show that he has important testimony to give on some counts and a strong need to

9    refrain from testifying on those he wants severed.").  In addition, the Arizona Supreme Court

10   found that a substantial portion of the evidence supporting the kidnapping charge would have

11   been admissible under state law for the felony murder charge. *Atwood*, 171 Ariz. at 612, 832

12   P.2d at 629.  This cross-admissibility of evidence significantly reduced any potential

13   prejudice. *See Davis*, 384 F.3d at 638-39 (finding no prejudice where evidence was cross-

14   admissible and the weight of evidence was roughly equivalent).  Further, the jury was

15   explicitly instructed that it "must decide each count separately and the evidence applicable

16   to it uninfluenced by your decision as to any other count."  (RT 3/24/87 at 184.)  Such

17   instruction limited any prejudice from the joinder. *See Davis*, 384 F.3d at 639.  Finally, the

18   Court notes that because the joined offenses – kidnapping and murder – are different in

19   nature, the risk of confusing or misleading the jury was reduced. *See United States v. Irvine*,

20   756 F.2d 708, 712-13 (9th Cir. 1985).  The Court finds that the Arizona Supreme Court's

21   ruling was not based on an unreasonable application of federal law.

22

**Claim 13-A:    Violation of the Fifth, Sixth, and Fourteenth Amendments resulting**
23   **                    from the admission of Petitioner's allegedly involuntary statements.**

24        Petitioner asserts that statements to FBI agents made following his arrest were

25   involuntary because he was mentally and physically fatigued and his condition was

26   compromised by drug and alcohol use.  (Dkt. 140 at 122.)

27        A determination of whether a waiver of *Miranda* rights is valid has two distinct

28                                                       - 73 -

dimensions: (1) whether the waiver was "voluntary" and (2) whether the waiver was "knowing and intelligent." *See Derrick v. Peterson*, 924 F.2d 813, 821 (9th Cir. 1990); *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987). Under the first prong, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Under the second prong, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In evaluating voluntariness, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick*, 924 F.2d at 817 (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

On direct appeal, the Arizona Supreme Court flatly rejected this claim:

> Specifically, we are unable to discern any improper, coercive activity by FBI agents who repeatedly administered defendant's *Miranda* warnings, both orally and on printed forms. Further defendant stated that he understood his rights and, contrary to his present assertion, he read part of his waiver of rights form aloud before signing it, thereby indicating to those present that he could read and understand. Although defendant mentioned he was tired, he continued to talk with the agents and made no request or suggestion that he wished to end the discussion. Also, as we have noted, defendant's ability to comprehend was not impaired by drug or alcohol use at the time of his arrest, and his demeanor was both calm and inquisitive. In short, defendant's sweeping allegations of physical and mental coercion are not substantiated by the record.

*Atwood*, 171 Ariz. at 619, 832 P.2d at 636. Pursuant to § 2254(e)(1), the state court's fact findings are entitled to a presumption of correctness, and the burden is on Petitioner to overcome this presumption by "clear and convincing evidence."

Petitioner proffers no evidence in support of his allegations that he was too fatigued and compromised by drug and alcohol use to waive his rights under *Miranda*. In addition, at the suppression hearing, Agent McCormick testified that Petitioner was read his rights orally upon arrest, was read his rights again when they arrived at the local police station, and was

1    provided a written "advice of rights" form that he signed.  (RT 6/24/86 at 29, 33-34.)  He

2    further testified that Petitioner "seemed calm," had "no animosity," "was inquisitive but

3    spoke clearly," and "[s]eemed to recall things."  (*Id.* at 40.)  Agent McCormick did not

4    observe any indication that Petitioner was under the influence of drugs or alcohol; he

5    acknowledged that Petitioner appeared tired, but said Petitioner did not request the interview

6    be stopped or say that he needed to sleep.  (*Id.* at 41.)  Petitioner has failed to establish that

7    the state court's factual determinations are "objectively unreasonable" in light of the

8    evidence presented in state court.  *Miller-El I*, 537 U.S. at 340.  Petitioner is not entitled to

9    relief on this claim.

10

11   **Claim 14:        Violation of the Fifth, Sixth, and Fourteenth Amendments based on the
                 trial court's denial of a trial continuance.**

12       Petitioner was arrested in September 1984, and trial began in January 1987.  During this

13   period, the trial court granted numerous defense continuance requests.  (ROA at 161, 259,

14   479, 846-47, 1191, 2092-93, 2108.)   In November 1986, two months before trial, the

15   prosecution's paint evidence expert died.[15]  (ROA at 2634.)  In December 1986, the court

16   permitted (over defense objection) the prosecution's new expert, FBI Agent James Corby,

17   to conduct his own testing of the pink paint smear found on the bumper of Petitioner's car.

18   (RT 12/3/86 at 49; ROA at 2629-33.)  The court directed that the examination be completed

19   expeditiously in light of the pending trial date.  (RT 12/3/86 at 49.)  On January 7, 1987, less

20   than two weeks before trial, Petitioner filed a motion to continue trial, arguing *inter alia* that

21   because he had not received the graphs, notes, and charts from Agent Corby's retesting

22   (although he did have the agent's report), he would be unable to interview Corby before the

23   start of trial.  The prosecution explained, in its opposition to the motion, that the materials

24

25           [15]   Beginning in February 1986, when the prosecution first learned that their expert
     was ill with cancer, the defense repeatedly fought attempts to preserve the expert's testimony.
26   (*See* ROA at 1054-55, 1112-17, 1223-24, 2093-94, 2137-38; RT 2/14/86 at 8-10; RT 4/1/86
     at 140-49; *see also* RT 3/4/87 at 91.)
27

28                                                    - 75 -

had been sent but were apparently lost in the mail. (ROA at 3146; *see also* RT 3/5/87 PM at 6, 55-56.) A new set of materials was hand delivered to defense counsel on January 8, and Agent Corby participated in an extensive day-long interview with defense counsel on January 9. (ROA at 3146; *see also* RT 3/5/87 PM at 7.) The trial court denied the continuance on January 12, stating that it would allow breaks during trial for counsel to prepare and complete any outstanding interviews. (RT 1/12/87 at 94; *see also* RT 1/19/87 at 70-71.) Jury selection began on January 19, 1987. Agent Corby made two trips to Arizona during trial and ultimately testified on March 4 and 5, 1987. (RT 3/4/87 PM at 7-8; RT 3/5/87 PM at 62-63.)

On appeal, Petitioner argued that his right to a fair trial was violated by the trial court's failure to grant a continuance. The Arizona Supreme Court disagreed, concluding that the trial court did not abuse its discretion in finding no "extraordinary circumstances" necessitating a delay under Arizona's rules of criminal procedure and finding that Petitioner had failed to demonstrate any prejudice. *Atwood*, 171 Ariz. at 621, 832 P.2d at 638. Regarding the latter, the court noted that defense counsel's cross-examination of Agent Corby "was extensive and reflected no lack of preparation." *Id.*

In this Court, Petitioner argues summarily that the Arizona Supreme Court's ruling is contrary to and an unreasonable application of *Powell v. Alabama*, 287 U.S. 45 (1932), and rests on an unreasonable determination of the facts. (Dkt. 140 at 126-27.) However, the relevant Supreme Court precedent with respect to the issue of whether the denial of a continuance violates due process is set forth in *Ungar v. Sarifite*, 376 U.S. 575 (1964), not *Powell*, which is a case concerning the right to counsel. In *Ungar*, the Court held that the concept of fairness implicit in the right to due process may dictate that an accused be granted a continuance in order to prepare an adequate defense. *Id.* at 589. The Court explained that there are no mechanical tests for determining whether the denial of a continuance is so arbitrary as to violate due process; rather, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*

1          Under the circumstances of this case, the trial court's denial of an additional

2    continuance did not violate due process.  The court fairly considered the reasons for which

3    Petitioner sought the continuance and agreed to allow any necessary recesses during the ten-

4    week trial to provide defense counsel an opportunity to interview witnesses.  At the point

5    Petitioner moved for the continuance, more than two years had elapsed since his arrest and

6    a multitude of witnesses were subpoenaed and scheduled to testify in this out-of-county

7    proceeding.  More significantly, the decision to deny Petitioner's motion for a continuance

8    did not render his trial unfair.  Petitioner's counsel interviewed Agent Corby extensively

9    about his report prior to trial and had sufficient time prior to Corby's testimony to have a

10   defense expert review Corby's notes, charts, and graphs.  Although the record does not reveal

11   why defense counsel did not interview Corby when he was in Arizona the week prior to

12   testifying, Corby was available during that time.  (*See* RT 3/5/87 PM at 62-63.)  Lastly, as

13   noted by the Arizona Supreme Court, defense counsel's cross-examination of Agent Corby

14   was extensive and evidenced no lack of preparation.  *See Armant v. Marquez*, 772 F.2d 552,

15   556-57 (9th Cir. 1985) (in order to establish a due process violation "[a]t a minimum . . . the

16   appellant must show some prejudice from the court's denial" of a continuance).

17         The Arizona Supreme Court's rejection of this claim was neither contrary to nor an

18   unreasonable application of controlling federal law.

19

20   **Claim 15-A:    Violation of the Fourteenth Amendment resulting from Petitioner's
            alleged incompetency to assist counsel during pretrial hearings.**

21         Petitioner argues that he was incompetent during pretrial proceedings to assist in his

22   defense due to his history of substance abuse and the administration of mind-altering

23   medications by jail personnel.  (Dkt. 140 at 128-29.)  Petitioner does not identify the

24   medications allegedly administered to him during the extensive pretrial period, nor does he

25   cite any portion of the record indicating an inability to understand the proceedings or to assist

26   counsel.  In the amended petition, Petitioner references a psychiatric profile prepared by a

27   Dr. Hinton for use in a civil proceeding brought against Petitioner by the victim's family

28                                                  - 77 -

1   (Dkt. 103 at 74); however, he has not provided a copy of the report to this Court.  Rather,

2   Petitioner simply argues that an evidentiary hearing is necessary to resolve this claim.  (*Id.*)

3   The Court disagrees.

4        A defendant may not be criminally prosecuted while incompetent.  *Odle v. Woodford*,

5   238 F.3d 1084, 1087 (9th Cir. 2001) (citing *Medina v. California*, 505 U.S. 437, 449 (1992)).

6   To be competent to stand trial, a defendant must have sufficient present ability to consult

7   with counsel with a reasonable degree of rational understanding and have a rational as well

8   as a factual understanding of the proceedings.  *Drope v. Missouri*, 420 U.S. 162, 172 (1975).

9        Petitioner raised this substantive claim of incompetency in his PCR petition.  (*See* ROA-

10  PCR at 495.)  In denying relief, the PCR court noted:  "The allegation that Mr. Atwood was

11  medicated is unsupported by specific allegation of fact describing the nature of the

12  medication allegedly given to Mr. Atwood or describing the effect of such medication on the

13  petitioner."  (ROA-PCR at 1011.)

14       Petitioner asserts that he requested an evidentiary hearing in state court and therefore

15  was "diligent" in trying to develop the claim.  However, the test for determining "diligence"

16  is whether Petitioner "made a reasonable attempt, in light of the information available at the

17  time, to investigate and pursue claims in state court."  *Williams*, 529 U.S. at 435.  As

18  previously noted, the mere request for an evidentiary hearing may not be sufficient to

19  establish diligence if a reasonable person would have taken additional steps.  *Dowthitt v.*

20  *Johnson*, 230 F.3d at 758; *Koste v. Dormire*, 345 F.3d at 985-86.

21       Under Arizona law, Petitioner had a duty to file affidavits, records, or other evidence

22  available to him to support the allegations raised in his PCR petition.  Ariz. R. Crim. P. 32.5.

23  While he did file a substantial amount of supporting materials for some his claims, the

24  petition is devoid of any evidence to support the allegation that he was incompetent during

25  pretrial proceedings.  Notably absent is an affidavit from Petitioner or trial counsel

26  concerning the medications Petitioner received while incarcerated and their effect on his

27  ability to understand the proceedings and communicate with counsel.  In addition, nothing

28

in the record indicates that PCR counsel attempted to obtain jail medication records or whether such records were obtainable.  Petitioner's lack of diligence in state court prohibits this Court from holding a hearing, and Petitioner has not attempted to satisfy the requirements of §§ 2254(e)(2)(A) & (B).

Based on the existing state court record, the Court finds that Petitioner is not entitled to relief on this claim.  Petitioner's trial counsel did not hesitate to bring up issues relating to Petitioner's well-being, including the need for hair cuts, appropriate clothing, a delay caused by fever and related illness, a leg injury, and dental problems.  (*E.g.*, ROA at 2163, 2179; RT 2/4/86 at 3-5; RT 5/9/86 at 3-4; RT 8/18/86 at 66-67; RT 9/3/86 at 70; RT 1/12/87 at 39, 97.)  At no time throughout the more than two years between Petitioner's arrest and the start of trial did either of Petitioner's attorneys raise a question concerning Petitioner's mental competency.  In addition, Petitioner answered questions and testified on a number of occasions in a clear, cogent manner.  (*E.g.*, RT 4/1/86 at 105; RT 5/9/86 at 4; RT 12/3/86 at 10-11; RT 5/6/87 at 87-121)  At sentencing, Petitioner's counsel argued to the court that Petitioner's ability to compose and maintain himself throughout trial despite more than two years of isolation from other inmates constituted a mitigating factor.  (RT 5/6/87 at 88-89.)  Nothing in this record indicates that Petitioner lacked sufficient mental competency during pretrial proceedings.

**Claim 16:       Violation of the Sixth and Fourteenth Amendments resulting from the systematic exclusion of minority jurors and the trial court's excusing jurors based on financial hardship.**

Petitioner asserts that he was denied a jury composed from a fair cross-section of the community.  (Dkt. 140 at 130.)  Specifically, he asserts that the use of Department of Motor Vehicle lists resulted in the systematic exclusion of Blacks and Hispanics.  (*Id.*)  He further asserts that the jury commissioner's "liberal" excusal of potential jurors from his venire on the basis of financial hardship systematically excluded poor people, African-Americans, Hispanics, and women.  (*Id.* at 131.)

1      To prevail on a fair cross-section claim, a litigant must prove:  "(1) that the group

2   alleged to be excluded is a 'distinctive' group in the community; (2) that the representation

3   of this group in venires from which juries are selected is not fair and reasonable in relation

4   to the number of such persons in the community; and (3) that this underrepresentation is due

5   to systematic exclusion of the group in the jury-selection process."  *Duren v. Missouri*, 439

6   U.S. 357, 364 (1979).  To establish a Fourteenth Amendment equal protection violation in

7   the jury selection process, a defendant also must show discriminatory intent.  *See Castaneda

8   v. Partida*, 430 U.S. 482, 494 (1977); *Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998).[16]

9      Petitioner presented Claim 16 on direct appeal.  Concerning the alleged exclusion of

10  Blacks and Hispanics based on the practice of selecting jury pools from voter registration and

11  Department of Motor Vehicles lists, the Arizona Supreme Court found that even if there was

12  an underrepresentation of these groups in Petitioner's case, Petitioner had failed to establish

13  the third *Duren* prong – that the underrepresentation was due to systematic exclusion.

14  *Atwood*, 171 Ariz. at 621-22, 832 P.2d at 638-39.  "At no time has defendant provided or

15  analyzed information indicating that either of these groups is systematically excluded in the

16  jury selection process in a way that results in its underrepresentation."  *Id.* at 622, 832 P.2d

17  at 639.  Regarding financial hardship, the court found that Petitioner failed to establish that

18  people whose employers do not compensate them while they serve jury duty are a distinctive

19  group under *Duren*.  *Id.* at 623, 832 P.2d at 640.  Finally, with respect to Petitioner's equal

20  protection argument, the court found that Petitioner had "failed to establish the degree of

21  underrepresentation 'by comparing the proportion of the group in the total population to the

22  proportion called to serve as . . . jurors, over a significant period of time.'"  *Id.* (citing

23  *Castaneda*, 430 U.S. at 494).

24     Petitioner contends that the state court's ruling was based on an unreasonable

25  _____

26     [16]  Petitioner also summarily asserts in his merits brief that his rights under *Batson
    v. Kentucky* were violated.  (Dkt. 140 at 132.)  This claim was not raised in Petitioner's

27  amended petition, nor in state court, and will not be further addressed.

28                                          - 80 -

determination of the facts because the trial court was "at fault" for not providing Petitioner with the statistical information he requested to make his cross-section argument. (Dkt. 140 at 133.) He further asserts that discovery and an evidentiary hearing is necessary to address the juror pools and selection procedures utilized in Maricopa County in the mid-1980s. (*Id.* at 133, 195.) Petitioner misstates the record.

On October 31, 1986, defense counsel filed a motion for discovery in support of his jury composition challenges. (ROA at 2296-2301.) At argument on the motion in December 1986, defense counsel stated:

> It's my understanding, and I don't have precise knowledge but I'm trying to get it by my disclosure motion, and rather than put a subpoena on the Maricopa County Jury Commissioner and cause great havoc up in Phoenix, because there are a lot of requests in this disclosure motion, I have filed this in front of Your Honor so that I could raise those issues and then decide, if at all, how a subpoena should be drafted on the Maricopa County Jury Commissioner and in fact if the information can be given even without subpoena.

(RT 12/3/86 at 73-74.) In the ensuing discussion, it became evident that one of counsel's primary concerns was to find out how the jury commissioner rules on excuse requests. (*Id.* at 80-86.) At the conclusion of argument, the prosecutor stated that he had "no objection to any discovery that can be arranged by the Court for Mr. Bloom to do concerning the jury pool and jury commissioner. I don't wish to obstruct him making any record. And it's my position that none has been made at this point." (*Id.* at 96.) The Court took the matter under advisement and indicated that he would get answers from the jury commissioner's office. (*Id.* at 97.) The record is silent as to how the court ultimately ruled on the discovery motion. However, defense counsel mentioned the need to question the jury commissioner at two subsequent hearings, and the assistant jury commissioner, Helen Caufman, testified near the conclusion of jury selection. (RT 1/19/87 at 20; RT 1/29/87 at 71; RT 2/5/87 PM at 52-66.)

In his examination of Caufman, defense counsel's questions focused on the system for handling juror excusals after the summonses were sent out in this case. Caufman relayed that of 400 summonses mailed, 136 were found qualified; 219 were excused, deleted, or postponed to another day; and 45 were never returned. (RT 2/5/87 at 55-58.) In response

1    to counsel's questioning about the 219 individuals excused, deleted, or postponed, Caufman

2    remarked that the records were no longer accessible and, had she been asked at the start of

3    the process, details about these individuals could have been tracked.  (*Id.* at 58, 60-61, 63-

4    64.)  In argument to the court, defense counsel expressed frustration regarding the lack of

5    statistics concerning the 400 individuals called in his case, believing the court had notified

6    the jury commissioner that these statistics should be kept, and asserted that Petitioner was

7    prejudiced by the arbitrary dismissal of potential jurors by the jury commissioner's staff.  (*Id.*

8    at 67, 69.)  The trial court overruled Petitioner's objection to the jury commissioner's

9    procedures but acknowledged that he may have been "partially at fault" for not accurately

10   conveying to Caufman the need to track the 400 summonses.  (*Id.* at 70.)

11        As is evident from a full review of the record, the trial court did not inhibit Petitioner

12   from gathering statistics relevant to the system used to obtain venires in Maricopa County;

13   the trial court's "admission" related only to statistics concerning the elimination of

14   individuals from the specific venire in Petitioner's case.  However, it is well settled that "a

15   showing that a jury venire underrepresents an identifiable group is, without more, an

16   insufficient showing of systematic exclusion under the third prong of the *Duren* test."

17   *Randolph v. People of the State of Cal.*, 380 F.3d 1133, 1141 (9th Cir. 2004).  To succeed

18   on this claim, Petitioner had to present (1) "proof, typically statistical data, that the jury pool

19   does not adequately represent the distinctive group in relation to the number of such persons

20   in the community," *Thomas*, 159 F.3d at 1150, and (2) "evidence that the underrepresentation

21   of Hispanics [and Blacks] is due to the *system* [Maricopa] County use[d] to assemble the

22   venire," *Randolph*, 380 F.3d at 1141 (emphasis added).  This he did not do, despite

23   acknowledging that he could subpoena records from the jury commissioner's office.  *Cf.*

24   *Thomas*, 159 F.3d at 1150 (denying cross-section claim where, because of counsel's failure

25   to preserve relevant statistics at the time of trial, petitioner unable to provide sufficient

26   statistical evidence to support claim).  Petitioner's lack of diligence in state court prohibits

27   this Court from holding a hearing, and Petitioner has not attempted to satisfy the

28                                          - 82 -

requirements of §§ 2254(e)(2)(A) & (B).  The Court finds that the Arizona Supreme Court's ruling is not based on an unreasonable determination of the facts in light of the dearth of statistical evidence presented in state court.

In addition, the Court finds that the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law.  Because Petitioner failed to provide any statistical evidence to support his claim that the use of Department of Motor Vehicle lists resulted in the systematic exclusion of Blacks and Hispanics, the state court's *Duren* analysis was not unreasonable.  Further, individuals who face financial hardship do not constitute a distinctive group, and underrepresentation of poor people in Petitioner's particular jury panel does not amount to systemic exclusion.  *Cf. Coleman v. McCormick*, 874 F.2d 1280, 1284 (9th Cir. 1989) (denying *Duren* claim where petitioner failed to allege any facts from which it could be concluded that persons from lower socioeconomic areas formed a distinctive group).  Accordingly, habeas relief on Claim 16 is denied.

**Claim 17-A:    Violation of the Sixth and Fourteenth Amendments based on the trial court's "death qualification" voir dire.**

Petitioner alleges that his constitutional rights were violated because the jury was "death-qualified," even though the sentence was to be imposed by the judge not the jury, and that the death-qualification process resulted in a jury that was more conviction-prone.  (Dkt. 140 at 134.)

On appeal, the Arizona Supreme Court rejected this claim, stating:

> We have expressly held that jury questioning regarding capital punishment is permissible where the questioning determines bias of a nature which would prevent a juror from performing his duty.  Under the procedure used in Arizona in death penalty cases, the jurors' duty is to determine guilt or innocence, while the sentence of death is solely the responsibility of the trial judge.  Nevertheless, voir dire questioning related to a juror's views on capital punishment is permitted to determine whether those views would prevent or substantially impair the performance of the juror's duties to decide the case in accordance with the court's instructions and the juror's oath.

*Atwood*, 171 Ariz. at 624, 832 P.2d at 641 (quoting *State v. Martinez-Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985)).  The court further noted that the United States Supreme

1   Court "has indicated that 'an impartial jury consists of nothing more than jurors who will

2   conscientiously apply the law and find the facts'" and that Petitioner had failed to assert or

3   demonstrate that any juror failed to fulfill this obligation. *Id.* (quoting *Lockhart v. McCree*,

4   476 U.S. 162, 178 (1986)).

5       Petitioner suggests that his jury was not impartial because a jury that has been death-

6   qualified is more likely to convict than a jury that was not put through that process. To date,

7   the Supreme Court has not agreed with that argument. To the contrary, the Supreme Court

8   has held: "We simply cannot conclude, either on the basis of the record before us or as a

9   matter of judicial notice, that the exclusion of jurors opposed to capital punishment results

10  in an unrepresentative jury on the issue of guilt or substantially increases the risk of

11  conviction." *Witherspoon v. Illinois*, 391 U.S. 510, 518, 523 n.21 (1968) (stating explicitly

12  that its reversal of the death sentence did not affect the conviction). In a subsequent reversal

13  of a death sentence, based on counsel not being allowed to ask jurors whether they would

14  automatically impose a sentence of death upon a finding of guilt, the Court specifically noted

15  that "[o]ur decision today has no bearing on the validity of petitioner's conviction." *Morgan

16  v. Illinois*, 504 U.S. 719, 728 (1992) (citing *Witherspoon*, 391 U.S. at 523 n.21). There is no

17  per se rule that death-qualification of a guilt-phase jury is a constitutional violation. Thus,

18  the decision of the Arizona Supreme Court is not an unreasonable application of controlling

19  federal law. *See Musladin*, 127 S. Ct. at 653-54 (denying habeas relief in absence of clearly

20  established federal law).

21

22  **Claim 21-A:    Violation of the Sixth, Eighth, and Fourteenth Amendments based on
                     the trial court's denial of a change of venue.**

23      Prior to trial, the court granted Petitioner's request for a change of venue from Pima

24  County, which had been inundated with significant media coverage of the case. *Atwood*, 171

25  Ariz. at 602, 832 P.2d at 619. After initially indicating the trial would be held in Mohave

26  County, a distant rural part of the state, the court settled on Maricopa County, a large, closer

27  metropolitan area. Petitioner asserts that the failure to grant a change of venue from

28                                                - 84 -

Maricopa to another county in Arizona violated his right to a fair and impartial jury.  (Dkt. 140 at 137.)

The Arizona Supreme Court rejected this claim on appeal.  *Atwood*, 171 Ariz. at 630-32, 832 P.2d at 647-49.  The court first addressed, in light of the Supreme Court's decisions in *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), whether the media coverage in Maricopa County was so extensive or outrageous that it permeated the proceedings or created a "carnival-like" atmosphere such that prejudice should be presumed:

> Our review of the record in this case does not reflect anything comparable to the mockery of justice that occurred in *Rideau, Estes,* and *Sheppard.*  Although the trial was televised in Tucson, the process of video broadcasting the proceedings did not diminish the "solemnity and sobriety" of the courtroom.  Nor, in our opinion, did the presence of members of the press distract the jurors, witnesses, or parties from their responsibilities.  If the media was a felt presence in the courtroom, it certainly was not a disruptive or overtly manipulative presence.  Further, although the publicity surrounding the case may have at one point reached a fever pitch perhaps comparable to the media frenzies condemned in *Rideau, Estes,* and *Sheppard,* Pima County, rather than Maricopa County, received the brunt of that publicity and, at the time of trial, almost two years had elapsed since the height of the media coverage.  Thus, we easily conclude that the publicity surrounding defendant's trial did not erupt into a "circus," and we therefore do not presume that defendant was prejudiced by the media attention.

*Atwood*, 171 Ariz. at 631, 832 P.2d at 648.

The state court then addressed whether extensive publicity compromised the ability of the jury to fairly decide Petitioner's case, specifically assessing Petitioner's claims that (1) it was impossible to find an impartial jury and (2) the jurors actually selected for the case were biased by media exposure:

> Concerning defendant's claim that "an impartial jury" could not possibly have been found in Phoenix, the state responds that, of the 136 persons in the venire, approximately only 10% were removed because of extensive media exposure to the case.  The state admits that, because some excusals were made without comment, this number might actually have been greater than 10%.  Nevertheless, we agree that the record does not portray a venire tainted by publicity.  Our review of the record indicates that as much as 25% of the venire had no prior exposure to the case at all, and that most other venire members had only minimal exposure to the case and had not developed any bias from the media coverage.  Thus, we conclude that publicity in the Phoenix area did not preclude the possibility of selecting an impartial jury and we accordingly hold that the trial court did not err in refusing defendant's request for an additional change of venue.

*See State v. Chaney,* 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984) (we will not reverse a trial court's denial of a motion for change of venue absent an abuse of discretion).

Concerning defendant's charge that some of the jurors actually selected for his jury had been exposed to prejudicial pretrial publicity, our analysis of the voir dire reveals that approximately one half of the jurors in fact had some prior media exposure to the case. That exposure, however, as well as the jurors' memory regarding the publicity, was minimal. Further, none of the jurors gave even the slightest indication during voir dire that prior knowledge of the case would impede their ability to serve as objective jurors. We believe these facts sufficiently rebut defendant's claim that his jury was biased against him. As the United States Supreme Court has recognized, even those persons whose exposure to pretrial publicity has led them to form opinions regarding a defendant are not necessarily incapable of serving as dispassionate jurors . . . . *Irvin v. Dowd,* 366 U.S. 717, 722-23 (1961). Our review of the record does not reveal, and defendant has not even attempted to demonstrate, that any of the 12 persons ultimately selected as jurors were unable to lay aside their prior impressions or opinions, if indeed they actually had any, and render a verdict based solely on the evidence presented in court.

*Id.* at 632, 832 P.2d at 649.

Petitioner does not assert in this Court that any of the jurors who sat on his trial were actually prejudiced; he argues only that the amount and nature of the publicity was presumptively prejudicial. (Dkt. 140 at 39.) Petitioner acknowledges that the Arizona Supreme Court cited the correct Supreme Court cases analyzing pretrial publicity, but asserts that the court "failed to appreciate the import of those decisions and, therefore, improperly applied those cases." (Dkt. 154 at 30; Dkt. 140 at 142.) This Court's review of the record reveals that the Arizona Supreme Court's decision is not based on an unreasonable application of the law or an unreasonable determination of the facts as developed in state court. The court's ruling is thorough and detailed. Petitioner does not set forth any specific legal or factual challenges to the state court's analysis, and does not identify any facts or legal issues not considered by the state court.[17] Petitioner disagrees with the outcome, but fails to establish that the court's ruling was objectively unreasonable. Accordingly, relief on

---

[17]   Tellingly, Petitioner does not provide or cite to any specific article or television broadcast in the Maricopa County area to support his claim. Rather, in a footnote, he lists a "representative sampling" of newspaper articles, all but one of which were published in Tucson newspapers more than two years before jury selection began. (Dkt. 140 at 138 n.17.)

1    Claim 21-A is denied.

2

3    **Claim 21-B:     Violation of the Sixth and Fourteenth Amendments based on the trial court's refusal to sequester the jury.**

4         Petitioner asserts that the court's failure to sequester the jury throughout trial, not just

5    during deliberations, violated his right to a fair and impartial jury under *Irvin v. Dowd*, 366

6    U.S. 717 (1961).  (Dkt. 140 at 142.)  In denying relief on this claim, the Arizona Supreme

7    Court stated:

8         Again, defendant has failed to demonstrate that the jury was exposed to publicity
          during the trial.  The trial court gave the jury repeated admonitions, both oral and
9         written, to avoid media coverage of the case.  Defendant does not allege "juror
          misconduct or disobedience to the court's admonitions," and we have found none
10        in our review of the record.

11   *Atwood*, 171 Ariz. at 632-33, 832 P.2d at 649-50 (internal citation omitted).  The court

12   therefore concluded that the trial judge had not abused his discretion.

13        It appears Petitioner believes the Arizona Supreme Court's decision constitutes an

14   unreasonable application of controlling law because the principles of *Sheppard* and *Estes*

15   necessarily include the duty to protect jurors from extensive media exposure by sequestering

16   them.  (Dkt. 140 at 144.)  Petitioner cites no authority for the proposition that a jury must be

17   sequestered simply because a case has been the subject of extensive publicity, and he makes

18   no assertion that any of the jurors who actually sat on his case were exposed to such coverage

19   during trial.  The Court finds no basis for concluding that the state court's ruling was based

20   on an unreasonable application of the law.

21

22   **Claim 21-C:     Violation of the Sixth and Fourteenth Amendments based on the trial court's failure to exclude a victims' rights group from the courtroom.**

23        Petitioner asserts that his right to a fair trial was violated by the "disruptive" presence

24   of a victim's rights group known as "We the People."  (Dkt. 140 at 145.)  Petitioner's

25   description of the group as disruptive is an overstatement.  On the second day of trial, the

26   following exchange occurred between defense counsel and the court:

27        MR. BLOOM: I want to make a record about this outburst that occurred in

28

this courtroom. And it came from the people that are here on behalf of Vicki Lynn Hoskinson on that side. And I know those people are connected with her. And when I asked the girl a question, there was a little laughter, titter and some noise that I thought was offense [sic].

And Your Honor said to call that to your attention back in Tucson and I'm calling it to your attention. I don't think it belongs in this courtroom, and if they're going to keep it up, I think they ought to be removed.

THE COURT: *I noted that it was not particularly distracting*, and I'll see to it that it doesn't continue because if it does, I'll clear those people from the courtroom.

(RT 2/10/87 PM at 27-28) (emphasis added.) Not long after this exchange, the trial judge addressed the gallery and stated:

I am not able to determine at the moment the persons who are responding to various things that are happening, but I will suggest to you that I have no intention of it continuing. So if you think you're going to be one of those who continues to react audibly to things that are happening, then I suggest that you leave now. Because if it continues to happen, then I will have to stop the trial and ask you to leave at that time, and I don't think you want that to happen. So that will be the first and last notice to you and that should be sufficient.

(*Id.* at 65.)

Regardless of how this episode is characterized, Petitioner is plainly not entitled to relief under the Supreme Court's recent decision in *Carey v. Musladin,* which held there is no clearly established federal law regarding the effect of private-actor courtroom conduct on a defendant's fair trial rights. 127 S. Ct. at 653-54. Therefore, the Arizona Supreme Court's decision denying this claim, *Atwood*, 171 Ariz. at 643-44, 832 P.2d at 650-51, was not contrary to or an unreasonable application of clearly established federal law. *Musladin*, 127 S. Ct. at 654 (denying habeas relief in absence of clearly established federal law).

**Claim 21-D:    Violation of the Sixth and Fourteenth Amendments based on television coverage of trial.**

Petitioner asserts that his right to a fair trial was violated by the televised broadcasting of the trial in Tucson. Specifically, he contends that because the vast majority of witnesses in his case resided in Tucson and had access to the television coverage, they could "tailor their testimony" to that presented by other witnesses. (Dkt. 140 at 148.) Petitioner fails to

1   identify any specific witness who watched the trial on television in Tucson or allege in what

2   manner one witness's testimony was tailored to that of another.   Petitioner's conclusory

3   allegations are insufficient to warrant habeas relief.   *Jones v. Gomez*, 66 F.3d at 204

4   (conclusory allegations unsupported by statement of facts insufficient to establish entitlement

5   to habeas relief).

6   **Claim 23-A:      Violation of the Eighth Amendment based on the admission of testimony**
7   **by the victim's mother.**

8       Petitioner asserts that the admission of testimony by the victim's mother violated his

9   rights under the Eighth Amendment because she "explode[d] into uncontrollable sobbing,

10  necessitating a court recess," after being shown her daughter's bicycle.  (Dkt. 140 at 148.)

11  On appeal, the Arizona Supreme Court addressed the admission of this evidence in the

12  context of Petitioner's argument that the prosecutor called this witness solely to arouse

13  sympathy with the jury.  *Atwood*, 171 Ariz. at 609, 832 P.2d at 626.   In finding no

14  misconduct, the court expressly found no prejudice from the testimony: "[The victim's]

15  mother was uniquely aware of her daughter's activities leading up to the kidnapping and,

16  concerning her testimony in rebuttal, she was able to describe certain of her daughter's

17  characteristics that conflicted with the testimony of persons who claimed to have seen the

18  child at a local mall."  *Id.*

19      A state court's procedural or evidentiary ruling is not subject to federal habeas review

20  unless the ruling violates federal law, either by infringing upon a specific federal

21  constitutional or statutory provision or by depriving the defendant of the fundamentally fair

22  trial guaranteed by due process.  *Pulley v. Harris*, 465 U.S. at 41.  Petitioner asserts that

23  admission of the victim's mother's testimony violated his rights under the Eighth

24  Amendment.  However, the right to be free of cruel and unusual punishment, by definition,

25  is a protection related to the imposition or carrying out of a sentence.  In other words, the

26  protection afforded by the Eighth Amendment does not attach until a person is convicted and

27  subject to punishment by the state.  *See Ingraham v. Wright*, 430 U.S. 651, 664, 667, 671

28

n.40 (1977) (summarizing that the Eighth Amendment circumscribes only the type of punishment imposable on those convicted, punishment grossly disproportionate to the crime and what can be criminalized and punished); *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (noting that the Eighth Amendment has no application to pretrial detainees). Thus, admission of the victim's mother's testimony at trial presents no basis for habeas relief based on a violation of the Eighth Amendment.[18]

To the extent Petitioner contends that this testimony was improperly considered by the judge at sentencing, the Court finds no basis for habeas relief. In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to the admission of victim impact evidence but left intact *Booth*'s prohibition on the admissibility of characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence to be imposed. *Id.* at 830 n.2.

Nothing in the victim's mother's testimony can be characterized as comments on Petitioner, the crime, or a recommendation about sentencing. Thus, admission of her testimony did not adversely affect Petitioner's rights at sentencing.

Even if her testimony could be construed as an implicit plea for the death penalty, trial judges are presumed to know and follow the law. *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994) (en banc). Therefore, "in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997). Petitioner is not entitled to relief on Claim 23-A.

---

[18]   In its June 6, 2005 Order, the Court found the Fifth, Sixth and Fourteenth Amendment aspects of this claim to be procedurally barred. (*See* Dkt. 127 at 36.)

1

2

**Claim 23-C:    Violation of the Fifth, Sixth, and Fourteenth Amendments based on the trial court allowing the jury to see videotapes of television broadcasts in which Petitioner was handcuffed and wore jail attire.**

3

4

Near the close of the prosecution's case and during deliberations, several videotapes of

5

television news broadcasts were played for the jury.  (RT 3/4/87 PM at 12; RT 3/25/87 at 3-

6

4.)  In some of the news footage, Petitioner is shown in handcuffs and wearing jail attire.

7

Petitioner asserts admission of this evidence violated his federal constitutional rights under

8

*Estelle v. Williams*, 425 U.S. 501 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986).  (Dkt.

140 at 153.)

9

10

On direct appeal, the Arizona Supreme Court concluded that the rule of *Williams*, which

11

held that the Fourteenth Amendment protects an accused from being tried before a jury while

12

dressed in prison clothing, should extend to videotaped portions of pretrial publicity because

13

"'the visual impact of the improper picture of a restrained defendant' might prejudice the jury

14

against the defendant by portraying him as a bad or dangerous person."  *Atwood*, 171 Ariz.

at 643, 832 P.2d at 660 (citing *Lucas v. State*, 791 S.W.2d 35, 56 (Tex. Cr. App. 1989)).  It

15

16

then concluded, however, that the videotape viewing in Petitioner's case "was not so

17

prejudicial that it abrogated the probative value of the evidence."  *Id.* at 645, 832 P.2d at 662.

18

Specifically, the court noted:

19

Several witnesses described for the jury the out-of-court identifications they made
of defendant when they saw him on television.  For the most part, these
identifications occurred when the witnesses saw the brief television clips of

20

defendant in police custody.  The videotapes shown to the jury contained those
television clips and demonstrated how and when the prior identifications had

21

occurred.  As such, the tapes were admissible.  Further, although we are aware of
the danger of "discount[ing] the constitutional presumption of innocence in favor

22

of strictly evidentiary concerns," *Lucas*, 791 S.W.2d at 55, we do not believe that
the use of the videotapes emasculated the presumption of innocence in this case.

23

24

We have reviewed the exhibits and concur with defendant that the television
footage does portray him in a prejudicial light.  We question, however, the exact
source of that prejudice.  Defendant is seen in the videos in handcuffs and, in

25

some of the footage, in identifiable jail attire.  Primarily, the clips show defendant
outside, apparently being transported from police vehicles to various jail facilities.

26

As in *Gates*, we believe this fact mitigates the prejudicial impact of the video
because the jury easily could conclude that common practice requires criminal

27

defendants in custody to be handcuffed when they are outside the jail setting.  In

28

addition, the viewings of defendant are very brief and were balanced by the presence of the well-groomed, unfettered defendant throughout the lengthy trial. Indeed, perhaps the most damaging aspect of the videotape clips is the disparity they illustrate between the physical appearance of defendant at the time of his arrest and his appearance in the courtroom during trial. The jury easily could have been more influenced by the appearance of defendant than by the incidental facts that he was handcuffed and in jail garb. This aspect of the videotapes, however, did not warrant their exclusion, for the out-of-court identifications centered on how defendant appeared in September 1984 – not on his considerably altered appearance at trial. Therefore, we believe that defendant was not impermissibly prejudiced by allowing the jury to see how he appeared at the time of the prior identifications.

*Id.*

Petitioner asserts, without specific argument, that the state court's ruling was contrary to and an unreasonable application of *Williams* and *Flynn*. He further contends that it was based on an unreasonable application of the law to the facts because the state court "rationalized its decision to ignore the improper and prejudicial nature of this evidence against Petitioner by implying that there was a wealth of incriminating evidence against Petitioner." (Dkt. 140 at 153.) Respondents counter that the United States Supreme Court has never held that admission of demonstrative evidence showing a defendant handcuffed or in jail clothing violates *Williams* and cite numerous federal appellate rulings upholding admission of similar evidence. (Dkt. 148 at 94, citing *United States v. Allen*, 390 F.3d 944, 950 (7th Cir. 2004); *United States v. Mohammad*, 27 F.3d 815, 822 (2d Cir. 1994); *United States v. Cannon*, 903 F.2d 849, 855-56 (1st Cir. 1990); and *United States v. Cochran*, 697 F.2d 600, 608 (5th Cir. 1983)).

As the Supreme Court recently explained in *Carey v. Musladin,* "[b]oth *Williams* and *Flynn* dealt with government-sponsored practices: In *Williams*, the State compelled the defendant to stand trial in prison clothes, and in *Flynn*, the State seated the troopers immediately behind the defendant." 127 S. Ct. at 653. Here, Petitioner challenges the admission of evidence, not a "practice" or "procedure" of the State. Given the lack of holdings from the Supreme Court concerning the potentially prejudicial effect of admitting videotape evidence of an accused in jail clothing, this Court cannot say that the Arizona

Supreme Court unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1); *Musladin*, 127 S. Ct. at 654.

Moreover, even if the Court considers admission of the videotape evidence as implicating due process under *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), or the presumption of innocence under *Williams*, the Court concludes that the videotape viewing was not so inherently prejudicial that it denied Petitioner a fair trial. As noted by the Arizona Supreme Court, the video images of Petitioner were relevant to demonstrate how and when several witnesses' identifications of Petitioner took place. In addition, the footage reflected Petitioner's appearance at the time of his arrest, which was relevant evidence in light of the testimony of numerous eyewitnesses and Petitioner's changed appearance at trial. (*See* Dkt. 103, Ex. A.) Finally, the viewings were brief, did not infer any prior criminal record, and did not serve as a "constant reminder of the accused's condition." *Williams*, 425 U.S. at 504.

**Claim 24-B:   Violation of the Fourteenth Amendment based on the Arizona Supreme Court's failure to provide an electronic copy of the trial record.**

On direct appeal, the Arizona Supreme Court declined to find that the "refusal to order the computerization of a trial record amounts to a deprivation of a criminal defendant's constitutional rights." *Atwood*, 171 Ariz. at 658, 832 P.2d at 675. Petitioner cites no authority to support his assertion that he had a constitutional right to an electronic copy of the record to ensure competent appellate representation. Accordingly, the state court's refusal to recognize such a right is not contrary to controlling federal law. *See Musladin*, 127 S. Ct. at 653-54.

**Claim 25:   Violation of the Sixth Amendment based on appellate counsel's failure to winnow issues.**

Petitioner alleges appellate counsel was ineffective for failing to winnow the issues

raised on appeal and to present a thoughtful analysis of the claims.[19]  (Dkt. 140 at 156-57.) Petitioner appears to be arguing as prejudice that "many issues" would have received more effective consideration if counsel had raised fewer issues.[20]

The PCR court denied the claim, noting that Petitioner failed "to specifically identify any meritorious arguments which should have been made but were not for failure to 'winnow' or to review the record."  (ROA-PCR at 1013.)  To establish prejudice, Petitioner must demonstrate that absent counsel errors, the result of the appeal would have been different.  Counsel fails to identify a single claim raised that would have been successful if counsel had spent more time briefing it rather than other claims.[21]  Because Claim 25 does not allege a reasonable probability of a different result on appeal, the Court finds that the PCR court's denial of the claim was not an unreasonable application of *Strickland*.

**Claim 27:**  **Violation of the Eighth Amendment by imposing a death sentence based on prior conduct that under current standards would not render Petitioner death-eligible.**

Under A.R.S. § 13-703(F)(1), a death sentence may be imposed against a defendant who "has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable."  At sentencing, the trial court found

---

[19]   To the extent Petitioner is attempting to expand this claim to include counsel's failure to raise specific claims, those allegations were not exhausted in state court (ROA-PCR at 503) and are not properly before this Court for consideration.  (*See* Dkt. 127 at 38.)

[20]   The Court notes the irony that Petitioner chastises appellate counsel for failing to winnow claims yet apparently chose to follow the same approach in these proceedings.

[21]   Petitioner alleges that state action interfered with appellate counsel's performance because counsel was denied an electronic copy of the record, the Attorney General tried to have him removed, and she had to undertake solo representation.  (Dkt. 140 at 154.) However, the Court need not reach those issues because this claim fails on the prejudice prong.  *See Strickland*, 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").  To the extent Petitioner alleges those state actions are independent constitutional violations, they are addressed separately in this Order.  *See* discussion *supra* Claims 9-K and 24-B.

the existence of the (F)(1) factor based on Petitioner's 1975 California conviction for lewd and lascivious conduct.  This was the only aggravating factor found to exist.

At the time Petitioner committed the California offense (in June 1974), Arizona law provided for a sentence of "not less than five years nor more than life" for lewd and lascivious conduct.  A.R.S. § 13-652 (amended by Laws 1965, Ch. 20, § 2, eff. Mar. 25, 1965).  In 1977, this statute was renumbered and amended to no longer provide for a sentence of life imprisonment.  A.R.S. § 13-1412 (amended by Laws 1977, Ch. 142, § 68, eff. Oct. 1, 1978, and repealed by Laws 2001, Ch. 382, § 1 eff. Aug. 9, 2001).  Consequently, Petitioner argued on direct appeal that his 1975 conviction could not support the (F)(1) factor because a sentence of life imprisonment for lewd and lascivious conduct was not imposable at the time of his sentencing in 1987.  The Arizona Supreme Court rejected this argument and held, for purposes of determining whether a prior conviction establishes the (F)(1) aggravating circumstance, that "the trial court should look at the sentence that was imposable at the time the prior offense was committed."  *Atwood*, 171 Ariz. at 647, 832 P.2d at 664.

In 1995, the Arizona Legislature passed a bill repealing the (F)(1) factor, but it was vetoed by the Governor and not enacted into law.  Subsequently, in his PCR petition, Petitioner argued that the legislature's action demonstrated society's evolving standard of decency against imposition of the death penalty based solely on a prior criminal record. (ROA-PCR at 499.)  The PCR court summarily denied the claim without explanation.  (*Id.* at 1013.)  In this Court, Petitioner further asserts that the state court's refusal to look at the underlying facts of Petitioner's 1975 conviction renders use of the (F)(1) factor arbitrary because it "permits no assessment of the harm caused to the victim, the presence or absence of violence, the state of mind of the defendant, or any other fact." (Dkt. 103 at 103; Dkt. 140 at 165.)  The Court disagrees.

In order for a capital sentencing scheme to pass constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found

guilty of" the capital crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  A death penalty scheme must provide an "objective, evenhanded and substantively rational way" for determining whether a defendant is eligible for the death penalty.  *Id.* at 879.  Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencing authority's] discretion."  *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).  The ultimate purpose of statutory aggravating factors is to direct and limit sentencing discretion and minimize the risk of arbitrary and capricious infliction of the death penalty.

Subject to the constitutional requirement that a death penalty statute define the class of death-eligible defendants in a non-arbitrary manner, states are free to determine what aggravating factors best serve this purpose.  In *Zant*, the Court stated that a statute identifying aggravating circumstances need not also provide standards to govern the sentencer in weighing the significance of those circumstances.  462 U.S. at 880.  In *Blystone v. Pennsylvania*, the Court stated that "the presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed" by the sentencer.  494 U.S. 299, 306-07 (1990).  Rather, "the requirement of individualized sentencing in capital cases is satisfied by allowing the [sentencer] to consider all relevant mitigating evidence."  *Id.*

To meet Eighth Amendment concerns, an aggravating circumstance must meet only two requirements.  First, "the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder."  *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *see Arave v. Creech*, 507 U.S. 463, 474 (1993).  Second, "the aggravating circumstance may not be unconstitutionally vague."  *Tuilaepa*, 512 U.S. at 972; *see Arave*, 507 U.S. at 473; *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  Arizona's (F)(1) factor satisfies both of these requirements, and this Court is bound by the Arizona Supreme Court's interpretation of its aggravating factors.  *Mullaney v. Wilbur*, 421

U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the expositors of state law, and that we are bound by their constructions except in extreme circumstances not present here") (citations omitted).  Because there is no constitutional requirement that, in determining eligibility for a capital sentence, individual circumstances underlying an aggravating factor must be weighed, *Blystone*, 494 U.S. at 306-07, Petitioner's claim necessarily fails.

**Claim 28-A:       Violation of the Eighth and Fourteenth Amendments based on the state courts' failure to find the existence of mitigating factors.**

Petitioner argues that the trial court violated his constitutional rights by failing to find any mitigating factors sufficient to call for leniency. (Dkt. 140 at 165-66.)  At sentencing, the trial court stated that it had considered all of Petitioner's proffered mitigating circumstances but found none sufficiently substantial to call for leniency.  (RT 5/8/87 at 27.)  In its written special verdict, issued the same day, the court provided a more detailed explanation of its findings:

> The Defendant, by memorandum filed April 30, 1987, has proffered eleven different circumstances for the Court to consider in mitigation.  Only two of these arguably fit any of the specific mitigating circumstances of A.R.S. § 13-703(G).  One is the Defendant's age of 28 years.  This Court finds that not a mitigating factor.  Defendant contends that his drug usage so incapacitated him as to significantly impair his ability to appreciate the wrongfulness of his conduct on September 17, 1984.  The Court finds that the Defendant has failed to prove that contention.

> The Defendant is not limited by the factors specifically enumerated in A.R.S. § 13-703(G) and has offered other matters in mitigation.  While the giving of the felony murder instruction might under some circumstances be a mitigating factor, the Court finds it no mitigation here where the Defendant was the only participant in this offense.

> No other of the suggested mitigating circumstances even warrant detailed discussion as those matters, even if true, do not even collectively support mitigation of the Defendant's actions.

> The Court finds no mitigating circumstances which are sufficiently substantial to call for leniency.

(ROA at 9316-17.)  On appeal, the Arizona Supreme Court addressed each of Petitioner's arguments concerning the trial court's mitigation findings (fourteen separate issues), and, in

1   upholding Petitioner's capital sentence, stated that it had independently "considered
2   defendant's proffered mitigating circumstances." *Atwood*, 171 Ariz. at 648-55, 657, 832
3   P.2d at 665-72, 674.

4       On habeas review, the federal court does not evaluate the substance of each piece of
5   evidence submitted as mitigation; rather, it reviews the state court record to ensure that the
6   state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d at
7   418 (holding that when it is evident that all mitigating evidence was considered, the trial
8   court is not required to discuss each piece of such evidence). As the Ninth Circuit has noted,
9   "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing
10  federal court can discern from the record that the state court did indeed consider all
11  mitigating evidence offered by the defendant.'" *Moormann v. Schriro*, 426 F.3d 1044, 1055
12  (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2984 (2006) (quoting *Clark v. Ricketts*, 958 F.2d 851,
13  858 (9th Cir. 1991)); *see Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (holding that
14  the sentencing court properly considered all information, including nonstatutory mitigation,
15  where the court stated that it considered all the evidence and found no mitigating
16  circumstances that outweighed the aggravating circumstances); *LaGrand v. Stewart*, 133 F.3d
17  1253, 1263 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997).

18      The record is clear that the trial court and the Arizona Supreme Court considered
19  Petitioner's proffered evidence as potential mitigation. That is all the Constitution requires.
20  *See Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (evidence must be considered but
21  the sentencer determines the weight it is to be accorded); *Lockett v. Ohio*, 438 U.S. 586, 604
22  (1978); *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998). What Petitioner appears to
23  contend is that the Arizona courts were obligated to find that his proffered evidence was
24  mitigating; the United States Constitution does not require such a finding. To the contrary,
25  there is a clear distinction between "a failure to consider relevant evidence and a conclusion
26  that such evidence was not mitigating," and the latter determination does not implicate the
27  Constitution. *Williams v. Stewart*, 441 F.3d at 1057.

28

**Claim 30-B:**     **Violation of the Eighth and Fourteenth Amendments based on the lack of objective standards for weighing aggravating and mitigating factors.**

**Claim 35:**     **Violation of the Eighth and Fourteenth Amendments based on the mandatory nature of Arizona's capital sentencing scheme.**

**Claim 36:**     **Violation of the Eighth and Fourteenth Amendments by imposing the burden to prove existence of mitigating factors on Petitioner.**

**Claim 37-A:**     **Violation of the Eighth and Fourteenth Amendments based on the absence of standards to guide the prosecutor's decision to seek the death penalty.**

**Claim 38:**     **Violation of the Eighth and Fourteenth Amendments by imposing the death penalty when it serves no penal purpose.**

In *Smith (Bernard) v. Stewart*, the Ninth Circuit summarily rejected the petitioner's claims regarding the constitutionality of Arizona's death penalty, including allegations that Arizona's statute does not properly narrow the class of death penalty recipients, that Arizona lacks proportionality review, that sentencing judges lack proper guidance, that imposition of the death penalty under the statute is mandatory, that the prosecutor can decide whether to seek the death penalty, and that the death penalty generally constitutes cruel and unusual punishment.  140 F.3d 1263, 1271 (9th Cir. 1998); *see also Blystone*, 494 U.S. at 305 (upholding statutory scheme providing for mandatory death sentence if aggravating circumstances outweigh mitigating circumstances).  Similarly, in *Ortiz v. Arizona*, the court noted that "[a]lthough the Constitution requires that the states devise procedures to guide a sentencer's discretion, the absence of specific standards instructing the sentencer how to weigh the aggravating and mitigating factors does not render a death penalty statute unconstitutional."  149 F.3d at 944  (citing *Zant*, 462 U.S. at 880).  Finally, in *Walton v. Arizona*, the United States Supreme Court expressly held that a defendant's federal constitutional rights are not violated by placing on him the burden to prove mitigating circumstances.  497 U.S. at 650 (1990); *see also Kansas v. Marsh*, 126 S. Ct. 2516, 2523-24 (2006) (applying *Walton*).  Claims 30-B, 35, 36, 37-A, and 38 are plainly meritless.

**Claim 40-B:     Violation of the Fifth, Sixth, and Fourteenth Amendments based on**

1            **cumulative sentencing errors.**

2        The Court has considered Petitioner's individual claims of sentencing error and found

3    none supportable.  Accordingly, Petitioner's assertion of cumulative error fails.

4

**Claim 41:        Violation of the Eighth and Fourteenth Amendments by imposing a
5                   death sentence on an innocent person.**

6        In this claim, Petitioner asserts a substantive (or "freestanding") claim of actual

7    innocence.[22]  In *Herrera v. Collins*, 506 U.S. 390, 398-99 (1993), the Court left open the

8    question whether execution of an innocent person would violate the Eighth Amendment

9    absent an independent constitutional violation occurring in the state trial.  The Court recently

10   revisited the issue in *House v. Bell*, 126 S. Ct. 2064 (2006), and again left undecided the

11   question whether a truly persuasive freestanding claim of innocence in a capital case would

12   warrant relief.  The Court explained:

13           We conclude here, much as in *Herrera*, that whatever burden a hypothetical
             freestanding innocence claim would require, this petitioner has not satisfied it.  To
14           be sure, House has cast considerable doubt on his guilt – doubt sufficient to satisfy
             *Schlup*'s gateway standard for obtaining federal review despite a state procedural
15           default.   In *Herrera*, however, the Court described the threshold for any
             hypothetical freestanding innocence claim as "extraordinarily high." . . . *Herrera*
16           requires more convincing proof of innocence than *Schlup*.  It follows, given the
             closeness of the *Schlup* question here, that House's showing falls short of the
17           threshold implied in *Herrera*.

18   126 S. Ct. at 2087.  In *Schlup*, the Court stated that a credible claim of innocence requires

19   presentation of "new reliable evidence – whether it be exculpatory scientific evidence,

20   trustworthy eyewitness accounts, or critical physical evidence – that was not presented at

21   trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  In analyzing a claim of innocence, a

22   habeas court "is not bound by the rules of admissibility that would govern at trial" and must

23   consider all the evidence, "whether excluded or unavailable at trial."  *Id.* at 327-28; *see*

24   _____

25           [22]  This claim is distinguished from the "actual innocence" discussion of the Court
     in its June 6, 2005 order regarding the procedural status of Petitioner's claims.  There, the
26   Court addressed Petitioner's claim of actual innocence only with regard to the miscarriage-
     of-justice "gateway" exception to procedural default (Dkt. 127 at 6-7, 53-58).  *See Schlup
27   v. Delo*, 513 U.S. 298, 327 (1995); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

28                                           - 100 -

1   *House*, 126 S. Ct. at 2077 (characterizing *Schlup* as allowing for review of "old and new,

2   incriminating and exculpatory" evidence).

3        Here, Petitioner's new evidence falls far short of meeting *Herrera*'s hypothetical,

4   extraordinarily high standard for a claim of innocence.   Petitioner asserts that law

5   enforcement planted pink paint from the victim's bicycle onto the bumper of his car.

6   However, even if true, such evidence would only weaken the State's case; it would not

7   establish "conclusive exoneration."  *House*, 126 S. Ct. at 2086.  Petitioner also asserts that

8   the victim had to have been buried and therefore he lacked the time, based on witness

9   sightings, to abduct the victim, drive her to a remote desert area in northwest Tucson, kill her,

10  dig a grave, and return to DeAnza Park.  However, when studied closely, Petitioner's "proof

11  of burial" amounts to nothing more substantial than a dispute between experts over whether

12  the body would have formed adipocere absent inhumation under ground.  Petitioner cannot

13  point to any indisputable evidence that the body was buried.  In addition, Petitioner's

14  "timeline" theory is based primarily upon the testimony of street people, alcoholics, and drug

15  addicts to establish the time of his return to the park.  As discussed with respect to Claim 2-

16  D, these witnesses were hardly trustworthy.

17       Moreover, Petitioner admitted to a jailhouse informant that he killed the victim and did

18  not bury her body.  Before trial, the court suppressed testimony from Jonas Bowen, who was

19  housed in the same jail pod as Petitioner following his transport from Texas.  *Atwood*, 171

20  Ariz. at 664, 832 P.2d at 681 (Corcoran, J, specially concurring).  Bowen took "copious

21  notes" of his conversations with Petitioner (*id.*) and also drew a map of where the victim's

22  body might be found based on information Petitioner provided (RT 12/3/86 at 146).  Bowen

23  claimed that during a conversation in December 1984, five months before the victim's

24  remains were discovered near the end of a road in the desert in northwest Tucson, Petitioner

25  detailed the events of September 17 and admitted kidnapping and murdering Vicki Lynn

26  Hoskinson.  *Atwood*, 171 Ariz. at 664, 832 P.2d at 681.  In a deposition included in the

27  appellate record at the State's request (RT 5/8/87 at 21-22), Bowen claimed that after several

28

weeks of earning his trust, Petitioner described how he had struck the victim's bicycle with his car, driven north on the freeway, gone out into the desert, forced her to commit fellatio on him, and then killed her by cutting her throat and stabbing her in the chest.  (Dep. 1/9/87 at 63-64.)  Petitioner told Bowen he was surprised the police had not found the victim's body because they had been searching in the right area and her body had not been buried.  (*Id.* at 46, 56-57.)  Bowen's hand-drawn map, created months before the victim's remains were found, correlates closely to the general vicinity of where the remains were ultimately discovered.  (*Id.*, Ex. 1.)

Additional evidence not available to the prosecution during trial included the statement of Brian Hall, who died unexpectedly and whose testimony was not memorialized.  In an interview with investigators three days after the victim's disappearance, Hall claimed Petitioner did not return to the park until 6:30 or 7:00 p.m. and that he had blood on his hands.  (ROA at 2514-15.)  This evidence casts further doubt on the timing of Petitioner's return to the park and corroborates the sighting of blood on Petitioner's hands by McDonald and Parisien.

Considering the totality of the evidence, including evidence not presented at trial, Petitioner's claim of actual innocence fails.

**Claim 42:    Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments based on the lack of voir dire of sentencing judge.**

Petitioner argued on appeal that his death sentence was improperly imposed because he was precluded from "death qualifying" the trial judge, who, under Arizona law at the time, served as the fact finder for all aspects of sentencing.  The Arizona Supreme Court dismissed the claim, holding that the right to voir dire a trial judge concerning possible bias or prejudice is not encompassed within the constitutional right to a fair trial before an impartial judge.  *Atwood*, 171 Ariz. at 645 n.21, 832 P.2d at 662 n.21 (citing *State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987)).   The court further cited *State v. Beaty*, 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988), for the proposition that the trial judge in a capital case is

1    presumed "to be able to focus on the relevant sentencing factors and to set aside the

2    irrelevant, the inflammatory, and the emotional factors." *Atwood*, 171 Ariz. at 645 n.21, 832

3    P.2d at 662 n.21.

4         Petitioner cites to no authority for the proposition that a defendant has a constitutional

5    right to voir dire a judge, let alone to inquire about a judge's views on the death penalty.  The

6    rule in *Witherspoon* and *Morgan* that provides for inquiry into prospective jurors' views on

7    capital punishment derives from the right to an impartial and unbiased jury under the Sixth

8    and Fourteenth Amendments.  *Morgan*, 504 U.S. at 726.  As already noted, trial judges are

9    presumed to follow the law.  *Walton*, 497 U.S. at 653.  Because Petitioner has not shown that

10   he has a constitutional right to voir dire a sentencing judge, the state court's refusal to

11   recognize such a right is neither contrary to nor an unreasonable application of federal law.

12   *See Musladin*, 127 S. Ct. at 653-54.

13                           **CERTIFICATE OF APPEALABILITY**

14        Although this is not a final order in these proceedings, the Court has endeavored to

15   determine, if judgment is ultimately entered against Petitioner, whether a certificate of

16   appealability (COA) should be granted on the issues addressed herein.  Pursuant to 28 U.S.C.

17   § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

18   the denial of a constitutional right."  This showing can be established by demonstrating that

19   "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

20   have been resolved in a different manner" or that the issues were "adequate to deserve

21   encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

22   *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

23   issue only if reasonable jurists could debate (1) whether the petition states a valid claim of

24   the denial of a constitutional right, and (2) whether the court's procedural ruling was correct.

25   *Id.*

26        The Court finds that reasonable jurists could debate its analysis of Claims 2-D and 27.

27   Therefore, if Petitioner ultimately does not prevail on his petition, the Court intends to issue

28                                        - 103 -

1    a COA in accord with the above finding at the time of judgment. The Court further finds, for

2    the reasons set out in this Order and the Court's order of June 6, 2005, that reasonable jurists

3    could not debate the Court's dismissal of the remainder of Petitioner's claims as procedurally

4    barred or meritless.  Accordingly, the Court does not intend to issue a COA on any of these

5    issues in the event judgment is ultimately entered against Petitioner.  Petitioner may seek

6    reconsideration of this determination within any motion for reconsideration from this Order.

7                                        **CONCLUSION**

8          With the exception of Claim 1-B, the Court has considered Petitioner's claims and finds

9    that none establish entitlement to habeas relief.  The Court further finds that evidentiary

10   development of these claims is neither warranted nor required.

11         Based on the foregoing,

12         **IT IS ORDERED** that Claims 1-A, 2-A, 2-B, 2-D, 2-F, 3-A, 4-B, 5-A, 5-B, 5-C, 5-D,

13   7, 8, 9-A, 9-B, 9-E, 9-F, 9-G, 9-H, 9-I, 9-K, 10, 13-A, 14, 15-A, 16, 17-A, 21-A, 21-B, 21-C,

14   21-D, 23-A, 23-C, 24-B, 25, 27, 28-A, 30-B, 35, 36, 37-A, 38, 40-B, 41, and 42 are

15   **DISMISSED WITH PREJUDICE**.

16         **IT IS FURTHER ORDERED** that oral argument regarding Claim 1-B will be held on

17   **May 21, 2007, at 9:00 AM**, in Courtroom 6F.

18         **IT IS FURTHER ORDERED** that if, pursuant to LRCiv 7.2(g), Petitioner or

19   Respondents file a Motion for Reconsideration of this Order, such motion shall be filed

20   within **twenty (20) days** of the filing of this Order.

21         **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to

22   the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

23         SO ORDERED this 1st day of May, 2007.

24

25

26                                        _____
                                          John C. Coughenour
27                                        United States District Judge

28                                                - 104 -