**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Frank Jarvis Atwood, | No. CV-98-116-TUC-JCC |
| Petitioner, | DEATH PENALTY CASE |
| vs. | |
| Charles L. Ryan, et al., | **ORDER** |
| Respondents. | |

Pending before the Court is Petitioner's motion for reconsideration of the Court's order finding Claim 29 to be procedurally barred from merits review.  The motion is based on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), in which the Supreme Court held that where ineffective-assistance-of-counsel (IAC) claims must be raised in an initial-review post-conviction proceeding, failure of counsel in that proceeding to raise a substantial trial IAC claim may provide cause to excuse the procedural default of that claim.  For the reasons that follow, the motion is denied.

**FACTUAL BACKGROUND**

The following facts are taken from the Court's review of the extensive record.  On September 17, 1984, eight-year-old Vicki Lynn Hoskinson disappeared.  At trial, her mother testified that she had left their home at 3:30 p.m. to mail a card at a mailbox near their neighborhood.  The pink bike she had been riding was found abandoned on Pocito Place, an unpaved road a few blocks from her home.  Seven months later, skeletal remains determined

to be Vicki Lynn's were found in the desert northwest of Tucson.

The victim was last seen by two boys from her neighborhood, who passed her on Pocito Place while riding their bikes in the opposite direction. One testified at trial that before turning on Pocito and seeing Vicki Lynn, he saw a dark "Datsun Z" car with California plates driving very slowly near the intersection of Pocito and Root Lane, the main road into their neighborhood. The driver had long dark hair, a moustache, and appeared not to have shaved recently.

On the same day, Sam Hall, a teacher at Vicki Lynn's elementary school (located near her neighborhood), observed a dark "Z" car with California plates parked in an alley next to the school. The driver had long, unkempt dark hair and a beard and moustache. Hall noticed the driver making strange gestures and having difficulty getting his car into gear. Because the driver appeared out of place and made him nervous, Hall wrote down the vehicle's license plate information. After learning of Vicki Lynn's disappearance, Hall contacted the police, who traced the vehicle's registration to Petitioner.

On September 20, three days after the victim's disappearance, FBI agents learned from Petitioner's mother that Petitioner and a traveling companion, James McDonald, were at a Texas auto repair shop. Petitioner and McDonald were arrested, and Petitioner's black Datsun 280-Z impounded. At trial, an FBI examiner testified that pink paint found on the front bumper of Petitioner's car "matched" the victim's bicycle and that Petitioner's bumper was the "source" of nickel particles found on the bike. An accident reconstructionist who testified for the State opined that the pedal of the victim's bike fit a deformation on the gravel pan of Petitioner's car and supported a theory that the car had struck the bicycle at a low speed, causing the bike to become lodged underneath.

In a statement to police following his arrest, Petitioner said he had been at DeAnza Park near downtown Tucson around noon on September 17. After a fight with McDonald, he left to find other acquaintances and returned to the park between 4:00 and 5:00 p.m. In a subsequent interview, Petitioner changed the time of his return to 3:30 p.m. At trial, McDonald and Thomas Parisien, who lived near the park, testified they saw blood on

1  Petitioner's hands, clothes, and knife the afternoon of September 17.  Petitioner told them
2  he had stabbed a man who tried to rip him off during a drug deal and then had taken the body
3  out into the desert.

4       Following Vicki Lynn's disappearance, numerous individuals reported seeing a dark
5  "Z" car on September 17 and positively identified Petitioner as the driver.  Several claimed
6  they saw Petitioner in the victim's neighborhood; one saw Petitioner drive out of the
7  neighborhood with a small child in his car, and others placed Petitioner in the general vicinity
8  of the site where the victim's remains were ultimately found.

9       During the investigation, detectives also learned of Petitioner's contacts with Ernest
10  Bernsienne, a resident of Oklahoma who had been corresponding with Petitioner for about
11  four years.  Portions of letters to Bernsienne were admitted at trial, including Petitioner's
12  "confession" that he is attracted to children between the ages of seven and 12.  Bernsienne
13  testified that Petitioner told him, during a phone conversation several months before the
14  victim's disappearance, that he planned to go out and pick up a child and would make sure
15  the child would not report it.

16       Jonas Bowen, an inmate housed in the same jail pod as Petitioner following
17  Petitioner's transport from Texas, provided further inculpatory information to investigators.
18  Although ultimately not admitted at trial, Bowen took extensive notes of his conversations
19  with Petitioner and drew a map of where he believed the victim's body might be found based
20  on Petitioner's statements.  Bowen claimed that during a conversation in December 1984,
21  five months before the victim's remains were discovered near the end of a road in the desert
22  in northwest Tucson, Petitioner described how he struck the victim's bicycle with his car,
23  drove north on the freeway, exited into a desert area, forced the victim to perform fellatio,
24  and murdered the victim by cutting her throat and stabbing her in the chest.  Bowen further
25  claimed that Petitioner was surprised investigators had not found the victim's body because
26  they had been searching in the right area, and the two discussed ways to conceal Petitioner's
27  involvement in the crime.  According to Bowen, Petitioner also relayed that sex with children
28  was at one time acceptable and questioned why it should be wrong.

3

**PROCEDURAL HISTORY**

Petitioner was initially charged with one count of kidnapping and provided court-appointed counsel Lamar Couser. After the victim's remains were discovered in April 1985, he was also charged with one count of first degree felony murder. Around this time, Couser was replaced as counsel by Stanton Bloom, who was retained by Petitioner's father. Trial commenced in January 1987 and lasted approximately two months, with more than 75 witnesses testifying. On March 26, 1987, the jury returned a guilty verdict on both counts. Following an aggravation/mitigation hearing in May 1987, Pima County Superior Court Judge John G. Hawkins sentenced Petitioner to death for the murder and to a concurrent 25-year prison term for the kidnapping. In 1993, the Arizona Supreme Court affirmed on direct appeal. *State v. Atwood*, 832 P.2d 593 (Ariz. 1992), *cert. denied*, 506 U.S. 1084 (1993).

In 1998, following unsuccessful state post-conviction relief (PCR) proceedings, Petitioner initiated these federal habeas proceedings. He filed his first amended petition in May 2000, raising 89 claims for relief. (Doc. 103.) In June 2005, the Court dismissed 43 of the claims as procedurally barred, not cognizable, or plainly meritless. (Doc. 127.) In subsequent merits briefing, Petitioner alleged significant new facts in support of a law enforcement misconduct claim based on photographic "discoveries" by an individual researching Petitioner's case for a book. In May 2007, the Court ruled on the merits of all remaining claims except the misconduct claim, finding that none provided grounds for habeas relief. (Doc. 164.) With regard to the enhanced law enforcement misconduct claim, the Court determined that Petitioner's merits brief fundamentally altered the original misconduct claim, rendering it unexhausted, and concluded that the claim was neither plainly meritless nor clearly precluded from state post-conviction review. (Doc. 158 at 2–3; Doc. 172 at 5–6.) Because Respondents declined to waive exhaustion of the claim, the case was stayed pending resolution of a new PCR petition in state court.

State PCR proceedings on the misconduct claim concluded in August 2011. Thereafter, the Court lifted the stay of proceedings, Petitioner filed a second amended habeas petition, and the parties briefed the merits and propriety of further evidentiary development

4

1   of the misconduct claim.  The Court also substituted the Federal Public Defender as co-
2   counsel in place of Daniel Davis, who had represented Petitioner from the inception of this
3   habeas case and throughout both state PCR proceedings.  (Doc. 272.)  Following oral
4   argument and an evidentiary proffer in June 2012, the Court denied habeas relief on the
5   misconduct claim. (Doc. 338.)  However, in lieu of entering judgment, the Court provided
6   Petitioner the opportunity to brief the effect of the Supreme Court's decision in *Martinez v.*
7   *Ryan* by filing a motion for reconsideration of the Court's dismissal of numerous IAC claims
8   as procedurally barred, including a claim of ineffectiveness at sentencing for failing to
9   thoroughly investigate Petitioner's background for mitigation ("Claim 29").

10      After granting two continuance motions for the filing of the reconsideration motion
11  to permit the Federal Public Defender to conclude its background investigation of Petitioner,
12  the Court denied a third request.  In doing so, the Court noted that it appeared from the
13  continuance motion that Petitioner intended to significantly expand the scope of Claim 29
14  by asserting a new theory of ineffectiveness based on the failure to retain experts for
15  sentencing.  Consequently, the Court provided an additional period of time for Petitioner to
16  seek leave to file a third amended petition to present any newly-developed claims.

17      In January 2013, Petitioner filed the instant motion for reconsideration, seeking
18  reconsideration only of Claim 29.  In its June 2005 order finding this claim procedurally
19  barred, the Court had concluded that Petitioner did not raise in state court any IAC claims
20  based on counsel's representation during sentencing and that he had failed to establish cause
21  and prejudice to excuse the default.  (Doc. 127 at 40, 48–52.)  One of the cause arguments
22  asserted by Petitioner was the ineffectiveness of PCR counsel.  Pursuant to *Coleman v.*
23  *Thompson*, 501 U.S. 722, 755 (1991), the Court found that ineffective assistance of PCR
24  counsel could not constitute cause because Petitioner had no constitutional right to the
25  effective assistance of such counsel.

26      In February 2013, Petitioner also filed a memorandum regarding amendment,
27  asserting that amendment to present new factual allegations is unnecessary and, alternatively,
28  seeking leave to amend if the Court concludes otherwise.  On March 7, 2013, the Court held

1   oral argument.  Because the briefs raised a significant question as to whether *Martinez* even

2   applied to Petitioner's case (in light of state appellate counsel's assertion of trial-related IAC

3   claims on direct appeal), the parties agreed that a ruling on the motion for reconsideration

4   should await a decision by the United State Supreme Court in *Trevino v. Thaler*, 133 S. Ct.

5   1911 (2013).   Following issuance of the *Trevino* opinion, Respondents withdrew their

6   objection to applicability of *Martinez* (Doc. 400), and the Court set an evidentiary hearing

7   to determine whether Claim 29 constituted a "substantial" claim of ineffective assistance of

8   counsel at sentencing.  (Doc. 401.)  A four-day hearing was held October 7-9 and November

9   4, 2013.  Petitioner, his trial counsel, his direct appeal counsel, trial counsel's paralegal, the

10   prosecutor, and two experts testified.

11   **DISCUSSION**

12   **I.   Scope of Claim 29**

13      Petitioner's motion for reconsideration significantly broadened the claim presented

14   in the second amended habeas petition, which in its entirety reads:

15         The mitigation case was heard within less than 60 days of the verdict
         in this case.  Defense counsel had neither the time nor the resources to prepare
16         appropriately for a mitigation hearing.   A thorough investigation of Mr.
         Atwood's background should have been undertaken, but was not.  In failing
17         to provide that investigation and mitigation development, Mr. Atwood was the
         victim of ineffective assistance of counsel.
18
         This case is closely similar on this issue to a case decided by the Ninth
19         Circuit Court of Appeals on July 21, of last year, *Wallace v. Stewart*, 184 F.3d
         1112 (9th Cir. 1999).  This is also a case in which Lamar Couser was trial
20         counsel.   In *Wallace*, however, Mr. Couser was also counsel at the first
         sentencing.  As was true in Mr. Atwood's case, Mr. Couser did next to nothing
21         to represent his client.  As the Ninth Circuit observed, had counsel "only
         looked, [they] would have discovered a great deal."  (*Id.* at 12).  See also
22         *Clabourne v. Lewis*, 64 F.3d 1373 (9th Cir. 1995), yet another recent case in
         which Mr. Couser's performance at sentencing was held to constitute
23         ineffective assistance of counsel.

24         The same may be said of this case.  We have requested the appointment
         of a mitigation specialist to assist in developing the record that was developed
25         in this case neither by Mr. Couser nor by Mr. Bloom.  We believe that, if
         appointed, the record would provide ample basis for believing that the death
26         sentence in this case was inappropriate.  The appointment of a mitigation
         specialist will assist us in establishing that counsel were ineffective and
27         deprived defendant of his rights to effective assistance of counsel at sentencing
         under the 6th, 8th and 14th Amendments.

28

6

One example might be cited. The Arizona Supreme Court, in rejecting arguments made by the defense on appeal, notes that the fact that Defendant may have been molested as a minor in no way "justifies, excuses or otherwise mitigates his crime here." *Atwood*, 171 Ariz. at 655, 832 P.2d at 672. The Supreme Court goes on to say that "the remedy for one who has been molested is not to molest others and ask to be excused, but rather to submit to therapy which, as noted above, Defendant has repeatedly refused." *Id.* The Court did not, of course, investigate whether Mr. Atwood had been amenable to therapy or whether therapy would have been productive. A wealth of literature is available today, and was 15 years ago, on the amenability to treatment of pedophiles. If one believes, as the Supreme Court apparently did, that Mr. Atwood is a pedophile, one must then ask whether his conduct was truly volitional or whether, to the contrary, his ability to control his behavior was in some way reduced. This was precisely the theme of the Hoskinson family's wrongful death action against Mr. Atwood's parents and the State of California. Aided by Dr. Hinton's evaluation of Mr. Atwood's history, these parties argued that as a "pedophile" he could have been predicted to have succumbed to acts of compulsion. If so, he would have available a statutory mitigator under subsection (G)(1).

This issue was addressed at the post-conviction stage. The United States Supreme Court has had occasion very recently to address this subject of ineffective assistance of counsel in connection with sentencing in *Williams v. Taylor*, 120 S. Ct. 1495 (2000). The discussion of counsel's sentencing duties provides an important template for counsel in the mitigation-development process.

(Doc. 269-2 at 110–11.)

In his motion for reconsideration, Petitioner alleges that counsel was ineffective for failing to provide the sentencing judge with "a thorough presentation of Atwood's background and character," failing to support his "drug abuse" mitigating factor with evidence explaining the long-term damage Petitioner's drug use had upon Petitioner at the time of the crime, and failing to consult with a mental health expert given Petitioner's history of psychiatric problems, head injuries, and chronic drug use. He further alleges that had counsel undertaken such an investigation, he would have discovered that Petitioner suffers from post-traumatic stress disorder (PTSD) as a result of childhood molestation and that Petitioner's deviant sexual desires can be explained by the fact that his own sexual development was skewered as a result of multiple sexual traumas. He argues that presenting evidence of Petitioner's traumatic experiences during his formative years, and their resulting psychological effects, would have rebutted the overwhelming public portrayal of Petitioner as a monster and could have provided some explanation for the crime. Because defense

7

1   counsel failed to provide a "complete picture" of Petitioner's background and character,

2   confidence in his capital sentence is undermined.  (Doc. 369 at 53–63.)

3           Petitioner argues that the claim as presented in the motion for reconsideration is not

4   different from that raised in the amended petition because "in the capital defense field,

5   research into a client's background unquestionably includes research into the client's mental

6   health history" and that it is "common practice to consult and employ mental health experts

7   in the background course of investigation."  (Doc. 369 at 8.)  Put another way, Petitioner

8   asserts that the amended petition's allegation of ineffectiveness based on counsel's failure

9   to investigate Petitioner's background necessarily included the failure to investigate

10  Petitioner's mental health history.  Therefore, according to Petitioner, the reconsideration

11  motion's allegation concerning counsel's failure to consult with mental health experts does

12  not constitute a new claim.  Respondents disagree, asserting that the amended petition did

13  not allege ineffectiveness based on counsel's failure to consult mental health experts and

14  noting that such claims are often raised separately from claims of ineffectiveness alleging

15  failure to investigate a defendant's background.

16          Pursuant to Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is

17  obligated to specify in a federal habeas petition all grounds for relief, as well as the facts

18  supporting each of these grounds.  *See Mayle v. Felix*, 545 U.S. 644, 661 (2005) (observing

19  that Rule 2(c) requires pleading "separate congeries of facts" in support of each ground for

20  relief); *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that "notice" pleading

21  in habeas is insufficient and that petition "is expected to state facts that point to a 'real

22  possibility of constitutional error'") (quoting Advisory Committee Note to Rule 4, Rules

23  Governing Section 2254 Cases).  In the context of exhaustion under 28 U.S.C. § 2254(b)(1),

24  federal law similarly requires that a claim raised in state court include "a statement of the

25  facts that entitle the petitioner to relief."  *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996)

26  (emphasis added).  To satisfy this "fair presentation" requirement, a petitioner must describe

27  both "the operative facts and the federal legal theory on which his claim is based."  *Castillo

28  v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005).  While a petitioner may provide further

1    facts to support a claim in federal court, this does not mean "that a petitioner who presented

2    any ineffective assistance of counsel claim [in state court] can later add unrelated alleged

3    instances of counsel's ineffectiveness to his claim." *Poyson v. Ryan*, — F.3d —, No. 10-

4    99005, 2013 WL 5943403, at *16 (9th Cir. Nov. 7, 2013) (quoting *Moormann v. Schriro*, 426

5    F.3d 1044, 1056 (9th Cir. 2005)).

6        Although it involved the question of exhaustion, *Poyson* is nevertheless instructive

7    In that case, the petitioner asserted in state court that trial counsel was ineffective for failing

8    "to request the appointment of experts in the field of mental health early in the case," which

9    resulted in the loss of mitigation evidence demonstrating brain damage. *Id.*  The petitioner

10   also argued in state court that counsel was ineffective for failing to show how the petitioner's

11   abusive childhood was connected to his conduct during the murders. *Id.* at *17.  However,

12   in his federal habeas petition, the petitioner alleged ineffectiveness based on counsel's failure

13   to investigate as mitigation the petitioner's possible fetal alcohol spectrum disorder.  The

14   Ninth Circuit concluded that the federal petition presented "a substantially different claim"

15   because it was based on a new theory of counsel's ineffectiveness. *Id.*  Similarly, in *Dickens

16   v. Ryan*, an en banc panel of the Ninth Circuit determined that new evidence of Fetal Alcohol

17   Syndrome and organic brain damage presented for the first time in federal court bore "little

18   resemblance to the naked *Strickland* claim raised before the state court. . . . in which Dickens

19   did not identify any specific conditions that sentencing counsel's allegedly deficient

20   performance failed to uncover." *Dickens v. Ryan*, — F.3d —, No. 08-99017, 2014 WL

21   241871 (9th Cir. Jan. 23, 2014) (en banc).

22       As in *Poyson* and *Dickens*, the Court concludes that Petitioner's allegation concerning

23   counsel's failure to consult and utilize mental health experts effectively states a new claim

24   for relief.  The second amended petition asserted ineffectiveness based on the failure to

25   conduct a thorough background investigation and demonstrate that Petitioner was unable to

26   control his conduct due to pedophilia, not on the failure to enlist and present evidence from

27   mental health experts regarding drug abuse and the traumatic effects of his childhood

28

1   molestation.[1] Petitioner does not allege that the factual basis of his experts-related claim was

2   unknown at the time he filed his federal habeas petition or subsequent amended petitions.

3   Indeed, Petitioner's new theory of ineffectiveness is based on records that were available

4   prior to trial that indicate Petitioner was the victim of sexual abuse at age 14 and a habitual

5   drug user.  In addition, Petitioner testified at the evidentiary hearing that he expressly asked

6   counsel prior to sentencing to have him examined by a psychiatrist in light of his mental

7   health history.  Thus, the Court can discern no reason why federal habeas counsel could not

8   have alleged counsel's ineffectiveness for failing to consult with mental health experts given

9   the information about Petitioner's background contained in those records.

10          In *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994), the Ninth Circuit

11  held that a traverse "is not the proper pleading to raise additional grounds for relief" and that

12  issues raised for the first time in the petitioner's traverse were not properly before the district

13  court.  Here, the Court permitted Petitioner to file a motion for reconsideration to address

14  applicability of *Martinez* to the trial ineffectiveness claims previously found to be

15  procedurally defaulted.  This was an opportunity to present legal argument in support of

16  reconsideration, "not to raise substantively new issues or claims."  *Id.*  Because Petitioner

17  failed to include the reconsideration motion's new factual allegations in his federal habeas

18  petition, the claim alleging ineffectiveness based on counsel's failure to consult with and

19  present evidence from mental health experts is not properly before the Court.

20  **II.   Amendment**

21          In the event the Court concludes that Petitioner's reconsideration motion presents a

22  new claim for relief, Petitioner seeks leave to amend under Rule 15(a) of the Federal Rules

23  of Civil Procedure.  Respondents oppose the request, asserting that amendment would be

24

25  ───────────────

26          [1]      It appears from the evidentiary hearing and related pleadings that Petitioner has
    abandoned any assertion that his ability to control his conduct was significantly impaired,
27  either due to pedophilia or some other mental dysfunction, such that Bloom should have
    argued applicability of a "statutory" mitigating factor under A.R.S. § 13-703(G)(1).  (*See,*
28  *e.g.*, Doc. 485 at 171.)

1   futile because Petitioner's new claim is barred by the one-year statute of limitations set forth

2   in 28 U.S.C. § 2244(d).   Respondents further argue that Petitioner has unduly delayed

3   seeking amendment.

4          Under Rule 15(a), leave to amend "shall be freely given when justice so requires," and

5   courts must review motions to amend "in light of the strong policy permitting amendment."

6   *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir. 1986).   The factors that

7   may justify denying a motion to amend are undue delay, bad faith or dilatory motive, futility

8   of amendment, and undue prejudice to the opposing party.   *Foman v. Davis*, 371 U.S. 178,

9   182 (1962); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).   Leave to amend may be

10  denied based upon futility alone.   *See Bonin*, 59 F.3d at 845.   If proposed claims are

11  untimely, unexhausted, or otherwise fail as a matter of law, amendment should be denied as

12  futile.

13         **A.    Futility**

14         Respondents argue that Petitioner's new allegations are barred by the statute of

15  limitations and that amendment is futile.   Petitioner asserts otherwise, arguing that his new

16  allegations relate back to Claim 29 and are therefore timely pursuant to Rule 15(c)'s

17  relation-back doctrine.

18         In *Mayle v. Felix*, 545 U.S. 644, 659 (2005), the Supreme Court held that new claims

19  brought in an amended habeas petition relate back to the original petition for purposes of

20  § 2244(d)'s statute of limitations only if they arise out of a common core of operative facts

21  uniting the original and newly asserted claims.   An amended petition does not relate back

22  when it asserts a new ground for relief *supported by facts that differ in both time and type*

23  from those set forth in the original pleading.   *Id.* (emphasis added); *see also Ha Van Nguyen*

24  *v. Curry*, 736 F.3d 1287 (9th Cir. 2013) (observing that the "time and type" language in *Felix*

25  refers not to grounds for relief but to facts supporting habeas claims).   "The facts alleged

26  must be specific enough to put the opposing party on notice of the factual basis for the

27  claim." *Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010); *see also Baldwin County*

28  *Welcome Center v. Brown*, 466 U.S. 147, 149 n.3 (1984) (per curiam) (observing that

11

1    pleadings must give defendant "fair notice" of plaintiff's claim and grounds upon which it

2    rests).  If a new claim merely clarifies or amplifies a claim or theory already in the original

3    petition, the new claim may relate back to the date of the original petition and avoid a time

4    bar.  *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001).

5         Petitioner asserts in his memorandum that his new "failure to consult with experts"

6    claim relates back to his timely-filed original petition because it amplifies Claim 29 by

7    including new factual allegations relating to Petitioner's mental health that arise "out of

8    events connected by time and type to counsel's general failure to properly investigate and

9    prepare for the penalty phase hearing." (*Id.* at 6.)  He asserts that his reconsideration motion

10   identifies a specific avenue of investigation and preparation that counsel failed to conduct

11   and therefore shares a common core of operative facts with the more general "failure to

12   investigate" claim raised in the timely filed amended petition.  Respondents counter that

13   Petitioner's proposed amendment does not relate back because Claim 29 challenged

14   counsel's failure to investigate Petitioner's background and social history, whereas the

15   proposed amendment challenges counsel's failure to retain experts to evaluate Petitioner's

16   mental functioning, diagnose a mental condition, and testify at sentencing regarding that

17   diagnosis. The Court concludes that, pursuant to *Felix*, Petitioner's new claim does not relate

18   back to the timely filed amended petition because it is not tied to a common core of operative

19   facts with Claim 29.

20        In *Schneider v. McDaniel*, the Ninth Circuit rejected the habeas petitioner's argument

21   that a claim asserting ineffectiveness for failing to raise a voluntary intoxication defense

22   shared a common core of operative facts with a new claim alleging ineffectiveness for failing

23   to raise a defense based on diminished capacity.  674 F.3d 1144, 1151–53 (9th Cir.), *cert.*

24   *denied*, 133 S. Ct. 579 (2012).  "Presenting a claim that trial counsel rendered ineffective

25   assistance because he failed to establish a particular defense cannot preserve for the

26   petitioner any claim of ineffective assistance based on failure to establish a defense that the

27   petitioner might later discover." *Id.* at 1152.  This, the court observed, would stand *Felix* "on

28   its head." *Id.*  The court further found that an IAC claim identifying issues appellate counsel

12

1  should have raised on appeal did not relate back to a claim of appellate ineffectiveness based

2  on the failure to raise different issues.  *Id.* at 1151.

3          Similarly, in *Turner v. United States*, the First Circuit held that a district court was

4  within its discretion to deny amendment where both the original petition and the amended

5  petition alleged ineffective assistance of counsel related to cross-examination of a

6  government witness.  699 F.3d 578, 585 (1st Cir. 2012).  The original petition claimed that

7  trial counsel was ineffective for eliciting prejudicial testimony regarding the petitioner's

8  illegal drug activities.  *Id.*  The amended petition claimed that trial counsel was ineffective

9  for not asking the same government witness about prior inconsistent statements he made to

10  the FBI.  *Id.*  The court concluded that the allegation in the timely filed petition about

11  eliciting prejudicial testimony was "fundamentally different in type" from the claim that trial

12  counsel was, in general, ineffective at cross-examining government witnesses.  *Id.*; *see also*

13  *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the

14  Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the

15  original petition, and then amending the petition to assert another ineffective assistance claim

16  based upon an entirely distinct type of attorney malfeasance.").

17          Here, Petitioner raised in his timely filed amended petition only a very general claim

18  of ineffectiveness based on counsel's alleged failure to conduct a "thorough" background

19  investigation and demonstrate that Petitioner's ability to control his conduct was substantially

20  impaired due to pedophilia.  He now asserts ineffectiveness based on a new and substantially

21  different mitigation theory—that counsel failed to consult with experts who would have

22  diagnosed Petitioner as suffering from PTSD.  Nothing in Petitioner's original petition put

23  Respondents on notice that he was claiming ineffectiveness based on trial counsel's failure

24  to develop expert PTSD evidence.  Accordingly, Petitioner's new allegations do not "clarify"

25  or "amplify" Claim 29; rather, they constitute a claim of ineffectiveness that differs in both

26

27

28

1  time and type from the ineffectiveness claim raised in the amended petition.[2]  As such,

2  Petitioner's new claim of ineffectiveness based on counsel's failure to enlist and present

3  evidence from mental health experts does not relate back and is untimely.  *Cf. Johnson v.*

4  *United States*, 860 F. Supp. 2d 663, 723 (N.D. Iowa 2012) (finding no common core of

5  operative facts between timely filed allegations of ineffectiveness based on failure to

6  investigate and present specific mitigation evidence and allegations that counsel failed to

7  present at sentencing (1) expert testimony regarding remorse and (2) evidence of the effect

8  execution would have on petitioner's family).  Petitioner does not assert that he has any

9  grounds for equitable tolling.  Consequently, the Court finds that Petitioner's new claim is

10  barred by the one-year statute of limitations and that amendment is therefore futile.

11     **B.     Undue Delay**

12     Even if not futile, the Court concludes that amendment should be denied because

13  Petitioner waited nearly 13 years after filing his first amended petition to add his new claim.

14  Petitioner's allegation that counsel should have retained mental health experts rests on

15  information contained in records obtained by trial counsel before trial as well as Petitioner's

16  own personal history.  Petitioner also testified at the evidentiary hearing that he discussed his

17  mental health history with Bloom and asked counsel to have him examined by an expert.

18  Thus, Petitioner was aware of the facts supporting his new IAC claim since before he filed

19  his initial habeas petition in 1998.

20     Tellingly, Petitioner does not assert otherwise.  Rather, he argues in reply to

21  Respondents' assertion of undue delay only that *Martinez* is new law and that he "could not

22  ask this Court to amend the factual basis of a claim that the Court had already found to be

23  procedurally defaulted under then-existing law."  (Doc. 387 at 3.)  Petitioner misses the

24

25     [2]     In contrast, when Petitioner alleged in his merits brief significant new facts
26  concerning his claim of law enforcement misconduct, the Court found that the new
   allegations related back to the timely raised original claim because both shared a common
27  core of operative facts—the alleged planting of pink paint from the victim's bicycle onto the
28  bumper of Petitioner's car.  (Doc. 164 at 9–10.)

point.  He offers no explanation as to why his new factual allegations were not presented in the first amended petition, filed in May 2000, more than two years after the appointment of habeas counsel and five years before the Court ruled on the procedural status of Petitioner's claims.  Moreover, the Court expressly stated at the start of these proceedings that the amended petition prepared by counsel "shall include every possible constitutional error or deprivation entitling Petitioner to habeas relief."  (Doc. 5 at 3.)  Inexplicably, it did not. Accordingly, the Court finds as a separate ground justifying denial of amendment that Petitioner unduly delayed raising an IAC claim based on counsel's alleged failure to consult with or present evidence from mental health experts concerning the impact of Petitioner's childhood sexual trauma and drug abuse.

**III.    Reconsideration of Claim 29**

As an alternative ruling, the Court reconsiders Claim 29 under the assumption that the allegation concerning counsel's failure to consult with mental health experts is properly before the Court either because it does not constitute a substantially different claim than that raised in the second amended petition or because further amendment is appropriate.

**A.    Exhaustion**

Before applying *Martinez*, the Court first addresses Respondents' assertion that the alleged ineffective assistance of PCR counsel cannot serve as cause because Petitioner failed to exhaust such an allegation in state court.  *See Edwards v. Carpenter*, 529 U.S. 446, 451–54 (2000) (requiring that claim of appellate IAC be properly exhausted in state court before serving as cause to excuse default of other claims).  The Ninth Circuit expressly rejected this argument in its recent en banc decision in *Dickens*, 2014 WL 241871 at *n.17.  Moreover, this Court observes that unlike appellate-counsel IAC, which is grounded in the Sixth Amendment right to effective assistance of counsel, PCR-counsel IAC is not a freestanding constitutional claim.  Concomitantly, because Arizona law does not recognize the ineffectiveness of PCR counsel as an independent claim, any exhaustion requirement is excused because such a claim cannot be raised under state law.  *See State v. Escareno-Meraz*, 307 P.3d 1013, 1014 (Ariz.App. 2013) (holding that the Supreme Court's decision in

1  *Martinez* does not entitle petitioner to raise claim of PCR counsel's ineffectiveness in state
2  court).

3  **B.   Standard of Law**

4  In *Martinez*, the Court outlined what a petitioner must show for a district court to
5  reach the merits of an unexhausted and procedurally defaulted ineffective-assistance-of-trial-
6  counsel claim.  First, a petitioner must show that PCR counsel was ineffective under the
7  standards of *Strickland* for not raising the ineffective-assistance-of-counsel (IAC) claim.
8  *Martinez*, 132 S. Ct. at 1318.  Second, the petitioner must demonstrate that the defaulted IAC
9  claim is substantial.  *Id.* at 1318–19.  If both of these are met, then cause exists to excuse the
10  default.  However, before a court may reach the merits of a procedurally defaulted claim, the
11  petitioner must also establish prejudice.  *Id.* at 1316 ("A prisoner may obtain federal review
12  of a defaulted claim by showing cause for the default *and prejudice from a violation of*
13  *federal law*.") (emphasis added).  Thus, the third showing a petitioner must make is that he
14  suffered prejudice.  *See Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012), *cert. denied*,
15  133 S. Ct. 863 (2013) ("In applying this standard, *Martinez* made clear that a reviewing court
16  must determine whether the petitioner's attorney in the first collateral proceeding was
17  ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial
18  counsel is substantial, *and* whether there is prejudice."); *but see Detrich v. Ryan*, — F.3d —,
19  No. 08-99001, 2013 WL 4712729, at *6 (9th Cir. Sep. 3, 2013) (en banc) (plurality opinion)
20  ("A prisoner need not show actual prejudice resulting from his PCR counsel's deficient
21  performance, over and above his required showing that the trial-counsel IAC claim be
22  'substantial' under the first *Martinez* requirement.").

23  As a practical matter, courts must evaluate the underlying IAC claim to evaluate any
24  of the three showings that must be made to excuse a procedurally defaulted IAC claim.  First,
25  to find that PCR counsel was ineffective for not raising the defaulted IAC claim, a court must
26  determine under *Strickland* whether PCR counsel's conduct fell below an objective standard
27  of reasonableness and whether the petitioner was prejudiced.  To this end, a court must
28  evaluate whether there was any reason to raise the claim, which necessarily requires an

inquiry into the merits of the claim.  In addition, to show prejudice from PCR counsel's failure to raise the defaulted IAC claim, a reviewing court must find a reasonable probability of a different outcome had the claim been raised in state court.  *See Lopez v. Ryan*, 678 F.3d 1131, 1138 (9th Cir.), *cert. denied*, 133 S. Ct. 55 (2012) ("To have a legitimate IAC claim a petitioner must be able to establish both deficient representation *and* prejudice.").  This cannot be determined without considering the merits of the defaulted IAC claim.  *See Sexton*, 679 F.3d at 1159 ("To establish that PCR counsel was ineffective, Sexton must show that trial counsel was likewise ineffective . . . .").  Similarly, a court cannot determine whether a defaulted IAC claim is substantial without looking at the substance of the claim.  Finally, to determine if a petitioner has established prejudice to overcome the default, a court must evaluate whether the petitioner was prejudiced by trial counsel's allegedly deficient performance.  *But see Detrich*, 2013 WL 4712729, at *6.

## C.  Sentencing IAC Allegations

Petitioner contends that trial counsel Stanton Bloom failed to conduct an adequate mitigation investigation.  Specifically, Petitioner faults Bloom for ignoring evidence of Petitioner's childhood molestation and family dysfunction, which was documented in Atascadero State Hospital (ASH) records reviewed by counsel, and for failing to retain a mental health expert to diagnose PTSD and testify at sentencing concerning the effects of Petitioner's childhood molestation and severe drug abuse.  Petitioner further contends that Bloom employed an unreasonable trial strategy by ignoring evidence of Petitioner's childhood molestation, and all of its effects, to prevent the introduction of evidence of prior convictions and other bad behaviors that were already before the sentencing judge via a presentence report.  Finally, Petitioner argues that Bloom's deficient performance resulted in prejudice because the state court "did not have an accurate understanding of the trauma that Petitioner endured and the effects of that trauma."  (Doc. 468 at 8–9.)

Respondents argue that Bloom made a reasonable strategic decision not to further investigate Petitioner's mental health after reviewing the ASH records because the records reflected a diagnosis of pedophilia, refusal to participate in treatment, involvement in

disruptive and antisocial behavior, and discharge as being unamenable to treatment. Respondents assert that although the ASH records included references to Petitioner's childhood molestation, they contained no reference to PTSD or other trauma-based mental condition and therefore counsel reasonably did not investigate the molestation's effects on Petitioner. Respondents further argue that Bloom's sentencing strategy was reasonable because counsel believed Petitioner would not cooperate with a mental health investigation. Finally, Respondents contend that presentation of PTSD or the effects of Petitioner's childhood molestation would have opened the door to devastating rebuttal evidence, including further details about Petitioner's criminal history reflecting escalating sexual violence against children as well as expert testimony that would have undermined the alleged PTSD diagnosis and supported findings of pedophilia and antisocial personality disorder.

### D.   Relevant Facts

#### 1.   Sentencing Proceedings

After the jury found Petitioner guilty of first degree felony murder, the trial court conducted an aggravation/mitigation hearing pursuant to then-existing Arizona law. The State urged the court to find three aggravating factors: (1) Petitioner was previously convicted of another offense in the United States for which Arizona law authorized a sentence of life imprisonment or death, A.R.S. § 13-703(F)(1) (1984);[3] (2) Petitioner was previously convicted of a felony involving the use or threat of violence on another person, A.R.S. § 13-703(F)(2); and (3) Petitioner committed the offense in an especially heinous, cruel, or depraved manner, A.R.S. § 13-703(F)(6). The court ultimately found only the first factor to have been proven beyond a reasonable doubt—that Petitioner was convicted in California in 1975 for lewd and lascivious conduct involving a ten-year-old girl.

In mitigation, defense counsel urged in a written memorandum that the following factors be considered: (1) Petitioner was convicted only of felony-murder, not premeditated

---

[3]   In 2009, Arizona's capital sentencing statute was transferred and renumbered to A.R.S. § 13-751.

murder; (2) Petitioner was under the influence of drugs at the time of the offense, thus significantly impairing his ability to appreciate the wrongfulness of his conduct; (3) Petitioner suffered from a "significant history of mental disease ranging from the time he was thirteen years of age;" (4) Petitioner behaved appropriately during trial; (5) Petitioner's family loved and supported him; (6) there was insufficient evidence to establish the victim's cause of death; (7) Petitioner's age was 28 at the time of the offense; (8) residual doubt about guilt; (9) Petitioner's cooperation with authorities at the time of his arrest; (10) Petitioner expressed sympathy for the victim's family but could not express remorse due to his purported innocence; (11) Petitioner's intelligence and capacity for rehabilitation; (12) Petitioner's concern for his parents' welfare; and (13) Petitioner's positive influence on other inmates.  (ROA at 9283–88.)[4]

In its response, the prosecution noted its intention to rebut the alleged mitigating factors with (1) Petitioner's confession to inmate Jonas Bowen, which was suppressed from use at trial; (2) details concerning a 1980 conviction for kidnapping, oral copulation, and child molestation; (3) unredacted letters authored by Petitioner to Ernest Bernsienne detailing his continued sexual interest in children; and (4) Petitioner's repeated refusals to participate in any of the rehabilitation programs offered to him.  (ROA at 9313–17.)

The court's probation department prepared a presentence report (PSR) for the court's review prior to sentencing.  Attached to the PSR were numerous California court documents, including presentence and probation violation reports.  The presentence report for the 1975 lewd and lascivious conviction stated that in July 1974, when he was 18 years old, Petitioner cornered a ten-year-old girl on a sidewalk and fondled her vaginal area.  The report further indicated that Petitioner had a drug problem and frequently used marijuana, speed, LSD, and

---

[4]     "ROA" refers to the fifty-five-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-87-0135-AP).  "RT" refers to reporter's transcript.  As is the general practice in this District, the original reporter's transcripts, the trial court's presentence report, and a certified copy of the record on appeal were provided to this Court by the Arizona Supreme Court. (*See* Doc.104.)

19

1  other narcotics; that Petitioner was declared a ward of the court at age 16 for "sex

2  perversion," was ordered to cooperate in psychotherapy, refused to take probation counseling

3  seriously, and exhibited bizarre behavior (including threatening his mother with a butcher

4  knife and "generally terrorizing the family"); and that at age 17 Petitioner was committed to

5  the California Youth Authority for receiving stolen property and attempted grand theft.  The

6  probation officer observed that Petitioner was "no stranger to anti-social and dangerous

7  behavior" and "had not made a sincere and genuine effort" to overcome his drug problems.

8  He therefore recommended commitment to the Atascadero State Hospital for treatment as a

9  mentally disordered sex offender.

10          An August 8, 1978 probation officer's report attached to the PSR stated that officials

11  from ASH recommended resumption of criminal proceedings for the 1975 lewd and

12  lascivious conviction because after over three years of treatment Petitioner failed to "make

13  any significant progress or show any motivation to change," "resisted all efforts at

14  rehabilitation," and was seen to be "unamenable to treatment" due to his "immaturity and

15  irresponsible attitude and behavior."  On this same date, Petitioner was ordered to enter a

16  residential drug treatment program for six to nine months as a condition of probation.  An

17  August 28, 1978 probation report indicated that Petitioner left the program without

18  permission after only ten days and that during this short period Petitioner smoked marijuana

19  daily and was subsequently arrested for drug possession.  On September 20, 1978, Petitioner

20  was found to be in violation of probation and ordered into a new residential drug treatment

21  program.  A November 1, 1978 probation report indicated that Petitioner left this program

22  on the first day of his arrival and recommended revocation of probation and incarceration at

23  the state prison.

24          Also attached to the PSR was a presentence report for a 1980 conviction for the

25  kidnap and molestation of a seven-year-old boy.  The report indicated that Petitioner pulled

26  the victim onto his motorcycle and took him to a park where he pulled down the victim's

27  pants, masturbated and orally copulated the victim, inserted a finger in the victim's rectum

28  while threatening to kill him if he screamed, and forced the victim to orally copulate him

1   while putting a finger in Petitioner's rectum.  Petitioner admitted that the victim did not want

2   to accompany him but denied forcing sexual contact, stating "it was more of a guidance," that

3   "it wasn't savage or anything," and that "there probably was a fear there, no doubt, but it was

4   some curiosity too . . . the same thing happened to me when I was 14."  Petitioner added that

5   it "puzzles" him why he chooses small children as victims and said he wanted therapy.

6        The 1980 presentence report also detailed Petitioner's psycho-sexual development.

7   It stated that at age 14 Petitioner was orally copulated by an adult male who picked him up

8   when Petitioner was hitchhiking, that a few weeks later he engaged in mutual oral copulation

9   with a male schoolmate on a regular basis for about one year, that at age 16 he began having

10  almost daily intercourse and oral copulation with a girlfriend, that at age 17 he began going

11  to the Hollywood area where he was picked up by numerous young men who would orally

12  copulate him, that during his three-and-a-half years at ASH he maintained an ongoing

13  homosexual relationship with a 20-year-old patient, and that Petitioner considered himself

14  bisexual but preferred homosexual relationships.

15       According to a psychiatric report dated December 23, 1980, referenced in the 1980

16  presentence report, Dr. Blake Skrdla characterized Petitioner as "a basically passive

17  aggressive, emotionally immature, homosexual young man with a significant anti-social

18  component in his personality."  The probation officer noted Dr. Skrdla's uncertainty about

19  whether Petitioner would make further sexual advances toward minors in lieu of other acting

20  out behavior, but also noted the psychiatrist's observation that Petitioner had a compulsion

21  to repeat pleasurable experiences, which "could readily encompass young minors."  In

22  recommending that Petitioner be imprisoned, the probation officer concluded that Petitioner's

23  desire for psychotherapy and his statements regarding the offense lacked insight and were

24  self-serving.

25       At the aggravation/mitigation hearing, defense counsel called Petitioner and his father,

26  John Atwood, as witnesses to portray Petitioner as an intelligent, gifted, happy individual

27  who started using drugs after falling in with the wrong crowd.  (RT 5/6/87.)  John Atwood,

28  a retired Army Brigadier General, testified that prior to age 13, Petitioner was an excellent

21

1  student, who actively participated in athletic, church, music, and family activities.  He
2  enrolled Petitioner in a private military junior high school, in which Petitioner excelled for
3  the first semester.  Thereafter, new leadership took over the school, which began accepting
4  students expelled from other schools, and Petitioner was introduced to drugs.  According to
5  John, from age 13 until his arrest in this case, Petitioner used amphetamines, marijuana,
6  cocaine, and LSD extensively.

7      John Atwood also testified that by the time of Petitioner's lewd and lascivious arrest
8  in 1974 at age 18, Petitioner had lost all respect for authority.  During Petitioner's various
9  incarcerations over the next ten years, he continued to use drugs but made an effort to get
10  clean and find a job after being released from prison in May 1984, four months before the
11  instant offense.  John further testified that Petitioner's opportunities were limited by his
12  refusal to change his physical appearance, that Petitioner's IQ was measured around 130, and
13  that Petitioner earned a GED and got accepted for admittance into college despite never
14  completing the first year of high school.

15      John Atwood opined that Petitioner could be rehabilitated and be a productive
16  member of society.  He noted that Petitioner, with his parents' help, was attempting to enroll
17  in a program to earn a college degree in prison.  John further testified that Petitioner's
18  relationship with him and Mrs. Atwood had improved substantially during Petitioner's
19  incarceration for the instant offense and that Petitioner was particularly concerned about the
20  trial's impact on his parents' health.

21      In his testimony, Petitioner described using a wide variety of drugs since age 13.
22  Although he denied killing the victim and professed sympathy for the victim's family,
23  Petitioner claimed that he had been using cocaine, codeine, Demerol, and marijuana on the
24  day of her murder, which impaired his ability to think clearly.  He briefly described his
25  incarceration at ASH, claiming he was not recommended for out-patient therapy because of
26  a verbal altercation.  He also claimed to having changed for the better since his arrest and
27  said he had assisted other inmates by teaching them the dangers of drugs.

28      On cross-examination, Petitioner admitted that he failed to complete therapy as a

22

1    parole condition, violated parole, incurred disciplinary write-ups while in jail pending trial

2    in this case, and failed to complete any rehabilitation programs.  He further acknowledged

3    being classified by ASH personnel as a mentally disordered sex offender, who was a danger

4    to others.  In a letter to the sentencing judge, Petitioner described having been raised in a

5    loving home but said he fell in with the wrong crowd and started using drugs.

6        At sentencing, the trial court determined that Petitioner had failed to establish any

7    mitigation. It did not consider Petitioner's age to be mitigating and found that Petitioner had

8    failed to prove that he was significantly impaired by drugs at the time of the offense.  It

9    further rejected the felony murder conviction as mitigation because Petitioner was the only

10   participant in the offense.  In conclusion, the court found that none of the alleged mitigation,

11   considered collectively, was sufficiently substantial to call for leniency.

12       On appeal, the Arizona Supreme Court independently reviewed and reweighed the

13   aggravating and mitigating factors and determined that death was the appropriate sentence.

14   *Atwood*, 832 P.2d at 665–72.  It agreed with the trial court that none of the alleged mitigating

15   circumstances were sufficiently substantial to call for leniency and found that Petitioner had

16   failed to prove by a preponderance of the evidence that his capacity to appreciate the

17   wrongfulness of his conduct was significantly impaired by drugs.  With regard to Petitioner

18   having been molested as a child, the Court rejected any suggestion that the molestation

19   "justifies, excuses, or otherwise mitigates" Petitioner's crimes and stated that the "remedy

20   for one who has been molested is not to molest others and ask to be excused, but rather to

21   submit to therapy, which, as noted above, defendant has repeatedly refused to do."  *Id.* at

22   672.

23                    2.    Federal Habeas Proceedings

24       Petitioner appended to his motion for reconsideration numerous records from ASH

25   and the California Department of Corrections, miscellaneous family records, declarations

26   from individuals who knew Petitioner as a child but were not contacted by defense counsel

27   prior to sentencing, and a report from forensic psychiatrist Donna Schwartz-Watts.  (Doc.

28   367-2.)  In opposition to the motion, Respondents provided a transcript of the deposition

1    testimony of jailhouse informant Jonas Bowen, a preliminary hearing transcript from

2    Petitioner's 1980 molestation conviction, Petitioner's letter to the sentencing judge, and

3    unredacted copies of Petitioner's pre-offense letters to Ernest Bernsienne.  (Doc. 373.)

4    During the evidentiary hearing, the court heard testimony from Petitioner, Petitioner's trial

5    counsel Stanton Bloom, Bloom's paralegal Deborah Gaynes, Petitioner's appellate counsel

6    Carla Ryan, prosecutor John Davis, Dr. Schwartz-Watts, and (testifying for Respondents)

7    psychologist Erin Nelson.  The Court further admitted numerous exhibits proffered by the

8    parties, including a supplemental report from Dr. Schwartz-Watts, a report from Dr. Nelson,

9    transcripts of Petitioner's interview with Dr. Nelson and the parties' deposition of Stanton

10   Bloom, 451 pages of ASH records, and various other documents.  In addition to these

11   materials and testimony, the Court has considered Petitioner's proffered expert declarations

12   concerning the prevailing professional norms for mitigation investigation and capital defense

13   practice at the time of Petitioner's trial.  (Doc. 459.)

14        *Family History*

15        According to Petitioner's aunt, Petitioner's mother Alice Atwood was born into a

16   Jewish family in 1916 in Austria and her family fled at the beginning of World War II,

17   narrowly escaping the Gestapo.  (Doc. 367-2 at 18.)  However, Alice never spoke about that

18   aspect of her life.  Petitioner's aunt also states that mental illness runs in Alice Atwood's

19   family and that Alice was emotionally erratic and sometimes physically rough with

20   Petitioner.  His aunt further asserts that she herself was an alcoholic and that her sons,

21   Petitioner's paternal cousins, both struggled with drug addiction.  In his interview with Dr.

22   Nelson, Petitioner acknowledged being spanked as a child for bad behavior but would not

23   characterize it as abusive.  (Ex. 98-B at 122.)

24        Sheila Greger was a neighbor of the Atwoods and knew Petitioner since he was he

25   was a one-year-old.  (Doc. 367-2 at 15.)  One of her sons was a close friend of Petitioner's,

26   and she told Dr. Schwartz-Watts that her son was with Petitioner when he was sexually

27   molested at age 14.  Greger attended the court hearing when Petitioner testified against his

28   abuser.  She opined that Petitioner's mother was emotionally fragile and said Petitioner was

24

1    "devastated" when his mother suffered a miscarriage when he was eight or nine years old.

2    She further stated that Petitioner was hard to handle emotionally and that his father expressed

3    concern about Petitioner's emotional condition when he was nine or ten years old.

4         Dr. Burt Crausman was Petitioner's mother's treating psychologist. (Ex. 6.)[5]  He saw

5    her once a week for about five years starting when Petitioner was three years old.  According

6    to Dr. Crausman, Petitioner's father was a cross-dresser, Petitioner's mother had anxiety due

7    to marital difficulties, and Petitioner shared a bed with his mother when he was a small child.

8    In an interview with Dr. Schwartz-Watts, Petitioner had no recollection of sharing a bed with

9    his mother or of any unusual behaviors from his father.  (Ex. 3 at 3; Doc. 485 at 132.)

10        *Atascadero State Hospital Records*

11        Defense counsel Bloom testified that he reviewed Petitioner's ASH records in

12   developing his mitigation strategy. (Doc. 505 at 55.)  The records  included the presentence

13   report of a 1974 conviction for possession of marijuana, which stated that "there has been a

14   need for psychiatric help since this young man was ten years of age." (Ex. 205 at 423.)  The

15   report further elaborated on Petitioner's 1972 conviction for child molestation, stating that

16   a January 1973 psychiatric report diagnosed Petitioner with "unsocialized aggressive reaction

17   of adolescence, chronic depressive neurosis, possible psychological drug dependency, and

18   ruling out of latent schizophrenia and ruling out of central nervous system damage." (*Id.* at

19   425.)  The psychiatric report also noted that Petitioner is impulsive, "has difficulty in

20   tolerating direction from others or in delaying seeking gratification" and "appeared to take

21   a barely serious attitude towards his behavior." (*Id.*)

22        In 1975, on the eve of his nineteenth birthday, Petitioner was referred to two

23   psychiatrists—Drs. Alfred Coodley and George Abe—for evaluation in connection with his

24   lewd and lascivious conviction.  Their reports are contained in the ASH records.  Petitioner

25   told Dr. Coodley that his arrest at age 16 for sexual perversion involved being the lookout

26   for a friend who molested a girl; he denied touching the child himself.  He described

27

28            [5]    "Ex." refers to exhibits admitted at the evidentiary hearing.

1    extensive drug use and claimed to have an active heterosexual life with two girlfriends since

2    age 15.  He estimated having intercourse about 75 times with 20–30 girls and homosexual

3    relationship 10–15 times, but preferred heterosexual relations.  Petitioner also told Dr.

4    Coodley that he was placed at Resthaven psychiatric hospital for three months in 1972, after

5    he threatened a cousin with a knife, and had also been in psychotherapy with a Dr. Brandt

6    for a number of years.  Dr. Coodley concluded that Petitioner was a mentally disordered sex

7    offender with a severe drug problem in addition to "impulsive, aggressive and somewhat

8    disorganized behavior."  (Ex. 205 at 431.)

9        Petitioner told Dr. Abe that he had experienced temper tantrums all of his life,

10   manifested by kicking and slamming doors, but that his parents did not scold or punish.  He

11   felt loved by his parents, believed his father was a reasonably strict disciplinarian, and that

12   his mother spoiled him.  He quit school in the eleventh grade at age 17 because he was taking

13   drugs and not studying.  Petitioner also reported seeing Dr. Brandt but said he did not receive

14   any help with his problems because he had no real interest in being helped.  Dr. Abe

15   observed no delusions, hallucinations, or disordered thinking and concluded that Petitioner

16   was a mentally disordered sex offender who was a danger to minor girls and would benefit

17   from commitment at a state hospital.  (Ex. 205 at 434.)

18       Petitioner was committed to Atascadero State Hospital on February 11, 1975.  He

19   resided there through August 1978.  In a report dated February 13, 1975, a psychiatrist noted

20   no abnormal thought content of any kind and diagnosed sexual deviation-pedophilia-female.

21   (Ex. 205 at 451.)  A social history obtained upon admission stated that Petitioner denied

22   interest in young girls, had a normal heterosexual relationship with a 20-year-old girlfriend,

23   was molested at age 14 by a 24-year-old man who "forced the patient to allow him to fellate

24   the patient," and beginning at age 15 allowed gay friends to fellate him "a couple of times."

25   (*Id.* at 300–01.)  Additional admission notes list schizoid personality as a tentative psychiatric

26   diagnosis and observed that Petitioner's mother was overly protective, made excuses for

27   Petitioner's behavior, and believed Petitioner had a drug, not sexual, problem.  (*Id.* at 299.)

28       On July 16, 1975, Petitioner reported that he was forcibly sodomized by a fellow

26

patient when he went to that person's room to obtain drugs.  He was examined by a doctor who made "no findings." (Ex. 205 at 277.)  Throughout the first six months of Petitioner's commitment, he engaged in frequent misconduct and lost privileges. (*Id.* at 283–93.) At one point, he expressed that he didn't care what anyone thought of him, that he was not truthful to his parents or staff about his relationships and activities, and that he openly defied rules. (*Id.* at 275–76.) On July 20, 1975, staff noted that Petitioner had severe behavior problems, especially in areas of impulse control and dishonesty, refused to cooperate, showed no real motivation for change, and was "very adept in his manipulations of others, including his peers, the treatment staff and his parents." (*Id.* at 275.)  Another note indicated that Petitioner "continues to be verbally assaultive toward his peers making snide and insulting remarks." (*Id.* at 264.)  A July 30, 1975 report indicated that Petitioner had "learned well" the art of manipulation, especially of his mother, and used others' weaknesses for his own gain. (*Id.* at 62.)

In August 1975, an Atascadero program director reported to the court that Petitioner's progress had been slow and minimal. (*Id.* at 410.)  A staff review dated October 27, 1975, concluded that Petitioner manipulates others for his own gains, blames others for his actions, denies responsibility, and misrepresents the facts regarding his behavior. (*Id.* at 54.)  It further noted that Petitioner's mother was overprotective and demanding with regard to Petitioner's treatment, which caused Petitioner to be less responsible. (*Id.*)  A January 1976 report indicated that Petitioner refused to follow rules, belonged to a Satanic religion, and believed that child molestation was "okay." (*Id.* at 63–64.)  A February 1976 court report stated that Petitioner was not making any appreciable progress. (*Id.* at 409.)  "He tends to be evasive regarding his offense" and "his primary problem is his rebellious attitude towards his parents, manifested in the form of drug abuse and child molestation." (*Id.*)  In March 1976, it was noted that Petitioner was not amenable to working on his problems "in the sexual realm." (*Id.* at 51.)  An August 1976 report stated that Petitioner had been transferred into a new program, had behaved well for several weeks, and had earned a high school equivalency certificate. (*Id.* at 408.)  Around this same time, progress notes indicated that

1   Petitioner still needed to work on his sexual acting out, dealing with authority, social

2   interaction with women, low self-concept, trust of others, sexual identity, and relationship

3   with his mother.  (*Id.* at 215.)  In addition, an August 1976 staff report indicated that

4   Petitioner knew "the proper words" to use in therapy but did not actually make gains, and

5   that he continued to manipulate his mother to his advantage.  (*Id.* at 46.)

6        In February 1977, it was noted that Petitioner's behavior had improved, he had not

7   been physically assaultive for over six months, and he seldom appeared to be under the

8   influence of drugs.  (*Id.* at 178.)  In July 1977, Petitioner's treatment team recommended that

9   he be released to outpatient treatment.  (*Id.* at 68–71.)  The court approved release in

10  December 1977 but then almost immediately revoked the order upon being informed by ASH

11  staff that Petitioner required further treatment.  (*Id.* at 37, 136–37, 395–402.)  In April 1978,

12  Petitioner was a "major person" involved in the theft of controlled substances from a

13  medication room and was found in a "homosexual pairing" with another patient.  (*Id.* at 39,

14  43–44, 103, 115–18.)  When confronted about another instance of sexual misconduct,

15  Petitioner became belligerent and threatened bodily harm to staff.  (*Id.* at 90.)  Staff review

16  at this time noted that Petitioner was not interested in change, was a negative influence on

17  other patients, was a danger to society, and was unwilling to work on his child molesting

18  problem.  (*Id.* at 44.)

19       A May 1978 staffing report summed up Petitioner's course of treatment at ASH,

20  noting that he was initially transferred between programs "due to his general refusal to follow

21  rules and regulations for becoming involved in numerous behavioral incidents."  (Ex. 205

22  at 38.)  Petitioner lost privileges due to suspicion of drug use.  "He generally failed to make

23  any significant progress or show any motivation to change, and was seen to be basically

24  unamenable to treatment."  (*Id.* at 39.)  After transfer to another program in April 1976,

25  Petitioner "continued to be under suspicion for the use of drugs and holding contraband, and

26  was believed to be part of the drug traffic problem in the hospital."  (*Id.*)  Thereafter,

27  Petitioner had a period of six months where he "reversed his negative pattern and showed

28  steady improvement in all areas of functioning.  A lot of therapy work has been focused on

28

1    Frank's relationship with his parents, also the problems which led him to act out through
2    child molesting behavior." (*Id.*) However, after community placement was approved in July
3    1977, Petitioner regressed back "to his old negative and belligerent behavior, which included
4    a physical acting-out of breaking a glass window." (*Id.*) Between December 1977 and April
5    1978, Petitioner "continued to make excuses for his behavior and to be impulsive. Frank
6    does not give thought to the consequences of his behavior. He has been presented with many
7    opportunities to work on his problems, but he is resentful of any limits placed on his
8    activities." (*Id.*)

9        An "acute assistance" team reported in June 1978 that Petitioner was "a constant
10   management problem" who "displayed manipulative behavior" and agitated other patients.
11   (Ex. 205 at 448.) On July 18, 1978, ASH's medical director informed the court that
12   Petitioner continued to be a mentally disordered sex offender, who had not recovered,
13   remained a danger to the health and safety of others, and would not benefit from further
14   treatment at a hospital. He therefore recommended that Petitioner be returned for resumption
15   of criminal proceedings. (*Id.* at 391.) In August 1978, Petitioner was released on probation.

16       *Post-ASH Evaluations*

17       Between August 1978 and June 1980, when he was arrested for kidnapping and
18   molesting a seven-year-old boy, Petitioner was arrested for various other criminal activities
19   and incarcerated for probation violations. A December 1978 prison psychological evaluation
20   by Dr. E. Rivlin observed no signs of psychosis and concluded that Petitioner had an
21   "inadequate" personality disorder: "He is a person who makes inadequate and/or ineffectual
22   responses to emotional, social, intellectual, and vocational demands placed upon him." (Ex.
23   163.) A November 1979 prison psychological evaluation by Dr. Robert Orling noted that
24   Petitioner had a "chronic" personality disorder, was "predisposed to alcohol and sexual
25   deviation," would likely continue to be a drug abuser and habitual criminal, and had poor
26   impulse control. (Ex. 171.) After his incarceration for the 1980 kidnap and molestation
27   conviction, prison staff psychologist R. Rose noted that Petitioner "thoroughly enjoys
28   wallowing in the unrestrained gratification of his regressive impulses" and diagnosed him

1   with an "immature" personality disorder with male pedophiliac tendencies.  (Ex. 162.)  Dr.

2   Rose further noted that Petitioner "has no real intention of giving up his privileged status to

3   do whatever he likes, whenever he likes."  (*Id.*)

4           In 1988, shortly after Petitioner's conviction and in conjunction with a civil lawsuit

5   filed by the victim's family, psychologist Dr. Richard Hinton reviewed numerous records

6   relating to Petitioner's criminal history in California, correspondence between Petitioner and

7   various individuals, and a large tack of predominately homosexual and pedophilic materials

8   seized by Petitioner's parole officer in September 1984.  (Ex. 108.)  From these materials,

9   Dr. Hinton stated that Petitioner had a history of polysubstance abuse, violent behavior, and

10  sexual acting out.  He further observed that Petitioner's pattern regarding child victims was

11  "highly consistent" and appeared to increase in force, threat, and intimidation with each

12  successive victim.  (*Id.* at 8.)  Dr. Hinton also noted that Petitioner's relationship with his

13  parents was "highly conflict-ridden" and that Petitioner "assumed a great deal of power and

14  control [over them] through his use of threat and intimidation."  (*Id.* at 9.)

15          In 1995, more than a decade after Petitioner's arrest and incarceration for the instant

16  offense, psychologists for the Arizona Department of Corrections diagnosed Petitioner with

17  sexual dysfunction (not otherwise specified), polysubstance dependence, and antisocial

18  personality disorder.  (Ex. 107 at 2.)  The report noted that Petitioner "has had a pervasive

19  and long standing pattern (beginning by early adulthood and present in a variety of contexts)

20  of antisocial behavior.  These factors include irritability and aggressiveness, impulsivity, lack

21  of regard for the truth, and reckless behavior."  (*Id.*)  The report further noted that Petitioner

22  had been threatened by fellow inmates in the past regarding his offense.

23          *Habeas Expert Evaluations*

24          Dr. Schwartz-Watts, a forensic psychiatrist, evaluated Petitioner in October 2012.  In

25  her first report, she concluded that Petitioner experienced normal development and

26  adjustment prior to being sexually abused at age 14 and began using drugs, engaging in

27  illegal behavior, and performing poorly in school afterward.  (Doc. 367-2 at 273.)  In

28  describing the molestation, Dr. Schwartz-Watts stated that Petitioner and a younger friend

were hitchhiking when an older male "lured him with pot." (*Id.* at 269.) The assailant put the younger friend in a closet and then forced Petitioner to perform fellatio. In addition to this traumatic event, Dr. Schwartz-Watts noted two additional sexual assaults: Petitioner reported to her that he had been forced to perform fellatio on three males in a juvenile detention facility at age 16, and ASH records indicated that Petitioner reported being the victim of rape by another patient. (*Id.* at 270.)

Dr. Schwartz-Watts diagnosed Petitioner as suffering from PTSD, substance abuse, and an avoidant personality disorder. (*Id.* at 271.) She based her PTSD diagnosis on the following criteria from the fourth edition of the DSM-IV-TR:

- Exposure to traumatic event—Petitioner experienced three episodes of sexual abuse and developed substance abuse and conduct disorders as a result of the first molestation at age 14.

- Re-experiencing of traumatic event—Petitioner experiences psychological distress and physiological activity when exposed to external cues that symbolize or remind him of the traumatic events, as evidenced by being placed on suicide watch in January 2012 when he threatened to hurt himself due to threats he received from other inmates.

- Persistent avoidance of stimuli associated with the trauma—Petitioner avoids dealing with all inmates due to the past juvenile hall incident and assaults by other inmates while incarcerated on death row.

- Persistent symptoms of increased arousal—Petitioner experiences hypervigilance (i.e., is "on guard" for threats).

- Duration—Petitioner has experienced the symptoms in the preceding three criteria for more than one month.

- Significant impairment resulting from the disturbance—Petitioner has a history of psychiatric treatment, has been treated for anxiety, experienced hallucinations while at ASH, and began abusing drugs after the assault at age 14.

1    (*Id.* at 271–73.)

2          After reviewing Dr. Nelson's report (summarized below), Dr. Schwartz-Watts met

3    again with Petitioner and issued a revised report.  At some point before this meeting,

4    Petitioner reviewed both her initial report and that of Dr. Nelson.  (Doc. 485 at 166–67.)

5    During their second interview, Petitioner told her that prior to the current investigation he

6    had not seen anything wrong with the molestation that occurred to him at age 14 but now

7    realizes he believed he was at fault for the abuse because he did not say "no."  (Ex. 3 at 7.)

8    "He has downplayed his guilt over the years by telling people he liked it and didn't mind."

9    (*Id.* at 13.)  He also provided "many more details" about being sexually pressured while

10   confined and reported a forced sexual encounter with a man he met at a bar.  (*Id.* at 8, 11.)

11         Dr. Schwartz-Watts's revised report acknowledged that Petitioner used drugs,

12   engaged in illegal behavior, and had a decrease in his school functioning before the

13   molestation, but concluded that these behaviors escalated afterward.  (Ex. 3 at 3, 15.)  She

14   again diagnosed Petitioner with PTSD and also a pedophilic disorder and antisocial

15   personality disorder by history.  With respect to PTSD, Dr. Schwartz-Watts applied the

16   following additional criteria set forth in the newly-released DSM-V:

17   •    Negative alterations in cognitions and mood—Petitioner has had a persistent

18        negative emotional state from blaming himself for the molestation and the

19        assault at ASH.

20   •    Marked alterations in arousal and reactivity—Petitioner has a 20-year history

21        of reckless and self-destructive behavior, has exhibited numerous angry

22        outbursts of verbal aggression towards corrections officers, and is

23        hypervigilant in situations.

24   •    Disturbance not attributable to other condition—PTSD is highest for survivors

25        of rape and military combat and captivity, and individuals with PTSD are 80%

26        more likely to meet diagnostic criteria for at least one other mental disorder,

27        such as Petitioner's substance abuse disorders.

28   (*Id.* at 13–14.)

1    At the evidentiary hearing, Dr. Schwartz-Watts testified that she could not determine
2    when Petitioner developed PTSD and that it could have been in response to his experiences
3    in prison since being incarcerated for the instant offense. (Doc. 485 at 101, 171.)  She further
4    stated that PTSD probably would affect Petitioner's ability to control his behavior only when
5    "he gets explosive and very verbally aggressive and says some very hurtful things" and that
6    it had no direct relationship to the instance offense.  (*Id.* at 171.)  Rather, she opined that a
7    common complication of PTSD is substance abuse, which "certainly played a role," along
8    with Petitioner's poor coping strategies and judgment."  (*Id.* at 172.)

9    Dr. Schwartz-Watts also testified that Petitioner met the criteria for pedophilia but she
10   declined to make it an active diagnosis in part due to the prejudicial nature of such a
11   diagnosis, the absence of physiologic testing (which she was not requested to undertake), the
12   lack of evidence that Petitioner "groomed" victims, and the lack of details regarding some
13   of Petitioner's offenses.  (*Id.* at 66–68, 137–39.)  She further acknowledged that Petitioner
14   would have met the diagnostic criteria for antisocial personality disorder, "[e]specially
15   around the time of his original trial," and that he's been diagnosed with it since being in the
16   Arizona Department of Corrections.  (*Id.* at 148–49.)  Although she attributed much of his
17   pre-incarceration antisocial acts to substance abuse, she said "it's very fair to say a lot of his
18   actions [once he was confined] were sociopathic.  They were to get something he wanted.
19   They were to manipulate."  (*Id.* at 151.)

20   Dr. Nelson, a forensic psychologist, evaluated Petitioner in June 2013.  Utilizing
21   criteria from the DSM-V, she diagnosed Petitioner as suffering from substance abuse (in
22   remission due to incarceration), pedophilic, and antisocial personality disorders.  (Ex. 98 at
23   46–51.)  Dr. Nelson based her pedophilia diagnosis on Petitioner's three prior convictions
24   for sexual offenses against children between 1972–1980 as well as on letters Petitioner wrote
25   to Ernest Bernsienne while incarcerated in California in the early 1980s.[6]  In one, Petitioner
26
27        [6]     Although not referenced in her report, Dr. Nelson testified at the evidentiary
28   hearing that her diagnosis of pedophilic disorder was further supported by a stack of

33

1    opined that he is "still attracted to kids" and that sex with children should be legal.  (*Id.* at

2    48.)  In another, he wrote of having urges that could be satisfied only by sex with a minor and

3    that his "love for innocent young boys is an earthly and physical desire."  (*Id.* at 49.)  Dr.

4    Nelson further noted that in 1996, almost ten years after his conviction for the instant offense,

5    Petitioner attempted to obtain pictures of young children from an international "sponsor-a-

6    child" organization.  (*Id.*)  With regard to her diagnosis of antisocial personality disorder, Dr.

7    Nelson stated that Petitioner meets "virtually every criterion."  (Ex. 98 at 50.)  She explained:

8        From a young age, Mr. Atwood has engaged in a pattern and practice of
         behavior focused predominately on personal gratification.  He has failed to
9        conform with lawful and culturally normative ethical behavior.  He has
         demonstrated a lack of concern for the feelings/needs of others and a lack of
10       remorse after hurting or mistreating others.  He has demonstrated manipulative
         behavior, callous disregard for the impact of his actions, dishonesty and anger.
11       He has engaged in dangerous, risky and potentially self-damaging behavior
         without regard for the consequences and has repeatedly demonstrated
12       impulsivity and irresponsibility.

13   (*Id.* at 51.)

14       Dr. Nelson further opined that at the time of the offense Petitioner's thinking was

15   "clear, deliberate, and organized" and his psychological and substance abuse conditions did

16   not impede his capacity to appreciate the wrongfulness of his conduct.  (Ex. 98 at 64–73.)

17   She noted that Petitioner's "history represents detailed, calculated and goal-directed

18   behavior, motivated by a desire to satisfy his own interests" and that he has "consistently

19   demonstrated foresight and the capacity for detailed planning."  (*Id.* at 64.)  In reaching her

20   conclusions, Dr. Nelson cited both pre- and post-offense behavior, including that Petitioner

21   (1) was a seasoned criminal well versed in the legal system with a history of attempting to

22   evade prosecution; (2) told Bernsienne just months before the instant offense that he "wanted

23   to find a kid and this time he'd make sure the kid wouldn't talk;" (3) knowingly violated

24   parole by traveling out of state but ensured that he did not miss appointments with his parole

25   officer; (4) crafted a detailed plan to develop a drug distribution ring during the time period

26   _____

27   voluminous pornographic materials that were in Petitioner's possession at the time of his
     arrest, including "extensive and detailed written fantasy stories specifically addressing
28   children."  (Doc. 485 at 193.)

immediately prior to the instant offense; and (5) made efforts to avoid detection following the crime. (*Id.* at 64–71.) "Prior to his current incarceration, Frank Jarvis Atwood repeatedly demonstrated a pathological desire for two things:  young children and illicit drugs.  Mr. Atwood also repeatedly demonstrated that he was willing to engage in any number of criminal activities in order to satisfy these desires." (*Id.* at 72.) She concluded: "Although Mr. Atwood has clearly made a series of exceedingly poor choices over the course of his lifetime, the choices were his own.  The instant offense was no exception." (*Id.*)

Dr. Nelson disagreed with Dr. Schwartz-Watts's PTSD and avoidant personality disorder diagnoses. (Ex. 98 at 52.)  Addressing each of the PTSD criteria found by Dr. Schwartz-Watts, Dr. Nelson made contrary observations based on Petitioner's history and behavior.  For example, she noted that Petitioner had consistently described the molestation at age 14 as benign and nothing indicated a traumatic response. (*Id.* at 53.)  Petitioner told a detective in the instant matter that he was forced and threatened to testify against his abuser, that the man would have stopped if Petitioner had asked, and that Petitioner had liked it. (*Id.*)  He told Bernsienne that he could remember no unpleasant or unusual childhood experiences other than seeing a psychiatrist at age six and that he had "enjoyed" the molestation encounter:  "This man did nothing but teach me how to 'french' kiss and gave me some head." (*Id.* at 53–54.)

Dr. Nelson also observed that Petitioner began abusing illicit substances and was kicked out of school for substance intoxication prior to the molestation and that Petitioner met the offender as a result of drug-seeking behavior. (*Id.* at 55.)  Citing a "parent/relative questionnaire" contained in California Department of Corrections records, she noted that teachers had trouble with Petitioner beginning in the seventh grade and that he started stealing things at age 10. (*Id.* at 56.)  In addition, Dr. Nelson observed that Petitioner did not exhibit hypervigilance or avoidance behavior following the molestation at age 14. "To the contrary, Mr. Atwood persisted in engaging in substance abuse, participating in sexual encounters with multiple partners, seeking out sexual contacts in exchange for payment, and engaging in a transient lifestyle including exposure to a variety of potential harms." (*Id.* at

59–60.)  To the extent Petitioner "fears" other inmates, Dr. Nelson attributed this to the
nature of the instant offense and Petitioner's own institutional behavior, not to the alleged
sexual traumas, and noted that Petitioner has developed friendships in prison and tried to
counsel other jail detainees following his arrest in this case.  (*Id.* at 57, 59.)  Moreover, she
saw "no indication that, at any point, despite spending years in a psychiatric facility that Mr.
Atwood reported, or was treated for, symptoms of trauma."  (*Id.* at 60.)  Similarly, she noted
that records from the Arizona Department of Corrections show an absence of mental health
services, except in recent years when Petitioner has complained of anxiety due to situational
factors such as change in housing or privilege levels.  (*Id.* at 61.)

At the evidentiary hearing, Dr. Nelson explained that she believed Dr. Schwartz-
Watts's PTSD diagnosis was not unreasonable based on how Petitioner currently presents,
but in her view "a large amount of the evidence" to support the criteria for Dr. Schwartz-
Watts' diagnosis occurred since his incarceration for the instant offense.  (Doc. 485 at
203–04.)  She also clarified that some of Petitioner's behaviors could fit the criteria for either
a PTSD or antisocial personality diagnosis.  However, she believed based on "the totality of
the information available," that Petitioner's "presentation is best captured by antisocial
personality disorder."  (*Id.* at 199, 232–33.)

*Mitigation Strategy*

In his deposition, defense counsel Bloom said he investigated Petitioner's life history
by reviewing the ASH records and speaking often with Petitioner and his parents throughout
the two years of pretrial proceedings.  (Ex. 217 at 32, 43–44.)  Bloom discussed the case
frequently with his paralegal but assumed the primary responsibility for developing
mitigation.  (*Id.* at 29–30.)  Although he considered obtaining Petitioner's previous mental
health records and consulting with a mental health expert, he chose not to do so.  (*Id.* at
40–44.)  He also considered introducing at sentencing the ASH records but decided against
it out of concern the prosecution would bring out conduct that demonstrated propensity and
because the records overall were, in his view, more harmful than helpful.  (*Id.* at 55–56; 143.)
Bloom therefore decided to allege only generally that Petitioner had "prior psychiatric

36

1  problems" without getting into detail and to suggest Petitioner's drug use may have affected
2  him mentally.  (*Id.* at 56, 65–67.)

3      Bloom explained that he chose not to develop evidence concerning Petitioner's mental
4  state because (1) Petitioner's parents believed Petitioner's problems were caused by drugs,
5  not mental disease; (2) Petitioner himself did not want Bloom "to bring in anything about his
6  mental problems or anything about his sexual past;" (3) the ASH records demonstrated
7  "sociopathic, antisocial behavior, [and] pedophilia," all of which Bloom thought were
8  harmful; (4) Bloom did not believe a mental health expert was going to find "some kind of
9  a mental disease that was of significant impairment that would be a mitigating factor"; and
10  (5) he was concerned that evidence demonstrating Petitioner's predisposition toward young
11  children would undermine his "lack of premeditation" argument.  (Ex. 217 at 68–71.)  He
12  also stated that none of the ASH records indicated that Petitioner suffered from a significant
13  mental disease and that he did not want to argue that as the victim of child molestation,
14  Petitioner had a propensity to be a child molester himself.  (*Id.* at 72–73.)

15      Bloom did not contemplate exploring PTSD because in his experience dealing with
16  mental state issues PTSD resulting from molestation was not a prevalent diagnosis at the time
17  of Petitioner's trial and because Petitioner did not appear to take the molestation very
18  seriously or to be traumatized by it.[7]  (*Id.* at 74, 79, 131.)  Bloom said he and Petitioner
19  discussed the molestation "in the initial stages" so that Bloom could assess how it had
20  affected him and whether there was cause to have him examined.  (*Id.* at 79.)  However,
21  Petitioner was "reluctant to talk about it, didn't go into details about it, said it was not a big
22  deal to him, didn't think it was any big deal."  (*Id.*)  Bloom further stated that Petitioner

23

24      [7]      By the time of Petitioner's trial in 1987, Bloom had tried around 250 jury
25  felony trials, including 35–40 murder cases, and had represented defendants in thousands of
    felony matters.  (Doc. 505 at 51–53.)  Bloom also had extensive experience with mental
26  health issues and had enlisted mental health experts to investigate and develop mitigation in
27  prior cases.  (*Id.* at 48–49, 68–69.)  Although he had worked on at least of couple of capital
    cases, Petitioner's case was Bloom's first to advance to a capital sentencing hearing.  (*Id.* at
28  48.)

37

1  indicated he would not cooperate with an examination or investigation into his mental health.

2  (*Id.* at 80–81, 120–22, 128, 142.)

3      At the evidentiary hearing, Petitioner testified contrary to Bloom with regard to

4  pursuit of mental health as a mitigation strategy.  According to Petitioner, he never told

5  Bloom that he objected to having a mental health exam conducted. (Doc. 486 at 45.)  Indeed,

6  Petitioner claimed that prior to sentencing he specifically asked Bloom to have him examined

7  by a psychiatrist and to obtain records that could support "some of the things that I had told

8  him about my prior mental health history," including his being treated by Dr. Brandt and

9  being placed in mental hospitals in his youth.  (*Id.* at 44.)

10     Because Bloom was unavailable for the originally set hearing dates, the Court

11 intended to consider a transcript and videotape of his deposition in lieu of live testimony.

12 However, in light of Petitioner's testimony, the Court continued the evidentiary hearing to

13 hear testimony from Bloom.  At that hearing, Bloom denied that Petitioner had ever asked

14 to be examined by a mental health professional or requested that counsel investigate his

15 mental health history; rather, he reiterated that Petitioner did not want to be examined and

16 that he did not believe Petitioner would cooperate with an expert.  (Doc. 505 at 21–23, 61.)

17 Bloom also testified that he discussed with Petitioner mitigation strategies and told him that

18 pursuing mental health would lead to admission of other antisocial acts he committed while

19 at ASH as well as testimony and evidence concerning his beliefs in and proclivity for sex

20 with children.  (*Id.* at 21.)  Bloom was also concerned that the prosecution would obtain a

21 rebuttal mental health expert and utilize unfavorable evidence from Jonas Bowen and two

22 other witnesses that had been precluded from use at trial.  (*Id.* at 57–58.)  After consideration

23 and discussions with Petitioner and his parents, Bloom opted to portray Petitioner as a "better

24 person" since his incarceration for the offense, that drugs had been his downfall, and that he

25 could be rehabilitated.  (*Id.* at 56.)

26     At the hearing, Bloom elaborated on his understanding of PTSD.  He testified that

27 PTSD was first listed as a psychiatric disorder in 1980, when DSM-III was published.  He

28 believed PTSD was being utilized primarily in cases involving Holocaust victims and

Vietnam War veterans. (Doc. 505 at 36–37, 50.) He further testified that the criteria for PTSD became more specific when DSM-III-R was published in May 1987, the same month as the sentencing in this case. (*Id.*) Nonetheless, under either DSM version, Bloom did not believe that Petitioner had the necessary symptoms, "like hypervigilance, nightmares, insomnia, things of that nature, didn't seem to fit him." (*Id.* at 37–39, 50.) Bloom concluded that exploring Petitioner's mental health would be a waste of time and would do more harm than good. (*Id.* at 38.) Bloom also testified that the post-conviction evaluations conducted by psychologists at the Arizona Department of Corrections and Dr. Nelson—diagnosing Petitioner as having antisocial personality and pedophilic disorders—"kind of corroborated my fear about what would happen" if he had convinced Petitioner to cooperate and obtained a mental health examination. (*Id.* at 29.)

With regard to the ASH records, Bloom testified that he opted not to seek their admission because he believed they were potentially very harmful. (Doc. 505 at 55–56.) He testified that the prosecutor had agreed before sentencing not to seek admission of the records or offer testimony from ASH personnel concerning Petitioner's behavior while incarcerated so long as Bloom did not open the door regarding Petitioner's mental state.[8] (*Id.* at 9, 14–15, 65–66.) Bloom further explained that although the sentencing judge was aware through the presentence report of some of the damaging information contained in the ASH records, such as the fact that Petitioner had been deemed unamenable to treatment, the records themselves contained more explicit detail of Petitioner's offenses as well as his threatening and antisocial behaviors while at ASH. (*Id.* at 56, 62, 65, 73.) Bloom was also concerned that introduction of evidence at a public hearing regarding the details of Petitioner's criminal past, pedophilic

---

[8]     The prosecutor, John Davis, testified that he and Bloom had a chance encounter shortly before Bloom's deposition, that they conversed about Petitioner's case, and that Davis agreed with Bloom to the best of his recollection that they probably had an agreement not to use the ASH records. (Doc. 486 at 33.) However, after later reviewing the sentencing transcript and seeing that he cross-examined Petitioner during sentencing about being found unamenable to treatment at ASH, Davis concluded that there must not have been an agreement. (*Id.* at 33–34, 38.)

1   propensities, and poor conduct while at ASH would leave the trial judge no real choice but
2   to impose the death penalty.  (*Id.* at 62–63, 73.)

3   **E.   Analysis**

4   Claims of ineffective assistance of counsel are governed by the principles set forth in
5   *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner
6   must show that counsel's representation fell below an objective standard of reasonableness
7   and that the deficiency prejudiced the defense.  *Id.* at 687–88.  To demonstrate prejudice, a
8   petitioner "must show that there is a reasonable probability that, but for counsel's
9   unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.
10  When a defendant challenges a death sentence, "the question is whether there is a reasonable
11  probability that, absent the errors, the sentencer . . . would have concluded that the balance
12  of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S.
13  at 695.  In determining whether there is a reasonable probability of a different result, a
14  reviewing court "reweigh[s] the evidence in aggravation against the totality of available
15  mitigating evidence."  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).  The "totality of the
16  available evidence" includes "both that adduced at trial, and the evidence adduced" in
17  subsequent proceedings.  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98
18  (2000)).

19  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made
20  to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's
21  challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.*
22  at 689.  To this end, reviewing courts "must indulge a strong presumption" that counsel
23  "rendered adequate assistance and made all significant decisions in the exercise of reasonable
24  professional judgment."  *Id.* at 689–90.  As explained herein, the Court finds that Bloom's
25  representation was neither deficient nor prejudicial.

26  **1.   Deficient Performance**

27  Petitioner first argues that Bloom performed deficiently by failing to conduct a
28  "complete social history investigation" and that such investigation should have included

1   evaluations by experts concerning Petitioner's mental health.  He argues that at the time of
2   Petitioner's trial, counsel had a duty to determine whether a capital client suffered from
3   organic brain injury, psychiatric disorders, or trauma.  Because Bloom had sufficient
4   information concerning Petitioner's background from which to make a reasonable strategic
5   decision not to more fully investigate Petitioner's mental health, the Court finds that
6   counsel's failure to enlist an expert to evaluate Petitioner was not unreasonable.

7        Counsel has a duty to make reasonable investigations or to make a reasonable decision
8   that makes particular investigations unnecessary.     *Strickland*, 466 U.S. at 691.
9   Reasonableness requires more than just a cursory investigation. *See Rios v. Rocha*, 299 F.3d
10  796, 806–06 (9th Cir. 2002) (stating that counsel must interview more than one witness
11  before abandoning a particular defense).  However, there is no "set of detailed rules for
12  counsel's conduct" and "a particular decision not to investigate must be directly assessed for
13  reasonableness in all the circumstances, applying a heavy measure of deference to counsel's
14  judgments." *Id.* at 688–90; *see also Cullen v. Pinholster,* 131 S. Ct. 1388, 1406–07 (2011)
15  (noting that *Strickland* "rejected the notion that the same investigation will be required in
16  every case").  In addition, "when a defendant has given counsel reason to believe that
17  pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue
18  those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at
19  691.  With regard to a defendant's mental state, "[t]here is no clear Supreme Court case law
20  always requiring a mental health investigation at the guilt or penalty phase." *Gonzalez v.*
21  *Wong*, 667 F.3d 965, 991 (9th Cir. 2011).  Rather, counsel has a duty to investigate only "if
22  there is evidence to suggest that the defendant is impaired." *Douglas v. Woodford*, 316 F.3d
23  1079, 1085 (9th Cir. 2003).

24       Here, Bloom reviewed voluminous records from Petitioner's three-plus years in the
25  Atascadero State Hospital and had numerous discussions with Petitioner and his parents
26  concerning potential mitigation, including Petitioner's mental health.  The records
27  documented Petitioner's history of antisocial and pedophilic sexual behaviors, his refusal to
28  follow rules or participate in rehabilitation, his propensity to blame others and deny

41

1    responsibility for his own actions, and his character for untruthfulness and manipulation, all

2    of which Bloom reasonably perceived to be harmful.  Nothing in the extensive notes and

3    reports documenting Petitioner's time at Atascadero suggested that a mental health

4    investigation would lead to favorable mitigating evidence.  On the contrary, the information

5    available to Bloom suggested that Petitioner had an antisocial personality disorder and was

6    an unrepentant pedophile who refused numerous opportunities for treatment and

7    rehabilitation.  After consideration of all the evidence, the Court finds that nothing in the

8    ASH records or in Bloom's conversations with Petitioner and his parents put counsel on

9    notice of organic brain damage or psychosis such that it was unreasonable not to have

10   Petitioner examined by mental health experts.

11         The Court further finds that Bloom was aware Petitioner had been molested as a child

12   but had no "objective indication" either from the ASH records, Petitioner, or his parents that

13   the molestation had traumatized Petitioner in any meaningful way. *Gonzalez v. Knowles*, 515

14   F.3d 1006, 1015 (9th Cir. 2008) ("Absent any objective indication that Gonzalez suffered

15   from any mental illness, [counsel] cannot be deemed ineffective for failing to pursue this

16   avenue of mitigation where Gonzalez's mental illness seemed unlikely.").  Post-traumatic

17   stress disorder was not a recognized diagnosis at the time of Petitioner's hospitalization at

18   Atascadero; it first appeared as a subtype anxiety disorder in DSM-III in 1980.  Nonetheless,

19   although the ASH records documented Petitioner's childhood molestation, there is no

20   indication that staff found this to be an event of any significance in terms of understanding

21   and treating Petitioner's deviant behaviors.

22         The records are also devoid of any suggestion that Petitioner experienced symptoms

23   of PTSD either before or during his three years of hospitalization.  The DSM-III, with which

24   Bloom was familiar at the time he represented Petitioner, listed the following diagnostic

25   criteria:

26         A.    Existence of a recognizable stressor that would evoke significant
               symptoms of distress in almost everyone.
27
28         B.    Reexperiencing of the trauma as evidenced by at least one of the
               following:

(1) recurrent and intrusive recollections of the event
(2) recurrent dreams of the event
(3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

C.   Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma as shown by at least one of the following:

(1) markedly diminished interest in one or more significant activities
(2) feeling of detachment or estrangement from others
(3) constricted affect

D.   At least two of the following symptoms that were not present before the trauma:

(1) hyperalertness or exaggerated startle response
(2) sleep disturbance
(3) guilt about surviving when others have not, or about behavior required to survival
(4) memory impairment or trouble concentrating
(5) avoidance of activities that arouse recollection of the traumatic event
(6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 238 (3d ed. 1980).  Bloom testified that he did not observe any of these symptoms in Petitioner.  To the contrary, rather than avoid activities that would arouse recollection of the molestation, Petitioner persisted in engaging in reckless conduct, including soliciting strangers to fellate him.  Counsel was also aware from his conversations with Petitioner, as well as Petitioner's correspondence with Ernest Bernsienne and statements to a detective, that Petitioner had not taken the molestation very seriously and had "enjoyed" it.  Considering all of the information known to counsel at the time, the Court finds that it was not unreasonable to forego further investigation regarding the effects of the molestation on Petitioner.

The Court's finding that Bloom made a reasonable decision not to more fully investigate Petitioner's mental health is further supported by counsel's testimony that he did not believe Petitioner would have cooperated with a mental health evaluation.  Petitioner testified to the contrary, denying that he ever objected to such an exam and asserting that he

affirmatively asked Bloom to have him evaluated by a psychiatrist.  The Court finds that Petitioner's testimony was not credible.  At no point prior to the day Petitioner testified did he make such an allegation, either in his pleadings or in a supporting affidavit.  He did not assert either in his initial habeas petition (prepared *pro se*) or in his first and second amended petitions that Bloom had ignored his request to be evaluated by a mental health expert.  Nor did Petitioner include this allegation in his motion for reconsideration or his proposed findings of facts, the latter of which was filed just prior to the start of the evidentiary hearing.  Conversely, the Court finds that Bloom was a highly credible witness and credits fully his testimony that Petitioner did not want to be examined.  The Court also finds credible Bloom's assertion that he contemplated a mental health exam but feared Petitioner either would not cooperate or would tell an examiner "about his proclivity and some of his feelings about society and sex with young kids."  (Doc. 505 at 22.)

Moreover, Bloom had good strategic reasons not to further investigate a mental health theory of mitigation.  First, as already noted, Bloom reasonably believed that Petitioner either would not cooperate or would espouse to an examiner the sentiments he relayed to Bernsienne—that sex between adults and children should be legal and that psychological damage from such encounters occurs only because of "senseless" societal taboos.  (Doc. 373-2 at 59–60.)  Second, Bloom reasonably feared that Petitioner would be diagnosed with pedophilic and antisocial personality disorders, neither of which Bloom considered to be mitigating, especially given the prosecution's theory of the case.  *See Leavitt v. Arave*, 646 F.3d 605, 612 (9th Cir. 2011) (observing that evidence of mental disorders to create empathy might instead give rise to concern a defendant is an "irreparable monster").  Third, Bloom reasonably believed that any evidentiary proffer concerning Petitioner's mental health would have opened the door to a rebuttal expert's likely diagnoses of pedophilia and antisocial personality disorders.  *See Campbell v. Kincheloe*, 829 F.2d 1453, 1464 (9th Cir.1987) (finding no ineffectiveness where counsel reasonably believed available mitigating evidence would have opened the door to damaging rebuttal evidence).  To support those diagnoses, the prosecution likely would have sought admission of evidence that Bloom had successfully

excluded at trial, including portions of Petitioner's letters to Bernsienne concerning his aberrant beliefs about sex with children, Petitioner's alleged confession to Jonas Bowen that Petitioner forced the victim to perform fellatio before murdering her, and numerous ASH records documenting myriad antisocial and manipulative behaviors as well as a refusal to follow rules or participate in rehabilitation.  In addition, the prosecution likely would have focused on the details of Petitioner's three prior convictions and argued that Petitioner was a predator engaged in escalating acts of violence against children who was incapable of rehabilitation.

The Supreme Court has recognized that there are "countless ways to provide effective assistance in any given case" and that there "comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" *Pinholster*, 131 S. Ct. at 1407–08 (quoting *Strickland*, 466 U.S. at 689, 691) (alteration in original).  Here, Bloom made a reasonable tactical decision based on extensive information about his client not to pursue a mental health theory of mitigation he concluded would not produce favorable results.  Instead counsel chose to portray Petitioner as someone who was led astray by drugs but who was loved by his parents and had potential to contribute positively in prison.  Counsel's decision not to enlist mental health experts and investigate the effects of Petitioner's childhood molestation is due "a heavy measure of deference." *Id.*

Petitioner next argues that Bloom's chosen strategy was unreasonable because Petitioner's prior convictions and other bad behaviors were already before the sentencing judge through the presentence report.  While it is true that counsel who conducts a reasonable investigation may still act unreasonably in selecting the defense theory to present, *Mickey v. Ayers*, 606 F.3d 1223, 1236 (9th Cir. 2010), that is not the case here.

Under Arizona law prior to the changes enacted by *Ring v. Arizona*, 536 U.S. 584 (2002), capital trial judges were limited to considering evidence properly admitted and proven beyond a reasonable doubt to determine the existence of statutory aggravating factors. *State v. Stokley*, 898 P.2d 454, 468 (Ariz. 1995).  They were not permitted to consider any other types of evidence in considering aggravation. *Id.*  Thus, although the presentence

1   report identified the nature of Petitioner's prior convictions, generally described the reasons

2   for his discharge from Atascadero, and noted his "severe sexual dysfunction pattern," none

3   of this was relevant to the court's consideration of aggravating factors.   Nor was it

4   particularly relevant as rebuttal to mitigation in light of counsel's chosen mitigation

5   theory—that Petitioner was led astray by drugs and negative peers but could lead a positive

6   life in prison.

7          In addition, the presentence report was a fairly summary document, appended with

8   documents and presentence reports from California that were themselves summary in nature.

9   The materials alluded to Petitioner's antisocial behavior and sexual dysfunction, but in only

10   "a very mild form." *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998).   In *Smith*, the

11   court observed that defense counsel could have developed positive information from a

12   presentence report through evidence or argument and placed the defendant in "a somewhat

13   different light." *Id.*   The same is true here, except that if Bloom had asserted that Petitioner

14   suffered from some kind of mental disturbance resulting from his childhood molestation, the

15   prosecution could have more fully developed negative information contained in the report.

16   For example, the ASH records alone would have painted a vivid picture of Petitioner's

17   pedophilia diagnosis, refusal to follow rules, resistance to all rehabilitative efforts, character

18   for untruthfulness, manipulative and threatening behaviors, and propensity to blame others

19   and forsake responsibility for his actions.   In addition, the prosecution could have utilized the

20   Bernsienne letters and Bowen deposition to demonstrate Petitioner's depraved attitude

21   towards sex with children, called witnesses to detail his prior convictions, proffered child-

22   related pornographic materials seized from Petitioner after his arrest, and enlisted its own

23   mental health expert, who likely would have diagnosed Petitioner as having an antisocial

24   personality disorder in addition to pedophilic and substance abuse problems.

25          Bloom did not have a lot of options.   He "confronted a challenging penalty phase with

26   an unsympathetic client, which limited [his] feasible mitigation strategies." *Pinholster*, 131

27   S. Ct. at 1405.   Bloom's concern that Petitioner would be diagnosed with an antisocial

28   personality disorder was not unfounded, and it therefore was not unreasonable for him to

1    want to avoid delving into Petitioner's mental functioning.  *See Crittenden v. Ayers*, 624 F.3d

2    943, 968 n.15 (9th Cir. 2010) (finding that counsel made tactical decision supported by

3    adequate investigation to keep evidence of antisocial personality disorder away from

4    sentencing jury).  The Ninth Circuit has repeatedly observed that evidence of an antisocial

5    personality disorder may be potentially more harmful than helpful.  *See, e.g.*, *Daniels v.*

6    *Woodford*, 428 F.3d 1181, 1204, 1210 (9th Cir. 2005) (suggesting that evidence the

7    defendant may have been a sociopath was aggravating); *Beardslee v. Woodford*, 358 F.3d

8    560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be

9    damaging); *Clabourne v. Lewis,* 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that mental

10   health records omitted from the sentencing hearing "hardly turned out to be helpful" because

11   they indicated that the defendant had an antisocial personality, not a thought disorder).

12         Moreover, Bloom reasonably did not want to argue that Petitioner's sexual

13   dysfunction was the result of his own childhood molestation, which was known to the

14   sentencing judge through the presentence report.  This would have opened the door to

15   evidence of Petitioner's deviant pedophilic beliefs and persistent refusal to participate in

16   treatment, which would not have placed him in a very sympathetic light, especially in a case

17   involving the abduction and murder of a child.  *See Atwood*, 832 P.2d at 672 ("The remedy

18   for one who has been molested is not to molest others and ask to be excused, but rather to

19   submit to therapy, which as noted above, defendant has repeatedly refused to do."); *see also*

20   *Pinholster*, 131 S. Ct. at 1407 (finding reasonable counsel's decision to forgo presentation

21   of evidence "that could explain why Pinholster was the way he was" and approving of the

22   notion that "'humanizing' the defendant . . . may be the wrong tactic in some cases because

23   experienced lawyers conclude that the [sentencer] simply won't buy it") (quoting *Pinholster*

24   *v. Ayers*, 590 F.3d 651, 692 (2009) (Kozinski, C.J., dissenting)).  Similarly, it was not

25   unreasonable to forego evidence or argument about the effects of the molestation given

26   Petitioner's repeated downplaying of the abuse and the likelihood the prosecution would

27   have utilized in rebuttal Petitioner's unsolicited letter to Bernsienne and statement to a

28   detective that he had "enjoyed" and "liked" it.

In sum, the Court finds that Bloom's decision not to further investigate Petitioner's molestation or mental health history, including enlisting a mental health expert, was not objectively unreasonable in light of all the circumstances. Similarly, the Court finds that Bloom's chosen mitigation theory was not objectively unreasonable given that pursuit of mental health-related mitigation likely would have been more harmful than helpful.

### 2.    Prejudice

Even assuming Bloom acted deficiently, Petitioner has not established a reasonable probability of a different result because he has not proven that an expert would have diagnosed PTSD, evidence of PTSD would have carried little mitigating weight, and pursuit of a mental health theory of mitigation would have opened the door to damaging rebuttal evidence.

First, assuming Petitioner cooperated with a mental health examination, the Court finds there is little likelihood an expert, applying the DSM-III criteria for PTSD, would have found that at the time of the offense Petitioner suffered from PTSD as a result of being molested at age 14 or assaulted at Atascadero. There is no dispute that Petitioner's habeas expert, Dr. Schwartz-Watts, was unable to determine when Petitioner's alleged PTSD developed. She acknowledged that it could have developed in response to Petitioner's experiences in prison since being incarcerated for the instant offense. Thus, although Dr. Schwartz-Watts has diagnosed Petitioner as presently suffering from PTSD using the DSM-V criteria, it is nothing but speculation to opine that he suffered PTSD at the time of the offense.

In finding that any expert hired by Bloom likely would not have diagnosed Petitioner with PTSD, the Court also finds persuasive Dr. Nelson's critique of Dr. Schwartz-Watt's PTSD diagnosis, particularly that Petitioner had begun "getting in trouble" and using drugs prior to the molestation, that he did not exhibit hypervigilance or avoidance behavior but instead frequently engaged in reckless sexual conduct, and that the ASH records are devoid of any reference to symptoms of trauma. It is further telling that Petitioner spent over three years at Atascadero in treatment with specialists for his sexual "acting out" and yet there is

48

1   no suggestion in the records that the childhood molestation or the alleged assault at ASH was

2   considered by staff to be relevant to understanding his behavior. Because Petitioner's habeas

3   expert can only speculate about whether he suffered from PTSD at the time of the offense,

4   Petitioner cannot establish prejudice. *See Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009)

5   (holding that speculation the petitioner may have some type of organic brain dysfunction or

6   disorder "is not sufficient to establish prejudice"); *Raley v. Ylst*, 470 F.3d 792, 802 (9th Cir.

7   2006) (finding no prejudice in part because none of the petitioner's experts "conclusively

8   opined that [he] had a mental defect").

9        Second, even assuming Bloom could have found an expert to diagnose PTSD at the

10  time of the offense, the Court finds that such evidence would have been of only marginal

11  value. In Arizona, the sentencing authority assesses whether mitigating factors are proven

12  and considers "the quality and strength of those factors." *State v. Newell*, 212 Ariz. 389, 405,

13  132 P.3d 833, 849 (2006). While mitigating evidence must be considered regardless of

14  whether there is a "nexus" between the mitigating factor and the crime, the lack of a causal

15  connection may be considered in assessing the weight of the evidence. *Id.* When experts

16  indicate that a defendant "knew right from wrong and could not establish a causal nexus

17  between the mitigating factors and [the] crime," a sentencer may accord evidence of abusive

18  childhood, personality disorders, and substance abuse limited value. *State v. Johnson*, 212

19  Ariz. 425, 440, 133 P.3d 735, 750 (2006).

20       Here, Petitioner does not suggest that he kidnapped and murdered the victim "while

21  in any kind of PTSD-induced dissociative state." *Rhoades v. Henry*, 638 F.3d 1027, 1050

22  (9th Cir. 2011). Both experts testified at the hearing that Petitioner's alleged PTSD would

23  have had no direct relationship to the instant offense, and the Court agrees. The abduction

24  and murder here was calculated and deliberate. He stalked the victim, hit her bike as part of

25  a kidnapping plan, put her in his car, drove to a remote desert location, and murdered her.

26  The new evidence that Petitioner may have had PTSD "does not explain his actions in this

27  case and is insufficient to overcome their egregious nature." *Scott v. Ryan*, 686 F.3d 1130,

28  1134 (9th Cir. 2012), *cert. denied*, 134 S. Ct. 120 (2013); *see also Leavitt*, 646 F.3d at 615

49

(finding no prejudice from counsel's failure to present mental health evidence where alleged brain dysfunction did not explain the defendant's mutilation of the victim during the murder); *Mickey*, 606 F.3d at 1248 (finding no prejudice in counsel's failure to adequately prepare mental health expert whose testimony "suffered from a fundamental weakness[:] . . . a jury was unlikely to believe that a defendant suffering as [the expert] diagnosed could act as the facts of the crime showed Mickey did"). Nor has Petitioner asserted that his psychological and substance abuse problems rendered him incapable of knowing right from wrong at the time of the instant offense, thus discounting the weight such evidence would have been given in the sentencing calculus. *See State v. Smith*, 159 P.3d 531, 545 (Ariz. 2007) (deciding that weight of defendant's mental health evidence was diminished by evidence the defendant "likely knew what he was doing and that it was wrong"). For these reasons, the Court finds that there is no reasonable probability testimony from a mental health expert such as Dr. Schwartz-Watts would have been found very weighty or changed the sentencing outcome.

Finally, as counsel recognized in making his strategic decision not to pursue a mental health theory of mitigation, presenting evidence about the alleged traumatic effects of Petitioner's childhood molestation would have opened the door to devastating rebuttal evidence. For example, if Bloom had found an expert to diagnosis PTSD, the prosecution would have retained a rebuttal expert, who likely would have diagnosed Petitioner with pedophilic and antisocial personality disorders. *Cf. Pinholster*, 131 S. Ct. at 1410 ("If Pinholster had called Dr. Woods to testify consistently with his psychiatric report, Pinholster would have opened the door to rebuttal by a state expert).

Such diagnoses would have opened the door to admission of a mass of harmful evidence, including the ASH records, details about Petitioner's prior pedophilic-related convictions, child pornography seized from Petitioner at the time of his arrest, and Petitioner's correspondence and statements to Bernsienne and Bowen concerning his unrepentant attitude towards sex with children. *See Wong v. Belmontes*, 130 S. Ct. 383, 389–90 (2009) (per curiam) (taking into account that certain mitigating evidence would have exposed the petitioner to further aggravating evidence). This evidence would have portrayed

Petitioner as a remorseless pedophile who rejected numerous opportunities for treatment and rehabilitation and who engaged in escalating violence against children. Given the nature of the instant offense, any attempt to "explain" Petitioner's sexual deviancy may have caused the sentencer to conclude that Petitioner "was simply beyond rehabilitation." *Pinholster*, 131 S. Ct. at 1410. Thus, the evidence Petitioner now says should have been presented at sentencing would likely have been more harmful than helpful. Petitioner has not established prejudice from counsel's allegedly deficient performance.

## CONCLUSION

The Court finds that Petitioner's motion for reconsideration raises a new ground for relief based on counsel's alleged ineffective assistance at sentencing for failing to enlist experts to investigate and present mitigation evidence. Upon consideration of Petitioner's alternative motion to amend, the Court finds that Petitioner's new claim is barred by the statute of limitations and that amendment is therefore futile. The Court further denies amendment because Petitioner unduly delayed in raising the claim.

Alternatively, the Court has considered the merits of newly expanded Claim 29 and finds that trial counsel's representation at sentencing was neither deficient nor prejudicial. Because this Court finds that Claim 29 is meritless, it may be denied notwithstanding the failure of Petitioner (through PCR counsel) to exhaust it in state court. *See* 28 U.S.C. § 2254(b)(2). Nonetheless, applying *Martinez*, the Court finds that PCR counsel was not ineffective for failing to raise Claim 29 in state court because the claim "is insubstantial, i.e., it does not have any merit." *Martinez*, 132 S. Ct. at 1319. Therefore, Petitioner has not demonstrated cause to overcome the procedural default of Claim 29. Additionally, for the reasons discussed above, Petitioner has not shown prejudice.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final

order adverse to the applicant.  If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that Claims 2-D, 27, and 29 are adequate to deserve encouragement to proceed further or are debatable by reasonable jurists.  The Court further finds, for the reasons set out in this Order and the Court's orders of June 6, 2005, May 1, 2007, and September 10, 2012 (Docs. 127, 164, 338), that the Court's dismissal of the remainder of Petitioner's claims as procedurally barred or meritless is not debatable among reasonable jurists, and none of the claims are adequate to deserve encouragement to proceed further.  Accordingly, the Court declines to issue a COA on any of these issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Motion for Reconsideration Based Upon *Martinez v. Ryan* (Doc. 369) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's alternative motion to amend his habeas petition (Doc. 379) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's petition for writ of habeas corpus, including all amendments thereto (Docs. 1, 103, 269-2), is **DENIED WITH PREJUDICE**.  Accordingly, the Clerk of Court shall enter judgment against Petitioner and shall terminate this case.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

Whether Petitioner's claim alleging violation of the Eighth Amendment by imposing a death sentence based on prior conduct that under current standards

1   would not render Petitioner death-eligible lacks merit.

2

3   Whether Petitioner's claim alleging ineffective assistance of trial counsel for failing to investigate and appreciate the scientific importance of adipocere lacks merit.

4

5   Whether Petitioner's claim alleging ineffective assistance of trial counsel for failing to investigate and present a mental health theory of mitigation is

6   properly before this Court for consideration, and, if so, whether the claim lacks merit.

7
        **IT IS FURTHER ORDERED** that the Clerk of Court provide a courtesy copy of this
8
    Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-
9
    3329.
10
        DATED this 27th day of January 2014.
11

12

13

14

15   John C. Coughenour
     UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22

23

24

25

26

27

28

                                        53